Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Joanna Cahoon (AK Bar No. 1405034)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
bbrisson@trustees.org
jcahoon@trustees.org

*Attorneys for Plaintiffs*
*Alaska Wildlife Alliance, Alaska Wilderness League,*
*Defenders of Wildlife, Environment America,*
*and Sierra Club*

Karimah Schoenhut (*pro hac vice pending*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Attorney for Plaintiff Sierra Club*

Kristen Monsell (*pro hac vice pending*)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150
kmonsell@biologicaldiversity.org

*Attorney for Plaintiffs Center for Biological Diversity*
*and Friends of the Earth*

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA WILDLIFE ALLIANCE, ALASKA WILDERNESS LEAGUE, CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, ENVIRONMENT AMERICA, FRIENDS OF THE EARTH, and SIERRA CLUB,<br><br>                 Plaintiffs,<br><br>       v.<br><br>U.S. FISH & WILDLIFE SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR, SHANNON ESTENOZ, in her official capacity as Assistant Secretary for Fish and Wildlife and Parks, and DEBRA HAALAND, in her official capacity as Secretary of the Interior,<br><br>               Defendants. | Case No. 3:21-cv-00209-JWS |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Marine Mammal Protection Act, 16 U.S.C. §§ 1371-1423h; Endangered Species Act, 16 U.S.C. §§ 1531–1544; National Environmental Policy Act, 42 U.S.C. §§ 4321–4370j; Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiffs Alaska Wildlife Alliance, Alaska Wilderness League, Center for

Biological Diversity, Defenders of Wildlife, Environment America, Friends of the Earth,

and Sierra Club (collectively, Plaintiffs) file this Complaint for Declaratory and

Injunctive Relief, alleging:

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS              Page 2 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 2 of 65

# I.    NATURE OF THE CASE

1.    This action seeks declaratory and injunctive relief against the U.S. Fish and Wildlife Service and the United States Department of the Interior (collectively, FWS) for its decision to issue a five-year incidental take regulation (ITR) under the Marine Mammal Protection Act (MMPA) approving the Alaska Oil and Gas Association's (AOGA) petition to take Southern Beaufort Sea stock (SBS) polar bears and Pacific walrus in the Beaufort Sea and adjacent northern coast of Alaska (North Slope). These animals are protected from "take" by the MMPA. Polar bears are also protected as a threatened species under the Endangered Species Act (ESA).

2.    FWS's ITR, along with the related Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and Biological Opinion (BiOp), violate the MMPA, the National Environmental Policy Act (NEPA), the ESA, and the Administrative Procedure Act (APA). These statutes and their implementing regulations impose important protections for marine mammals and threatened species such as polar bears, and mandate careful, informed analysis of FWS's decision to issue an ITR. In particular, the MMPA places the burden on FWS to supply scientific evidence rationally demonstrating that all non-speculative impacts comply with the stringent thresholds imposed by that Act to allow take. If it cannot do so, FWS cannot lawfully authorize an exception from the MMPA's moratorium on take.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 3 of 65

3.      The ITR enables companies, groups, or individuals conducting onshore and offshore oil and gas exploration, development, and production activities on the North Slope to request a letter of authorization (LOA) to take polar bears via nonlethal, incidental, Level B harassment. As explained below, Level B harassment is defined as an act with the potential to disturb a marine mammal.

4.      The ITR will authorize the Level B harassment of up to 443 individual SBS polar bears over the next five years. Based on FWS's assessment that the current population is approximately 907 polar bears, this means that up to approximately *half* of the SBS population (49%) will be subjected to Level B harassment by the oil and gas activities covered by the ITR.

5.      In making its finding that the activities covered by the ITR would not result in take more severe than Level B harassment, FWS segmented the total Level A harassment. As detailed below, the MMPA defines Level A harassment as an act with the potential to injure a marine mammal. Here, FWS divided the Level A harassment into "serious" and "non-serious" Level A harassment, and defined "serious" Level A harassment to mean an injury likely to cause mortality. That division has no basis in law. By dividing Level A harassment in this manner, FWS avoided contending with the results of its own modeling.

6.      FWS's modeling of the covered activities shows that there is a 45% to 46% annual probability of "serious" Level A harassment (an act with the potential to injure,

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 4 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 4 of 65

where the injury is likely to result in death) or lethal take of at least one polar bear cub. That annual probability means that over the course of the five years that the ITR is in place, it is more than 94% likely that a "serious" Level A harassment/lethal take will occur in at least one of the five years due to the covered activities. There also is more than a 70% probability that a "serious" Level A harassment/lethal take will occur in at least two of the five years. Despite these facts, FWS contends that take more severe than Level B harassment is not sufficiently likely to occur, and that it therefore need not consider the impacts of Level A take when evaluating whether it can authorize Level B harassment caused by the same activities. FWS does not assert that it could authorize any take more severe than Level B harassment in compliance with the MMPA. Indeed, given the precarious state of the SBS population due to sea ice loss, and its low cub survival rates, the authorization of take more severe than Level B harassment would not comport with the MMPA.

7.      FWS's failure to comply with the law places SBS polar bear cubs at risk of death, and will expose a vast proportion of the population to industrial disturbance. FWS's determinations that issuance of the ITR would result in no more than negligible impacts to the SBS population and that take of this imperiled stock would be of small numbers violate the MMPA and are arbitrary and capricious.

8.      Despite the high probability of at least one Level A harassment or lethal take occurring from the covered activities, FWS authorized Level B harassment without

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 5 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 5 of 65

addressing the more severe form of take resulting from those same covered activities. Issuing an ITR to authorize take by Level B harassment when there is such a high probability that unauthorized Level A harassment or lethal take will also result from those activities violates the MMPA.

9.      In making its finding that the ITR would cause no more than a negligible impact, FWS did not analyze the impacts of taking cubs by "serious" Level A harassment or lethal take on the SBS population. Instead, it concluded that the annual 45% to 46% probability of such take was not sufficiently likely to warrant considering cub loss in the negligible impact finding. It also discounted the impact of "non-serious" Level A harassment of newborn cubs on the ground that it lacked data to determine how likely it is that the injury (a reduction in fitness) would cause death.

10.      In reaching its small numbers finding, FWS did not analyze how total take authorized by the ITR — involving roughly half the population of SBS polar bears — could reasonably be considered small numbers. Instead, it departed from its prior practice by only considering whether the number of individuals taken in a given year was a small proportion of the population. FWS adopted this new practice without acknowledging its departure from its prior practice of considering whether the total number of individuals taken over the entire five-year ITR is a small proportion of the population.

11.      FWS also failed to ensure the least practicable adverse impacts on SBS polar bears as required by the MMPA by failing to adequately consider and prescribe

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 6 of 65

mitigation measures limiting the timing or geographic scope of onshore seismic exploration.

12.     FWS's FONSI and final EA violated NEPA because the agency failed to consider reasonable alternatives to limit impacts on SBS polar bears, such as timing or geographic restrictions on seismic exploration projects, or to adequately explain its reasons for not considering such an alternative.

13.     Finally, FWS's BiOp was arbitrary and capricious and violated the ESA because the level of take authorized in the agency's incidental take statement (ITS) failed to account for reasonably certain Level A and lethal take of SBS polar bears and because the BiOp's reinitiation notice states that reinitiation is discretionary, rather than mandatory, when take in exceedance of that specified in the ITS occurs.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (action to compel mandatory duty), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

15.     FWS's ITR, BiOp, final EA, and FONSI are final agency actions for which Plaintiffs have a right to judicial review under the APA. 5 U.S.C. §§ 701–706.

16.     Defendants' sovereign immunity is waived pursuant to the APA. 5 U.S.C. § 702.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 7 of 65

17.     Venue is proper in the District of Alaska under 28 U.S.C. § 1391(a)–(c) and

(e) because a substantial part of the events giving rise to the claims occurred within the

FWS Alaska Regional Office, because many groups are primarily located in or maintain

offices in Alaska, and because the ITR geographic area includes the Beaufort Sea and

North Slope, in Alaska.

### III.     PARTIES

<u>Plaintiffs</u>

18.     Plaintiff Alaska Wildlife Alliance (AWA) was founded by Alaskans in

1978 to protect intact ecosystems so that our state's wildlife can be managed for

biodiversity and the benefit of present and future generations. AWA has over 300

members and supporters. AWA and its members speak out against energy development

that unduly threatens vulnerable Alaskan ecosystems and species. AWA is particularly

concerned about the impacts of climate change and oil and gas development to threatened

SBS polar bears. AWA's efforts to protect SBS polar bears include encouraging the

public to take protective actions through social media posts, hosting educational seminars

and film screenings, and joining legal actions to protect polar bears from threats posed by

oil and gas development. AWA's staff and its members also engage in research and

advocacy efforts around agency compliance with the ESA and MMPA by drafting

research publications, reviewing ESA designations for species, and engaging in other

scientific research opportunities involving marine mammals.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 8 of 65

19.     Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization

founded in 1993 with approximately 100,000 members and supporters, including many

members in Alaska. AWL's mission is to galvanize support to secure vital policies that

protect and defend America's last great wild public lands, waters, and species such as

threatened polar bears that depend on them. AWL advocates for the protection of

Alaska's wild lands and waters and works to prevent environmental degradation on

Alaska's public lands and waters, including the North Slope. AWL actively works on

issues related to oil and gas development and the protection of Alaska's North Slope.

AWL is committed to honoring the human rights and traditional values of the people of

the Arctic and has pushed to stop or slow the projected extirpation of all polar bears from

Alaska by 2050. AWL has joined letters and comments calling for stronger protections

for polar bears under the ESA and MMPA, engages with the media to highlight threats to

polar bears from oil and gas development, has participated in legal actions to protect

polar bears, and, in 2020, AWL helped to introduce federal legislation safeguarding SBS

polar bear denning habitat from oil and gas activities.

20.     Plaintiff Center for Biological Diversity (the Center) is a national, nonprofit

organization, with offices across the country and in La Paz, Mexico. The Center's

mission is to ensure the preservation, protection, and restoration of biodiversity, native

species, ecosystems, public lands, and public health. The Center has more than 84,300

members throughout the United States, including in Alaska. The Center is actively

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 9 of 65

involved in species and habitat protection issues throughout the United States, including protection of the Arctic and its wildlife. The Center also led the efforts to secure ESA protections for polar bears and the designation of about 187,000 square miles as polar bear critical habitat. The Center also intervened in several lawsuits to help defend ESA protections for polar bears. The Center continues to fight for greater protections for polar bears, including filing lawsuits to protect these animals from the numerous harms inherent in oil and gas exploration and development, including noise pollution, habitat destruction, oil spills, and greenhouse gas pollution that exacerbates the climate crisis.

21. Plaintiff Defenders of Wildlife (Defenders) is a nonprofit conservation organization and one of the nation's leading advocates for endangered species and wildlife. Founded in 1947, Defenders is headquartered in Washington, D.C. and maintains six regional offices throughout the country, including in Anchorage, Alaska. Defenders represents approximately 1.8 million members and supporters nationwide and around the world, including more than 6,000 in Alaska. Defenders uses education, public outreach, science, policy, and litigation, along with legislative and administrative advocacy, to defend the species, ecosystems, and habitats that are central to the organization's mission, including on the North Slope. Defenders has worked for decades to safeguard polar bears and their habitat from destructive oil and gas development. Protecting threatened polar bears is key to implementing Defenders' vision to ensure that diverse wildlife populations are secure and thriving, sustained by a healthy and intact

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 10 of 65

network of lands and waters. Defenders also works to support implementation of FWS's Polar Bear Conservation and Recovery Plan, and to reduce any conflicts or impacts to polar bears and other wildlife that may arise from current or proposed development activities in the Arctic. Defenders has participated in legal actions to protect polar bear habitat and worked to introduce the Polar Bear Cub Survival Act of 2020 which aimed to protect SBS polar bear denning habitat from oil and gas activities.

22.     Plaintiff Environment America, Inc. (Environment America) is a national environmental advocacy group with twenty-nine affiliate state organizations and members and supporters in every state, including Alaska. Environment America works to protect the places that Americans love, and promote core environmental values such as clean air to breathe, clean water to drink, and clean energy to power America's energy needs. Environment America engages in independent research and advocates for policies by lobbying and mobilizing the public. Environment America has worked to raise awareness about the harmful impacts of oil and gas drilling on public lands, including in Alaska, the need to protect America's natural heritage over fossil fuel extraction, and the urgency of protecting threatened and endangered species.

23.     Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation. Friends of the Earth is a membership organization consisting of more than 280,000 members, including more than 660 members who live in Alaska, and more than 4.5 million activists nationwide. Friends of the Earth is also a member of

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 11 of 65

Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide. Friends of the Earth's mission is to protect our natural environment, including air, water, and land, and to create a more healthy and just world. Friends of the Earth utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals. Friends of the Earth is concerned about the potential adverse impacts that fossil fuel exploration and development activities in Alaska's Arctic, including on the North Slope and Beaufort Sea, have on our climate, and on wildlife, such as polar bears, and the people who depend on them. Therefore, on behalf of its members and activists, Friends of the Earth actively engages in advocacy to influence U.S. energy and environmental policies affecting Alaska's Arctic and help protect polar bears and other wildlife threatened by oil and gas activity.

24.     Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization of approximately 830,000 members dedicated to exploring, enjoying, and protecting the wild places of Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment, and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,800 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska, and the organization has long been active on issues related to the protection of

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 12 of 65

polar bears and their critical habitat. The Sierra Club has submitted extensive public comments on projects impacting polar bears, participated in the federal decision-making process concerning protections for polar bears under the ESA, informs its members and the general public about the legal and ecological issues surrounding polar bears, and contributed to the introduction of federal legislation to protect polar bear denning habitat in 2020.

25.     Plaintiffs participated actively in the administrative process related to FWS's promulgation of the ITR and issuance of the EA and FONSI by submitting public comments, engaging with and contracting experts to review the analysis, and engaging their members and supporters to participate in support of protection for polar bears and walrus. Plaintiffs also have an interest in ensuring that FWS complies with applicable laws mandating protection of sensitive species and requiring informed and transparent agency decision making.

26.     Plaintiffs' members and supporters travel to the North Slope to research, observe, and enjoy polar bears in their natural habitat. Plaintiffs' members and supporters have subsistence, cultural, economic (i.e., guiding), recreational and aesthetic (i.e., viewing and photographing), scientific and educational, environmental, conservation, and other interests in SBS polar bears and depend upon the continued health of the stock for their use and enjoyment.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 13 of 65

27.     Plaintiffs' members' and supporters' use and enjoyment of the polar bears that inhabit the North Slope will be adversely affected by impacts to SBS polar bears caused by the take authorized under the ITR. The ITR provides for imminent issuance of LOAs that authorize take, causing disturbance to SBS polar bears and substantial risks of serious injury or death of cubs, thereby harming the interests of Plaintiffs' members and supporters and their ability to observe, photograph, research, and otherwise rely on polar bears for subsistence and cultural practices or economic activities like guiding.

28.     FWS's issuance of the ITR in violation of the MMPA, NEPA, and ESA harms SBS polar bears and harms the interests of Plaintiffs and their members. The agency's failure to adhere to mandated procedures and its reliance on a flawed analysis also harms Plaintiffs' and their members' and supporters' ability to engage in the public process and ensure informed decision making and compliance with statutory protections mandated for the protection of marine mammals and ESA-listed species.

29.     These actual, concrete injuries suffered by Plaintiffs and their members are fairly traceable to FWS's issuance of the ITR, EA, FONSI, and BiOp in violation of the substantive and procedural protections of these laws, and would be redressed by the relief sought in this case.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 14 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 14 of 65

30.     Defendant U. S. Fish and Wildlife Service is an agency within the Department of the Interior and is charged with administering the MMPA, NEPA, and ESA processes for proposed activities impacting marine mammals on the North Slope.

31.     Defendant Department of the Interior is an agency of the United States responsible for oversight of the U.S. Fish and Wildlife Service.

32.     Defendant Shannon Estenoz is the Assistant Secretary for Fish and Wildlife and Parks and is being sued in her official capacity. Ms. Estenoz is responsible for policy decisions and oversight of the U.S. Fish and Wildlife Service and is the official who signed the ITR.

33.     Defendant Debra Haaland is the Secretary of the Interior and is being sued in her official capacity. Secretary Haaland is the official ultimately responsible under federal law for ensuring that FWS's actions and decisions comply with all applicable laws and regulations.

## IV. LEGAL BACKGROUND

### Marine Mammal Protection Act

34.     Congress enacted the MMPA in 1972 based on its finding that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic[.]" 16 U.S.C. § 1361(6). The MMPA's stated purpose is "that [marine mammals] should be protected and encouraged to develop

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 15 of 65

to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem." *Id*.

35.     The National Marine Fisheries Service and FWS jointly administer the MMPA, with jurisdiction over different species. FWS has responsibility for administering the MMPA for polar bears. 50 C.F.R. § 18.3.

36.     To carry out its protective and conservation purposes, the MMPA imposes a moratorium on the taking of marine mammals. 16 U.S.C. § 1371(a). Under the MMPA, "take" is broadly defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13). Under the MMPA, the term "harassment" means "any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild; or has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." *Id*. § 1362(18)(A). Harassment that "has the potential to injure a marine mammal or marine mammal stock in the wild" is "Level A harassment." *Id*. § 1362(18)(C). Harassment that "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering" is "Level B harassment." *Id*. § 1362(18)(D).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 16 of 65

37.     The MMPA contains several narrow exceptions to the moratorium on take. The ITR challenged here was promulgated pursuant to the exception provided at section 1371(a)(5)(A)(i). Under that provision, for "a specified activity . . . within a specified geographical region," the Secretary has authority to allow "during periods of not more than five consecutive years each, the incidental, but not intentional, taking . . . of small numbers of marine mammals of a species or population stock," but only if the Secretary "finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock and will not have an unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses[.]" *Id.* § 1371(a)(5)(A)(i). These findings must be "based on the best scientific evidence available." 50 C.F.R. § 18.27(a)–(b).

38.     The MMPA regulations define negligible impact to mean "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." *Id*. § 18.27(c).

39.     The MMPA regulations define "small numbers" as "a portion of a marine mammal species or stock whose taking would have a negligible impact on that species or stock." 50 C.F.R. § 18.27. The Ninth Circuit held that regulatory definition of "small numbers" inconsistent with the MMPA. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 903–904 (9th Cir. 2012).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                                 Page 17 of 65

40.     An agency authorizing incidental take pursuant to an activity must

promulgate specific ITRs prescribing (1) "permissible methods of taking pursuant to such

activity, and other means of effecting the least practicable adverse impact on such species

or stock and its habitat;" (2) measures "necessary to ensure no unmitigable adverse

impact on the availability of the species or stock for taking for subsistence uses;" and (3)

"requirements pertaining to the monitoring and reporting of such taking." 16 U.S.C. §

1371(a)(5)(A)(i); *see also* 50 C.F.R. § 18.27(e).

41.     The findings of "small numbers" and "negligible impacts" are two separate

and distinct requirements. *See* Marine Mammals; Incidental Take During Specified

Activities, 81 Fed. Reg. 52,276, 52,277 (Aug. 5, 2016); *see also Ctr. for Biological

Diversity*, 695 F.3d at 903.

42.     Small numbers and negligible impact findings must be based on the total

amount of take authorized during the entire ITR period. 16 U.S.C. § 1371(a)(5)(A)(i)(I).

43.     The burden of proof to support a negligible impact finding is on both the

applicant and FWS. Incidental Take of Endangered, Threatened and Other Depleted

Marine Mammals, 54 Fed. Reg. 40,338, 40,343 (Sept. 29, 1989).

44.     The MMPA prohibits FWS from authorizing only part of the take that will

occur under an ITR when the covered activities will cause other, unauthorized take.

*Kokechik Fishermen's Ass'n v. Sec'y of Com.*, 839 F.2d 795, 801–02 (D.C. Cir. 1988).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 18 of 65

Case 3:21-cv-00209-JWS    Document 1    Filed 09/16/21    Page 18 of 65

45.     LOAs are required to conduct activities pursuant to an ITR and may only be issued if the level of take authorized in a LOA will be consistent with the total take allowable under an ITR. 50 C.F.R. § 18.27(f)(1)–(2).

46.     The MMPA also requires FWS to annually conduct stock assessment reports for marine mammals that are listed under the ESA. 16 U.S.C. § 1386(a), (c)(1)(A). As part of that annual stock assessment report process, the agency must estimate the "potential biological removal" level for each marine mammal stock under its jurisdiction. *Id*. § 1386(a)(6). Potential biological removal is defined as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population" under the MMPA. *Id*. § 1362(20).

47.     The MMPA defines a strategic stock as one "for which the level of direct human-caused mortality exceeds the potential biological removal level; . . . or which is listed under the [ESA], or is designated as depleted under the MMPA." *Id.* § 1362(19). The MMPA defines a depleted stock as one which is below its optimum sustainable population or listed under the ESA. *Id.* § 1362(1). SBS polar bears are considered a depleted, strategic stock.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 19 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 19 of 65

## National Environmental Policy Act

48.     NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before taking an action and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.16. By focusing the agency's attention on the environmental consequences of its proposed action, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

49.     NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that will have a significant impact on the quality of the human environment. *Id*. § 4332.

50.     An agency may avoid preparing an EIS if the agency: (1) prepares an environmental assessment identifying and analyzing the action's environmental effects; and (2) finds that the action would not cause any significant impacts, and presents the agency's conclusions in a FONSI. 40 C.F.R. §§ 1501.5, 1501.6.

51.     The purpose of an EA is to assist the agency in determining whether a project may significantly affect the environment. An EA must provide evidence and analysis in order to determine whether to prepare an EIS or issue a FONSI, and either aid

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 20 of 65

an agency's efforts to prepare a necessary EIS or, should an EIS be unnecessary, aid the agency's compliance with NEPA. 40 C.F.R. § 1501.5.

52.     NEPA requires agencies provide a "detailed statement" of alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). In order to fulfill this purpose, an EA must discuss (1) the purpose and need for the proposal, (2) reasonable alternatives to the proposed action as required by NEPA, and (3) the environmental impacts of both the proposed action and all reasonable alternatives. 40 C.F.R. § 1501.5.

Endangered Species Act

53.     Congress enacted the ESA to protect and conserve threatened and endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b), (c)(1).

54.     The goal of the ESA is not only to save endangered and threatened species from extinction but also to recover these species to the point where they are no longer in danger of extinction, nor likely to be in danger of extinction in the foreseeable future, and thus no longer in need of ESA protection. *Id*. §§ 1531(b) (purposes), 1532(3) (definitions).

55.     The National Marine Fisheries Service and FWS jointly administer the ESA, with jurisdiction over different species. FWS has responsibility for administering the ESA and performing consultations for polar bears. 50 C.F.R. §§ 17.11(h), 402.01(b).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                          Page 21 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 21 of 65

56.     The ESA prohibits any "person," including private parties as well as local, state, and federal agencies, from committing or causing others to commit unauthorized "take" of individual members of an endangered species, as well as threatened species protected from such take by species-specific regulations or a "Section 4(d) Rule." 16 U.S.C. §§ 1538(a)(1)(B), (G), 1538(g). For polar bears, the Section 4(d) Rule prohibits unauthorized incidental take from an activity unless the taking has been authorized or exempted under the MMPA. 50 C.F.R. § 17.40(q)(2); *see also* 16 U.S.C. § 1371 (prohibiting take of marine mammals unless specifically permitted). The authorization of take under the MMPA does not exempt an agency from complying with Section 7 of the ESA.

57.     Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" or any attempt to do the above actions. 16 U.S.C. § 1532(19). "Harm" means an "act which actually kills or injures wildlife." 50 C.F.R. § 17.3. "Harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id*.

58.     Section 7(a)(2) of the ESA obligates federal agencies to ensure "that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                              Page 22 of 65

continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

59.     To fulfill this substantive duty, Section 7(a)(2) imposes procedural obligations on federal agencies to consult with FWS. *Id*.

60.     The ESA prescribes a multi-step process to ensure compliance with its substantive provisions. A federal agency proposing to take an action, i.e., the "action agency," must inquire of FWS whether any threatened or endangered species "may be present" in the area of the proposed action. *Id.* § 1536(c)(1); *see also* 50 C.F.R. § 402.14(a) (requirement for formal consultation). If the answer is affirmative, the action agency shall prepare and submit to FWS a biological assessment to determine whether such species "is likely to be affected" by the action. 16 U.S.C. § 1536(c)(1); 50 CFR § 402.02. For the purposes of the ITR, FWS is the action agency, and is conducting a Section 7 consultation with itself.

61.     If the action agency determines that the action "will likely affect" the listed species, formal consultation is required. 16 U.S.C. § 1536(a)(3); 50 C.F.R. § 402.14(a), (b). Formal consultation concludes with FWS's issuance of a BiOp. 50 C.F.R. § 402.02. FWS must "use the best scientific and commercial data available" during the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

62.     In a BiOp, FWS must determine whether the federal action subject to consultation is likely to jeopardize the continued existence of the listed species or destroy

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                          Page 23 of 65

or adversely modify its designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. A likelihood of jeopardy is found when "an action . . . reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

63.    The BiOp must include a summary of the information upon which the opinion is based, an evaluation of the current status of the listed species, the effects of the action, and the cumulative effects. *Id*. § 402.14(g)(2)–(3), (h)(1)(i)–(iii). The "effects of the action" include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* § 402.02.

64.    The BiOp must consider the relevant factors and articulate a rational connection between the facts found and the choice made. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir. 2012).

65.    If the BiOp concludes that an action is likely to result in jeopardy to a listed species, it must set forth the reasonable and prudent alternatives, if any, that would avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(h)(2).

66.    If the BiOp concludes that an action is unlikely to result in jeopardy but that take is reasonably certain to occur, FWS must provide an ITS specifying the amount or extent of incidental take authorized, reasonable and prudent measures necessary to

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 24 of 65

Case 3:21-cv-00209-JWS    Document 1    Filed 09/16/21    Page 24 of 65

minimize the impact of authorized taking, in the case of marine mammals, any measures

necessary to comply with Section 1371(a)(5) of the MMPA, and terms and conditions

necessary to implement the measures specified in the ITS. 16 U.S.C. § 1536(b)(4); 50

C.F.R. § 402.16.

67.     Taking in excess of the amount authorized in an ITS is prohibited and

requires immediate re-initiation of formal consultation. 16 U.S.C. § 1536(o)(2); 50 C.F.R.

§§ 402.14(i)(4), 402.16.

Administrative Procedure Act

68.     Courts review agency actions under the APA. 5 U.S.C. §§ 702, 704.

69.     Under the APA, Courts "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," in excess of statutory authority, or made "without

observance of procedure required by law." *Id.* § 706(2)(A)–(D).

70.     When an agency reverses a prior policy or decision, the agency is

"obligated to supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of*

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). An agency change in

position is arbitrary and capricious under the APA unless the agency (1) displays

"awareness that it *is* changing position," (2) shows that "the new policy is permissible

under the statute," (3) "*believes*" the new policy is better, and (4) provides "good

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                      Page 25 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 25 of 65

reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *see also Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc).

# V. STATEMENT OF FACTS

## Southern Beaufort Sea Polar Bears

71.     In 2008, FWS published its final rule listing the polar bear as a threatened species under the ESA. FWS, Determination of Threatened Status for the Polar Bear (*Ursus maritimus*) Throughout Its Range, 73 Fed. Reg. 28,212 (May 15, 2008). FWS also published a Special Rule for the Polar Bear, 73 Fed. Reg. 76,249 (Dec. 16, 2008), which specifies the protective measures that apply to the polar bear because of its threatened status.

72.     Of the two polar bear populations (or stocks) found in the United States, the SBS population is the most likely to occur in the nearshore Beaufort Sea and North Slope. The SBS population is among the most imperiled polar bear populations in the world, having declined dramatically since the 1990s. In addition to climate change, polar bears in the SBS population face threats from a wide range of industrial activities,

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                          Page 26 of 65

including onshore and offshore oil and gas development and increased shipping. They are also subject to subsistence hunting and mortality due to interactions with humans where there is a perceived threat to life and property.

73.     FWS designated critical habitat under the ESA for polar bears in Alaska in 2011. Designation of Critical Habitat for the Polar Bear (*Ursus maritimus*) in the United States, 75 Fed. Reg. 76,086, 76,088–91 (Dec. 7, 2010). The vast majority of the coastal and offshore area covered by the ITR is designated as critical habitat for the species. *Id.* at 76,086.

74.     The SBS stock is in decline but data and information on the population dynamics for the SBS polar bears are outdated and incomplete. The most recent SBS stock assessment relied on data from 2001–2010 and estimated the population at approximately 900 bears, representing a 50 percent decline since the 1980s. U.S. FISH & WILDLIFE SERV., POLAR BEAR: SOUTHERN BEAUFORT SEA STOCK ASSESSMENT (2021) at 6, 8. The minimum population estimate for the SBS stock is considerably lower: 782. *Id.* at 8. A recent scientific report cited in the ITR, which relies on data gathered from 2001–2016, estimates the SBS population at 907 bears. Todd C. Atwood et al., U.S. Geological Survey Wildlife Program, Analyses on Subpopulation Abundance and Annual Number of Maternal Dens for the U.S. Fish and Wildlife Service on Polar Bears (*Ursus maritimus*) in the Southern Beaufort Sea, Alaska, Open-File Report 2020-1087 (2020). The most recent estimate of the number of polar bears in the Alaska portion of the SBS

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 27 of 65

stock, which encompasses 77.8% of the total range of this stock, was 573 bears in 2015, with a fairly stable trend from 2006–2015, noting a sharp decline in 2013. *Id.*

75.     The startling evidence of adverse impacts from climate change on SBS polar bears is mounting and studies indicate that this stressed species is increasingly incapable of absorbing continued disturbance from industrial activities. Research also demonstrates that oil and gas activities pose a multi-faceted threat to polar bears and suggests climate change will likely lead to reduced populations or even extirpation of SBS polar bears.

76.     The evidence also indicates that oil and gas activities on the North Slope will exacerbate the threat of climate change to SBS polar bears. Noise and other impacts from human activity and operation of equipment, especially aircraft and vehicle traffic, have the potential to disturb polar bears nearby.

77.     Cub mortality due to den disturbance and premature den abandonment is one of the most significant risks posed by oil and gas activities. Disturbance of maternal females during the winter denning period can result in premature den abandonment, or earlier den emergences and departures, adversely affecting polar bear cub survival.

78.     Aerial forward looking infra-red (FLIR) den detection technology, historically relied upon by the oil and gas industry to detect and thus avoid disturbance of polar bear dens, is not as effective as previously assumed.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 28 of 65

79.     Recent research to test aerial FLIR effectiveness cited in the ITR found that even after multiple aerial FLIR surveys, only 50% of dens were detected, indicating a 16% success rate for any single FLIR survey in that study. Susannah P. Woodruff & Ryan R. Wilson, Evaluating the Efficacy of Aerial Infrared Sensors to Detect Artificial Polar Bear Dens (2021) (under peer-review) (available at: https://www.regulations.gov/document/FWS-R7-ES-2021-0037-0013) [hereinafter Woodruff & Wilson 2021]; *see also* Comments from Dr. Steven C. Amstrup, Chief Scientist for Polar Bears International re: Proposed Incidental Take Regulations for the Take of SBS Polar Bears, 86 Fed. Reg. 29,364 (June 30, 2021) at 10 (explaining implications of Woodruff & Wilson 2021 results).

80.     A recent 2020 study by FWS and the United State Geological Survey (USGS) stated that the current level of lethal takes for SBS polar bears "does not allow any additional lethal take under the MMPA from other sources," such as oil and gas activities. Ryan R. Wilson & George M. Durner, *Seismic Survey Design and Effects on Maternal Polar Bear Dens*, J. OF WILDLIFE MGMT. (2020) [hereinafter Wilson and Durner 2020]. The study further states that due to the negative effects to cub survival from early den emergence, nearly all dens must remain undisturbed for oil and gas activities to meet MMPA requirements. *Id*.

81.     Recent studies also indicate that bears that encounter oil and gas activities are likely to already be in an energy-deficit state due to a loss of sea ice habitat because

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 29 of 65

their energy demands exceed their gains from capturing prey. George M. Durner, et al.,

*Increased Arctic Sea Ice Drift Alters Adult Female Polar Bear Movements and*

*Energetics*, 23 GLOBAL CHANGE BIOLOGY 3460 (2017); J.P. Whiteman et al., *Summer*

*Declines in Activity and Body Temperature Offer Polar Bears Limited Energy Savings*,

349 SCIENCE 295 (2015); A.M. Pagano, et al., *High-Energy, High-Fat Lifestyle*

*Challenges an Arctic Apex Predator, the Polar Bear*, 359 SCIENCE 568 (2018). As a

result, disturbance from oil and gas and other industrial activities will likely have a

greater impact than it would have in the past.

## FWS's Beaufort Sea ITR Process

82.     In March 2021, AOGA submitted its complete petition requesting

incidental take regulations to FWS. The petition described intensive oil and gas

development currently in place on the North Slope as well as numerous expansion

projects and new exploration and development activities slated to occur across the North

Slope, including the Willow Master Development Project and additional westward

expansion into the National Petroleum Reserve-Alaska.

83.     In order to facilitate these developments and maintain existing

infrastructure, AOGA's application proposed FWS issue an ITR authorizing take of SBS

polar bears and Pacific walrus incidental to a broad range of industrial activities

including, but not limited to, drilling wells, constructing landing strips, roads, pads,

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 30 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 30 of 65

onshore and subsea pipelines, conducting seismic and other surveys, and geotechnical boring both on and offshore. *Alaska Oil and Gas Association, Amended Petition for United States Fish and Wildlife Service Incidental Take Regulations for Oil and Gas Activities in the Beaufort Sea and Adjacent Lands 2021–2026*, at 7–8 (Mar. 2021).

84. FWS issued a draft ITR in June 2021 analyzing AOGA's petition. Marine Mammals; Incidental Take During Specified Activities, 86 Fed. Reg. 29,364 (June 1, 2021) [hereinafter Draft ITR]. FWS stated that the specified activities covered by the draft ITR include "oil and gas exploration, development, and production, extraction, processing, transportation, research, monitoring, and support activities of multiple companies" on the North Slope and nearshore Beaufort Sea. *Id.* at 29,365.

85. In its draft ITR, FWS determined that up to 92 polar bears would be taken yearly by Level B harassment. *Id.* at 29,413. FWS calculated that 92 individuals represent roughly 10% of the estimated population of 907 polar bears in the SBS stock and therefore concluded that take would be of "small numbers." *Id*. at 29,420.

86. FWS's small numbers analysis based on annual take in the draft ITR was inconsistent with the agency's approach in three recent Alaska ITRs — all of which reached conclusions regarding the MMPA's small numbers requirement based on the total number of marine mammals taken over the five-year ITR. *See* Marine Mammals; Incidental Take During Specified Activities: Cook Inlet, Alaska, 84 Fed. Reg. 37,716, 37,733 (Table 10, Table 12), 37,735–36. (Aug. 1, 2019) (basing small numbers finding

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                               Page 31 of 65

on total sea otter take over five-year period); Marine Mammals; Incidental Take During Specified Activities, 81 Fed. Reg. 52,276, 52,277 (Aug. 5, 2016) (stating that small numbers finding for SBS polar bears must be based on "the total of such taking for the 5-year regulatory period"); Marine Mammals; Incidental Take During Specified Activities, 78 Fed. Reg. 35,364, 35,415 (June 12, 2013) (Chukchi Sea ITR explaining in response to a comment that FWS's small numbers finding was premised on comparing total polar bear take estimated over five-year period to the population).

87.     FWS also calculated that, over the five-year lifespan of the draft ITR, there would be 443 total Level B harassment takes of SBS polar bears. Draft ITR at 29,421. Noting that total SBS polar bear take during the five years in which the previous ITR was in place totaled 264, FWS explained that polar bear take under the draft ITR would be of a "similarly" small number. *Id.*

88.     In reaching its small numbers finding, FWS did not assess whether the total take of 443 polar bears over a five-year period would be considered a small number.

89.     The FWS also explained that it anticipated that only Level B harassment would occur in its small numbers determination, and that harassment was unlikely to significantly impact the health, reproduction, or survival of SBS polar bears. *Id.*

90.     In assessing the amount of Level A take anticipated by the activities described in AOGA's petition, FWS created two categories: "serious" Level A harassment, meaning impacts likely to result in mortality, and "non-serious" Level A

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                      Page 32 of 65

harassment. FWS did not define "non-serious Level A take," which is not a category of take recognized in the MMPA, but interpreted it to mean injuries or impacts that did not fit its definition for "serious" Level A harassment. *Id*. at 29,395.

91.     Applying this framework, FWS found a 29% annual probability of at least one non-serious Level A take and a 45 to 46% annual probability of at least one serious Level A or lethal take occurring. *Id*. at 29,412.

92.     The draft ITR indicated that the annual mean number of cubs that would be subject to "serious" Level A take or lethal take was 1.2 cubs, and the median was 0. *Id*. The ITR also noted that the confidence interval for such take was 0 to 5 or 0 to 6 cubs each year. *Id*.

93.     FWS indicated that the calculated distribution of serious and non-serious Level A take was "heavily skewed," but did not explain what factors may have contributed to this skew. *Id*.

94.     FWS did not present the combined annual probability of all Level A harassment and lethal take. Nor did FWS consider or present the probability of Level A harassment or lethal take occurring in any one year of the five-year period of the ITR.

95.     Ultimately, FWS concluded that the covered activities would not "result in non-serious or serious injury Level A harassment or lethal take of polar bears" based on the annual probability of each individual category of Level A take. *Id.* at 29,412. FWS concluded the probabilities of these more severe forms of take were too low to warrant

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 33 of 65

consideration of their impacts. *Id*. The draft ITR did not consider the impacts to the SBS stock from any Level A take occurring, and limited its consideration of impacts solely to Level B harassment. Based on these limited considerations, the draft ITR concluded that authorized polar bear take would not have a significant impact on the SBS stock of polar bears. *Id*.

96.     FWS also determined that the mitigation measures proposed in the draft ITR provided for the least practicable adverse impact to SBS polar bears. FWS relied primarily upon requirements that oil and gas operators utilize aerial FLIR surveys to detect and avoid polar bear dens. The draft ITR required that "all denning habitat within one mile of the ice-season industrial footprint will be surveyed twice each year. In years w[h]ere seismic surveys are proposed, all denning habitat within the boundaries of the seismic surveys will be surveyed three times." *Id*. at 29,383. FWS required a buffer zone of 1.6 km (1 mile) around known or suspected polar bear dens. *Id.* at 29,410.

97.     As part of its analysis of these mitigation measures, FWS averaged the success rate of aerial FLIR detection surveys from three studies and calculated that a single aerial FLIR survey would successfully locate on average 41% of dens. *Id*. at 29,411.

98.     FWS also issued a draft EA concluding that issuance of the draft ITR would not significantly impact SBS polar bears. U.S. Fish & Wildlife Serv., Draft Environmental Assessment for Proposed Rule to Authorize the Incidental Take of Small

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 34 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 34 of 65

Numbers of Polar Bears (*Ursus maritimus*) and Pacific Walrus (*Odobenus rosmarus divergens*) During Oil and Gas Activities in the Beaufort Sea and Adjacent Coastal (North Slope) Alaska, at 57 (2021).

99.     FWS's draft EA for the draft ITR considered an action and no action alternative and did not analyze any other alternatives. *Id.* at 4. FWS stated that any alternatives that might reduce impacts on denning polar bears by limiting the geographic scope or placing time limits on the activities outlined in AOGA's petition would not "be practicable as they may interfere with human health and safety as well as the continuity of oil and gas operations." *Id*. at 53.

100.    The draft EA's no action alternative assumed oil and gas activities, and commensurate incidental take of SBS polar bears, would proceed across the North Slope as described in AOGA's petition even if the FWS did not issue the draft ITR. *Id*. at 28.

101.    Plaintiffs and other individuals and groups submitted extensive legal and technical comments on the FWS's draft ITR and draft EA during the limited 30-day public comment period. Letter from Alaska Wilderness League et al. to Marine Mammals Management Office, U.S. Fish and Wildlife Serv., (July 1, 2021) [hereinafter League ITR Comments]; Letter from Karimah Schoenhut, Sierra Club Staff Attorney to U.S. Fish and Wildlife Serv. Re: Request for public comments on "Marine Mammals: Incidental Take During Specified Activities; North Slope, AK," Docket No. FWS-R7-ES-2021-0037, 86 Fed. Reg. 29,364 (July 1, 2021) [hereinafter Sierra Club ITR Comments]; Letter from

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                          Page 35 of 65

Center for Biological Diversity, et al. to Marine Mammals Management Office, U.S. Fish and Wildlife Serv., (July 1, 2021) at 12 [hereinafter CBD ITR Comments].

102.    In their comments on the draft ITR, Plaintiffs explained that FWS failed to provide a reasoned explanation for its determination that AOGA's contemplated oil and gas activities would take only "small numbers" of SBS polar bears, would have a negligible impact on the SBS stock, and that the ITR provided for the least practicable adverse impact to SBS polar bears and their habitat.

103.    Specifically, regarding FWS's small numbers finding, Plaintiffs pointed out that FWS considered only the number of polar bears authorized to be taken per year under the ITR and had failed to compare the total number of takes anticipated over the five-year life of the ITR — 443 Level B harassment takes — to the total population to evaluate how that could be a small proportion. League ITR Comments at 19–20. Plaintiffs explained that 443 takes amounted to a staggeringly high proportion of the total SBS polar bear population — roughly half — and that FWS had not explained how taking such a large percentage of the SBS stock constituted a "small number" under the MMPA. *Id*. at 20. Plaintiffs also noted that 443 takes represented a near doubling of the total take authorized under the previous Beaufort ITR and that FWS had failed to contextualize the increase or explain how such an increase could be deemed "similarly small." *Id*. at 20. Plaintiffs also explained that FWS's statement that take would be of small numbers because the area of industry activity would be small compared to the

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 36 of 65

entire range of polar bears was arbitrary because the MMPA requires the agency to consider impacts "within [the] specified geographic region" of the ITR, not across the entire range of the species. CBD ITR Comments at 12. Plaintiffs explained FWS's interpretation renders the MMPA's small numbers standard meaningless for species with large geographic ranges, such as SBS polar bears. *Id*.

104.    Plaintiffs also pointed out that FWS's small numbers finding in the draft ITR represented an unexplained departure from the agency's previous interpretation of the MMPA's small numbers requirement. Plaintiffs cited the preamble for the prior Beaufort ITR (2016–2021) in which FWS's statements articulated the small numbers requirement in terms of total take over a five-year ITR. Sierra Club ITR Comments at 9–10.

105.    Plaintiffs also explained that, even if the impact to polar bears from harassment were negligible, FWS could not allow take via harassment of more than small numbers of polar bears under the MMPA. League ITR Comments at 20–21.

106.    Additionally, Plaintiffs explained that because FWS had failed to determine the extent to which there would be repeated harassment of the same individuals, it therefore had to assume that each take would be of a distinct individual. *Id*. at 21; Sierra Club ITR Comments at 9.

107.    Regarding FWS's negligible impact finding, Plaintiffs demonstrated that FWS failed to rationally evaluate the probability of "serious" Level A harassment or

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 37 of 65

lethal take of at least one cub occurring over the five-year period of the ITR. League ITR Comments at 22. The draft ITR provided a table which stated the annual probability of serious Level A or lethal take occurring for each individual year of the ITR. The probabilities ranged from 45 to 46%. The accompanying text of the ITR stated that the probability was up to 42.6%. (This was apparently a typographical error, as the final ITR subsequently confirmed that the numbers in Table 8 were the correct values, meaning that the annual probabilities were from 45% up to 46.2%.)

108.    Plaintiffs' comments referenced and incorporated a memo from Dr. Trent McDonald, a statistician, explaining that given a 42.6% annual probability of serious Level A or lethal take, the probability of a serious Level A or lethal take occurring in at least one year during the five-year period of the ITR was 94%. *Id*. at 22–23. In addition, Dr. McDonald explained that given a 42.6% annual probability of serious Level A or lethal take, the probability of serious Level A or lethal take occurring in two or more years of the five-year ITR period was 70.64%. *Id*.

109.    Plaintiffs also pointed out that if FWS had not split up Level A take into "serious" and "non-serious" categories, the correct *annual* probability of at least one cub suffering Level A harassment or lethal take would be approximately 73% to 75% for each individual year of the ITR because "serious" and "non-serious" Level A take were modeled as mutually-exclusive occurrences. *Id*. at 22; Sierra Club ITR Comments at 24.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                        Page 38 of 65

110.     Plaintiffs also commented that the characterization of certain impacts to newborn cubs as "non-serious" Level A injury was arbitrary and capricious given the available science. Plaintiffs explained that the injury would be a reduction in the strength and mobility critical to keeping up with the mother bear during the trip from the den back to sea, and therefore critical to avoiding abandonment and predation. Sierra Club ITR Comments at 29–33.

111.     Plaintiffs also explained that accounting for the probability of lethal take of polar bears under the ITR was crucial in light of the Wilson and Durner 2020 study's conclusion that any additional lethal take of SBS polar bears from oil and gas activities would violate the MMPA and that nearly all dens must remain undisturbed for oil and gas activities to meet MMPA requirements. League ITR Comments at 23. Pointing to these findings, Plaintiffs explained it was critical for FWS to consider the high potential for lethal take under the draft ITR and analyze whether the ITR would have more than a negligible impact on the SBS population. *Id.*

112.     Plaintiffs also commented that given the extremely high (i.e., greater than 94%) probability of unauthorized Level A or lethal take of cubs occurring in at least one year of the ITR period due to the activities covered by the ITR, FWS's authorization of Level B harassment from those activities would violate the MMPA. Sierra Club ITR Comments at 24.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                Page 39 of 65

113.    Plaintiffs also commented that FWS's decision not to consider the impacts of cub loss from serious Level A harassment or lethal take in its negligible impact determination on the ground that a 45% to 46% probability of such take occurring in each individual year of the ITR was too low to warrant consideration was unlawful. Plaintiffs commented that FWS's assertion that such a substantial probability was not sufficiently likely to warrant consideration was plainly unlawful and arbitrary in light of FWS's own regulation making clear that an impact need only be "reasonably likely" — not likely, or more likely than not. *See* Sierra Club ITR Comments at 15–16.

114.    Plaintiffs also asserted that FWS had underestimated the probability of Level A harassment and lethal take of newborn cubs by relying on irrationally inflated success rates for den detection by aerial FLIR surveys. FWS's model assumed that only the dens that remain undetected after aerial FLIR surveys will be vulnerable to take. Thus, the detection success rate used in FWS's modeling of impacts affects its assessment of the probability of take occurring. FWS relied on a detection success rate that was obtained by averaging the rates from three studies. However, as Plaintiffs commented, the data relied on in one of these studies was obtained under conditions that were not commensurate to prevailing conditions during actual aerial FLIR surveys.

115.    Plaintiffs' comments incorporated a comment letter from polar bear expert Dr. Steven Amstrup, the lead author of one of the studies used by FWS to generate the aerial FLIR detection rate modeled for the draft ITR, who explained at length why FWS's

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 40 of 65

reliance on a detection rate derived from his study would bias the results. *See* Sierra Club ITR Comments at 36–38. Dr. Amstrup explained that the detection rates derived from his study were biased high compared to detection rates realistically expected for the aerial FLIR surveys that would occur under the ITR. *Id*. He explained that this was because in his study, the researchers knew the locations of the dens in advance, and because they used helicopters instead of fixed-wing aircraft, which allowed them to maneuver and hover over the known den locations at different angles to maximize the potential for detecting the den's heat signal. *Id*. Dr. Amstrup also explained why the lower detection success rates from the Woodruff and Wilson (2021) and Smith (2020) studies (the other two studies used to generate the aerial FLIR detection rate modeled in for the draft ITR) were more realistic. *See* Sierra Club ITR Comments at 42.

116.    Regarding mitigation, Plaintiffs also pointed out that the draft ITR failed to ensure the least practical adverse impact on polar bears because FWS's assumption that a single aerial FLIR survey would detect 41% of dens on average was a vast overestimate. Plaintiffs explained that the ITR's assumptions regarding the net detection success rate of multiple aerial FLIR surveys were inflated and irrational, and that practicable mitigation measures were disregarded. League ITR Comments at 51–55. First, as described above, Plaintiffs explained that FWS's decision to average three den detection studies was improper, in part because at least one of the studies averaged substantially overestimates the success of aerial FLIR surveys. *Id*. at 52–53. Second, Plaintiffs pointed out that

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 41 of 65

adequate den detection surveys require operators to follow specific criteria, such as specifying the number of passes over an area and treatment of certain landscape features, but FWS failed to include any detailed requirements for aerial FLIR surveys in the draft ITR. *Id*. at 52.

117. Plaintiffs explained that FWS's reliance on aerial FLIR surveys for mitigation was problematic given the low success rate of the technology and FWS's failure to account for likely den detection rates under prevailing conditions. *Id*. at 52–53. Plaintiffs cited studies indicating that reliance on FLIR technology could have significant consequences as a large percentage of SBS polar bears are expected to be within the area covered by the ITR and recent research indicates that aerial FLIR surveys may only detect 16% of dens in the project area. *Id*. at 53.

118. Plaintiffs advised FWS to consider additional mitigation measures to ensure the least practicable adverse impact on threatened SBS polar bears. Plaintiffs' suggestions included requiring protected species observers, restricting or prohibiting oil and gas activities in certain areas, imposing a 1-mile buffer around suitable denning habitat, and imposing spatial and temporal restrictions on activities impacting denning bears and cubs, in particular seismic exploration. *Id*. at 54–55. Plaintiffs cited Wilson and Durner 2020 as indicating that spatial and temporal restrictions help reduce impacts on denning bears, and noted that FWS had recently required such restrictions in a proposed incidental harassment authorization (IHA) for a seismic survey in the Arctic National Wildlife

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 42 of 65

Refuge to reduce impacts to SBS polar bears. *Id.* at 55; *see* Marine Mammals; Incidental Take During Specified Activities; Proposed Incidental Harassment Authorization for Polar Bears in the Arctic National Wildlife Refuge, Alaska, 85 Fed. Reg. 79,082 (Dec. 8, 2020) [hereinafter KIC IHA] at 79,086, 79,088–89, 79,110, 79,115.

119.    Plaintiffs' comments also addressed issues with FWS's draft EA and advised that the gaps and flaws contained in the draft ITR were reflected in the draft EA. Plaintiffs explained that, as a result of the ITR's deficiencies, the draft EA failed to fully consider impacts to SBS polar bears and to demonstrate that the agency took a hard look at the environmental impacts of the draft ITR. League ITR Comments at 13.

120.    Plaintiffs further noted that the draft EA's failure to analyze any alternatives to the proposed action violated NEPA's mandate to analyze a reasonable range of alternatives. *Id.* at 14. Plaintiffs suggested alternatives such as limiting the geographic scope of proposed oil and gas activities and placing time limits on activities such as seismic exploration in order to reduce impacts on denning polar bears and their critical habitat. *Id.* Plaintiffs pointed out that FWS had deemed such alternatives reasonable in the context of the recently proposed KIC IHA. *Id.* at 14–15; *see* KIC IHA at 79,088–89, 79,112. Plaintiffs noted that FWS failed to explain why alternatives limiting the geographic scope and timing of oil and gas activities were deemed unreasonable in the draft ITR. League ITR Comments at 15.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 43 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 43 of 65

121.     Given the flaws in FWS's modeling and the resulting underestimate of take, Plaintiffs also cautioned FWS regarding the agency's yet-unfulfilled obligations under the ESA. *Id*. at 10.

122.     The ITR in effect at the time AOGA filed its petition expired on August 5, 2021. Draft ITR at 29,364.

123.     On August 5, 2021, FWS issued the final ITR and made the regulations effective immediately. Marine Mammals; Incidental Take During Specified Activities; North Slope, Alaska 86 Fed. Reg. 42,982 (August 5, 2021) [hereinafter Final ITR].

124.     In the final ITR, FWS conceded that the agency had to assume that each of the 443 incidences of take it anticipated occurring under the ITR would impact a distinct individual bear because FWS lacked the data to determine the extent to which there would be repeated takes of the same bear. Final ITR at 43,039. Thus, FWS made clear that up to 443 different members of the population of approximately 907 bears would be taken by Level B harassment over the entire five-year period of the ITR.

125.     FWS explained in the final ITR that the highest anticipated annual take of 92 individual polar bears for a single year of the ITR constitutes 10.14% of the total SBS stock and concluded that proportion represents a small number. *Id*.

126.     In reaching its small numbers finding in the final ITR, FWS still did not consider the total taking authorized under the five-year ITR, which amounts to up to 443 distinct individuals and therefore 48.8% of the total SBS polar bear population of

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 44 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 44 of 65

approximately 907 bears. FWS also dismissed concerns that it had considered whether take would be of small numbers in the context of the SBS polar bear's geographic range, rather than within the specified geographic area for the ITR. FWS stated the SBS polar bear's larger range means only a small proportion of polar bears will occur in the areas where industrial activities occur. FWS reiterated that its small numbers determination was based on the number of individual bears exhibiting a Level B response and the population estimate.

127.   FWS did not address, explain, or show awareness of the agency's change in policy regarding its interpretation of "small numbers," despite the fact that the agency previously interpreted small number analysis to require consideration of the total taking over the entire five years of the ITR, whereas for the 2021–2026 Beaufort ITR, the agency considered only annual take. FWS merely stated that its small numbers finding was consistent with law, policy and "longstanding" agency practice. *Id*. at 43,044–45.

128.   FWS reiterated in its comment response that it considered small numbers on an annual basis and indicated that the agency's use of annual take to reach its small numbers finding was appropriate because (1) the SBS population estimate provides the "population in any given contemporary year," (2) LOAs are issued for one year, and (3) use of annual take estimates "tracks with the use of 'each' in 16 U.S.C. 1371(a)(5)(A)(i)." *Id*. at 43,044–45.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                     Page 45 of 65

129.    The final ITR did not explain how nearly doubling the total SBS polar bear

take from the previous five-year ITR could reasonably be considered a "similarly small"

number. Instead, in FWS's response to comments, the agency stated that take estimates

from previous ITRs were not relevant to the agency's small numbers determination. *Id*. at

43,044.

130.    The final ITR restated FWS's negligible impact finding from the draft ITR,

which concluded that no take more severe than Level B harassment would occur, and did

not analyze the impact of serious Level A or lethal take of cubs on the population. FWS

reported an annual mean of 1.2 cubs taken by "serious" Level A or lethal take

representing a 45% to 46% yearly probability of serious Level A or lethal take, and a

29% yearly probability of non-serious Level A take, as in the draft ITR. *Id*. at 43,031.

FWS reiterated that the agency did not anticipate any Level A take based on those annual

probabilities of either category of Level A take occurring. *Id*. at 43,040, 43,045.

131.    In response to comments questioning FWS's failure to consider the impacts

of serious Level A or lethal take despite the substantial annual probability of 45% to

46%, FWS stated that it could discount that probability, as well as the mean "Serious

Level A lethal" take of 1.2 cubs each year because "the majority (*i.e.*, 54%) of model

iterations estimated 0 serious takes by Level A harassment or lethal takes occurring

annually." *Id*. at 43,044. In other words, FWS asserted that it could ignore that serious

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 46 of 65

Level A or lethal take of one or more cubs occurred in 46% of the model runs simply because it did not occur in the other 54% of the model runs.

132.    The final ITR explained that FWS distinguished between serious and non-serious Level A harassment because only serious Level A take (i.e., take likely to result in serious injury or mortality) affects annual rates of recruitment and survival and, therefore, only serious Level A take is pertinent to the negligible impact standard. *Id.* at 43,047. The final ITR acknowledged that the injury it had characterized as "non-serious" was a reduction in fitness of newborn cubs to survive the trip back to the sea, but asserted that it considered it "non-serious" because it lacked a study to quantify the likelihood that such injury would cause death. *Id.* at 43,055.

133.    The final ITR does not address the fact that the annual probability of serious Level A or lethal take predicted by FWS's model means that there is over a 94% probability of such take occurring in at least one year under the ITR or explain how FWS could reasonably disregard the extremely high probability of that take. *Id.* at 43,031, 43,040.

134.    Nor did FWS explain how it could disregard the 75% annual probability of an unauthorized Level A or lethal take for each year of the combined "serious" and "non-serious" categories.

135.    Given a 75% annual probability of Level A or lethal take, the probability of Level A or lethal take occurring in at least one year of the five years of the ITR is 99.9%.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                      Page 47 of 65

136.    A 75% annual probability of Level A or lethal take means that the annual probability that no Level A or lethal take will occur is 25% or 0.25 (100% - 75% = 25%). Given that 25% annual probability, the probability that no Level A or lethal take will occur in any year of the five-year ITR period is 0.25 x 0.25 x 0.25 x 0.25 x 0.25 = 0.0009765625. Thus, the probability that such take will occur at least once over the course of the five-year ITR period is 1 - 0.0009765625 = 0.999023, or 99.9%.

137.    Instead of addressing these issues, in the final ITR, FWS asserted that annual take is the most appropriate way to address the negligible impact standard "which is expressed in annual terms." *Id*. at 43,047.

138.    In response to comments that FWS improperly averaged the unrealistically high detection success rate for aerial FLIR surveys derived from the Amstrup (2004) study with the lower rates from the more realistic Smith (2020) and Wilson and Woodruff (2021) studies, FWS asserted that the 55% success rate from Amstrup (2004) was not meaningfully different from the 45% success rate from the Smith (2020) study. *Id*. at 43,060. FWS also asserted that it would be "likely inappropriate" to rely on an average detection success rate based only on the 24% success rate from Woodruff and Wilson (2021) study and the 45% from the Smith (2020) because there were "caveats" related to the Woodruff and Wilson study that FWS had not revealed to the public. *Id*. FWS provided only one example of such a reason — that the researchers were not allowed to see the GPS navigation coordinates for the areas they were scanning for dens. FWS failed

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                    Page 48 of 65

Case 3:21-cv-00209-JWS    Document 1    Filed 09/16/21    Page 48 of 65

to provide any rational explanation of why that measure, which was intended by the researchers to eliminate bias in the results, would instead introduce bias. *Id*. at 43,058. FWS did not examine how its modeling of impacts would be affected by using an average success rate for aerial FLIR surveys based only on the Woodruff and Wilson (2021) and Smith (2020) studies.

139. FWS therefore persisted in using the average 41% success rate determined by averaging together the 55%, 45%, and 24% success rates from the three studies for the aerial FLIR survey detection rate in its model.

140. The final ITR concluded that the mitigation measures required by FWS ensured the least practicable impact on SBS polar bears. *Id*. at 43,041. FWS retained the requirement to conduct three aerial FLIR surveys prior to seismic exploration and did not reconsider its assumption that each individual aerial FLIR survey would detect on average 41% of dens. *Id*. at 43,030, 43,059. FWS added requirements for weather conditions when aerial FLIR surveys could be conducted, but did not include parameters such as flight paths, requiring a specific number of passes over denning habitat, or use of helicopters as additional mitigation measures in the final ITR. FWS explained that such measures were "already implicitly required" because the estimated 41% den detection rate for a single aerial FLIR survey was based on studies with an "analytical approach" requiring that all den habitat be adequately surveyed. Final ITR at 43,060. FWS also stated that the number of survey flights required in the ITR was "adequate for reducing

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 49 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 49 of 65

take sufficiently while still feasible for Industry to conduct during the short period of the winter when [aerial FLIR survey] flights can be reliably done." *Id*.

141.    The final ITR included a list of mitigation measures that were deemed impracticable including spatial and temporal restrictions on activities and providing one-mile buffers, within which activities would be precluded, around all known polar bear denning habitat. *Id*. at 43,041.

142.    Regarding spatial and temporal restrictions, FWS explained that some restrictions "inherent to AOGA's specified activities" — such as project footprints and the seasonal nature of activities — were included in the final ITR and that FWS considered those to be "restrictions" on the timing and locations of activities. *Id*. at 43,063. The final ITR stated that additional spatial and temporal mitigation measures were rejected because AOGA "made clear" any further measures would be impracticable due to unspecified "regulatory and safety requirements." *Id*. at 43,041, 43,063. FWS did not explain what spatial and temporal restrictions were considered by the agency or what regulatory and safety requirements made imposition of all spatial and temporal restrictions, beyond the inherent parameters of individual oil and gas projects, impracticable.

143.    FWS concluded that imposing one-mile buffers around suitable denning habitat in order to potentially reduce impacts to denning SBS polar bears and cubs was

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                          Page 50 of 65

impracticable because many existing oil and gas operations occur within denning habitat. *Id*. at 43,041.

144. FWS did not explain why imposing buffers around suitable denning habitat for activities without existing facilities, such as seismic exploration, would be impracticable.

145. FWS also asserted that maintaining a buffer from suitable denning habitat was impracticable because snow drifts with sufficient snow for dens "differ from year-to-year [due to] terrain and weather conditions. The ability to identify areas in which these snow drifts may occur each year prior to operations is not practicable." *Id*. at 43,065. FWS failed to reconcile this assertion with the ITR's requirements for aerial FLIR surveys to survey denning habitat three times. Seismic operators necessarily would identify the locations of such snow drifts within the mapped suitable denning habitat (i.e., the locations with slope and bank characteristics capable of sustaining such snow accumulations) during the aerial FLIR surveys. Yet FWS did not explain why buffers could not be established based on the locations of the snow accumulations studied during the aerial FLIR surveys.

146. In July 2021, FWS issued a final EA concluding that issuance of the final ITR would not significantly impact SBS polar bears. U.S. Fish & Wildlife Serv., Final Environmental Assessment for the Final Rule to Authorize the Incidental Take of Small Numbers of Polar Bears (*Ursus maritimus*) and Pacific Walrus (*Odobenus rosmarus*

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                           Page 51 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 51 of 65

*divergens*) During Oil and Gas Activities in the Beaufort Sea and Adjacent Coastal Alaska (2021) [hereinafter Final EA].

147.   FWS did not consider any reasonable alternatives to AOGA's proposed action in the final EA. Final EA at 8–9, 45.

148.   Regarding alternatives, the final EA included the same list of potential mitigation measures found in the final ITR including "additional spatial and temporal restrictions on surface activity" and stated that none of the measures listed were considered practicable. *Id*. at 54–55.

149.   FWS explained that the agency did not need to consider spatial and temporal mitigation measures when reaching their least practicable impact finding because AOGA's application included "key" spatial and temporal restrictions. *Id*.

150.   The final EA does not explain what additional spatial and temporal restrictions were considered, why they were deemed impracticable, or otherwise explain FWS's failure to analyze reasonable alternatives to AOGA's proposed action.

151.   In August 2021, FWS issued the BiOp for the ITR analyzing impacts to polar bears and other protected species under FWS's jurisdiction. FWS, Biological Opinion for the Beaufort Sea Incidental Take Regulations 2021–2026 (August 3, 2021) [hereinafter FWS BiOp].

152.   FWS's BiOp concluded that the agency's decision to issue the ITR was not likely to jeopardize the continued existence of the polar bear species. *Id.* at 41.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 52 of 65

153.    FWS's BiOp stated that the ITR anticipated only Level B harassment of polar bears and no Level A harassment or lethal take. *Id.* at 38. The ITS was limited to 443 incidents of Level B harassment and did not authorize Level A harassment or lethal take. *Id*. at 41–42.

154.    The BiOp's reinitiation notice states reinitiation of formal consultation "may" be required if the amount of Level B harassment take authorized under the ITR is exceeded or if injury or lethal take of polar bears occurs. *Id.* at 43.

155.    The BiOp's reinitiation notice uses discretionary language. FWS interpreted its regulations as not mandating the reinitiation of consultation even when the level of take authorized in the ITS is exceeded.

## VI.    CLAIMS FOR RELIEF
### COUNT I
*(Violation of MMPA and APA; Arbitrary Small Numbers Finding)*

156.    Plaintiffs incorporate by reference all preceding paragraphs.

157.    Pursuant to the MMPA, agencies may authorize the incidental taking of small numbers of marine mammals for a period of up to five years, provided certain conditions are met. 16 U.S.C. § 1371(a)(5)(A)(i)(I). The MMPA requires agencies consider the total amount of take authorized during a five-year ITR period when reaching a small numbers finding, not only the amount of take authorized annually. *Id*.

158.    In several recent ITRs, FWS described or applied the small numbers requirement in a manner consistent with the interpretation that the total number of

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                              Page 53 of 65

Case 3:21-cv-00209-JWS    Document 1    Filed 09/16/21    Page 53 of 65

distinct individual members of the population taken over the entire period of the ITR must be compared to the population to determine whether it is a small proportion, and therefore a small number.

159.    In reaching its small numbers finding, FWS failed to compare the total take of distinct individual SBS polar bears over the five-year period of the Beaufort ITR to the SBS population. FWS solely considered the 92 polar bear takes predicted to occur annually in making that comparison.

160.    FWS's total take estimate indicates that oil and gas activities outlined in the ITR will result in 443 Level B harassment takes over the five-year ITR, which constitutes roughly half the population of SBS polar bears.

161.    FWS failed to acknowledge or explain how take of nearly half of all SBS polar bears could reasonably be considered a "small number" under the MMPA.

162.    FWS also failed to acknowledge the agency's changed interpretation of the small numbers requirement or provide a reasoned explanation for why the agency reversed its prior position that the total take authorized under a five-year ITR must be compared to the population when making its small numbers determinations.

163.    FWS's failure to evaluate the proportion of the population comprised by the total take of individuals over the five-year duration of the ITR, failure to reasonably explain its small numbers finding, and failure to acknowledge or explain its changed interpretation of the small numbers' requirement renders the ITR arbitrary, capricious,

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 54 of 65

and not in accordance with the law, and FWS's promulgation of the ITR was done without following the procedures required by the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## COUNT II
*(Violation of MMPA and APA; Arbitrary Negligible Impact Finding)*

164.    Plaintiffs incorporate by reference all preceding paragraphs.

165.    Incidental take of small numbers of marine mammals may only be authorized pursuant to the MMPA if the total take over a five-year period will have no more than a "negligible impact" on species and stocks. 16 U.S.C. § 1371(a)(5)(A)(i)(I).

166.    FWS failed to consider the total likelihood of Level A take by dividing it into two categories — serious and non-serious — and only accounting for take deemed "serious" in its negligible impact analysis. The MMPA contains no such categories of Level A take. Based on FWS's model, had FWS properly accounted for the probability of all Level A take as defined by the MMPA, the agency would have found a total *annual* probability of at least one cub suffering Level A harassment or lethal take of approximately 75%.

167.    FWS unlawfully classified and discounted the impact of "non-serious" Level A take on the ground that, though survival fitness would be reduced by the injury, FWS lacked data to quantify the probability of death occurring from that injury. FWS therefore treated an injury that it recognized would impair the ability of cubs to survive as if it had no effect at all, contrary to the evidentiary burden imposed by the MMPA.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                Page 55 of 65

168.    As a result of these errors, the negligible impact finding failed to consider the impact on the population of authorizing activities causing an *annual* 75% probability of reducing the fitness or causing the death of one or more cubs each and every year for the five years of the ITR.

169.    In reaching its negligible impact finding, FWS also failed to consider the projected total Level A take of SBS polar bears over the five-year period of the ITR. FWS predicted that the probability of serious Level A harassment or lethal take of at least one polar bear cub under the ITR ranged from 45% to 46% annually, for each year of the ITR. Based on these annual probabilities, FWS concluded the activities outlined in the ITR were not sufficiently likely to result in Level A harassment or lethal take.

170.    FWS failed to consider that the individual annual probabilities of 45% to 46% mean that there is over a 94% probability of serious Level A harassment or lethal take occurring in at least one of the five years of the ITR period, and over a 70% probability of it occurring in at least two of those five years.

171.    By failing to evaluate the probability of serious Level A or lethal take occurring in at least one or more years of the five-year period, and the resultant high probabilities of cub losses occurring in two or more years, FWS's negligible impact finding failed to consider the full impact of the ITR on the SBS population.

172.    FWS's negligible impact finding also failed to consider the impacts of "serious" Level A or lethal take of cubs by discounting the 45% to 46% annual

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 56 of 65

probability of such take occurring as not sufficiently likely to warrant considering the impacts of such cub loss on the SBS population. Discounting a 45% to 46% probability as "not reasonably likely" to occur is arbitrary and capricious, and contrary to the plain language of the MMPA.

173. Finally, FWS's estimates of the extent and likelihood of take of denning cubs were based on modeling that only considered impacts to dens that would be left undetected after multiple aerial FLIR surveys. In that modeling, FWS relied on a den detection success rate that was arbitrarily inflated by reliance on data from a study conducted under inapposite and unrealistic conditions, according to its lead author, Dr. Amstrup. FWS's reliance on the inflated den-detection success rate, and its failure to evaluate the impacts on the model outcomes of using that rate instead of one based only on the two more realistic studies renders the negligible impact finding arbitrary and capricious.

174. FWS's failure to account for total Level A take and failure to reasonably explain its negligible impact finding renders the ITR arbitrary, capricious, and not in accordance with the law, and FWS's promulgation of the ITR was done without following the procedures required by the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 57 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 57 of 65

## COUNT III
*(Violation of MMPA; Failure to Account for Take Likely to Occur)*

175.    Plaintiffs incorporate by reference all preceding paragraphs.

176.    Agencies authorizing incidental take of marine mammals must ensure that all take that will occur from the subject activities would comply with the MMPA. 50 C.F.R. § 18.27(f)(1)–(2); *Kokechik Fishermen's Ass'n*, 839 F.2d at 801–02.

177.    FWS violated the MMPA by authorizing Level B take of SBS polar bears when it is highly likely that the activities specified in the ITR will also result in unauthorized Level A harassment or lethal take. The annual probability of at least one cub suffering Level A harassment or lethal take is 75% (combined "serious" and "non-serious" Level A take as modeled) in each and every year of the five years of the ITR. That amounts to approximately a 99.9% probability of Level A or lethal take occurring in at least one year of the five-year ITR. Even accepting FWS's arbitrary segmentation of Level A take into "serious" and "non-serious," the total probability of "serious" Level A or lethal take of cubs occurring in at least one year of the five-year ITR period is over 94%.

178.    FWS's authorization of Level B harassment for activities that are highly likely to cause more Level A or lethal of take prohibited by the MMPA renders the ITR arbitrary, capricious, and not in accordance with the law, and FWS's issuance of the ITR was done in violation of the requirements imposed by the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                              Page 58 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 58 of 65

**COUNT IV**
(*Violation of MMPA and APA; Failure to Ensure the Least Practicable Adverse Impact*)

179.    Plaintiffs incorporate by reference all preceding paragraphs.

180.    Pursuant to the MMPA, an ITR authorizing take of marine mammals must prescribe the "means of effecting the least practicable adverse impact on such species or stock and its habitat." 16 U.S.C. § 1371(a)(5)(A)(i)(II); 50 C.F.R. § 18.27(e). Agencies are required to mitigate impacts to the greatest extent practicable even where the impacts that would be reduced or eliminated are "negligible impacts." *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1133–34 (9th Cir. 2016).

181.    In promulgating the ITR, FWS failed to adequately consider timing and geographic restrictions on seismic exploration and other oil and gas activities that would potentially reduce impacts to denning SBS polar bears and cubs.

182.    The final ITR considered only one geographic restriction — the placement of one-mile buffer around suitable denning habitat. FWS deemed this potential mitigation measure impracticable for all activities specified in the ITR because some existing oil and gas operations occur in suitable denning habitat. FWS did not consider placing a one-mile buffer around suitable denning habitat for new oil and gas activities specified in the ITR such as seismic exploration. FWS also did not consider any timing restrictions on activities, including for seismic exploration.

183.    FWS asserted that a buffer around suitable denning habitat would be impracticable because locating the areas with actual snow accumulation sufficient for

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 59 of 65

denning in a given year would be impracticable. FWS did not attempt to reconcile this assertion with the ITR's requirement that seismic survey operators conduct aerial FLIR surveys over such snow accumulation areas within mapped suitable denning habitat, and therefore the locations of suitable denning habitat in a given year would necessarily be identified in advance, making it practicable to impose such a buffer.

184.　A study cited in Plaintiffs' comments regarding restrictions contained in a recent draft IHA demonstrate that timing and geographic restrictions on activities such as seismic exploration both mitigate impacts and are practicable to implement. FWS offered conclusory statements but did not explain why such restrictions would not be practicable in the ITR.

185.　By failing to adequately consider timing and geographic restrictions as mitigation measures, FWS could not reasonably ensure that the oil and gas activities described in the ITR would have the least practicable adverse impact on the SBS polar bears.

186.　FWS's failure to adequately consider timing and geographic restrictions on oil and gas activities or to reasonably explain why such mitigation measures are not practicable renders the final ITR arbitrary, capricious, and not in accordance with the law. FWS's issuance of the ITR was done without following the procedures required by the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS　　　　　　　　　　　　Page 60 of 65

## COUNT V

*(Violation of NEPA; Failure to Consider a Reasonable Range of Alternatives)*

187.    Plaintiffs incorporate by reference all preceding paragraphs.

188.    NEPA requires agencies to consider a reasonable range of alternatives when preparing an EA. 40 C.F.R. § 1501.5.

189.    FWS failed to consider a reasonable range of alternatives in the final EA that would avoid or minimize impacts to SBS polar bears and their habitat from the oil and gas activities specified in the ITR.

190.    The final EA failed to consider viable alternatives with the potential to reduce adverse impacts on SBS polar bears and their critical habitat, including requirements for a narrower geographic scope of oil and gas activities and imposing timing limitations to avoid impacts to denning bears.

191.    FWS failed to adequately explain the failure to consider viable alternatives to reduce impacts resulting from the ITR.

192.    FWS's failure to consider alternatives renders the final EA and FONSI arbitrary, capricious, and not in accordance with the law, and the final EA and FONSI were adopted without observance of the procedures required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                        Page 61 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 61 of 65

## COUNT VI
*(Violation of ESA Section 7; Failure to Prepare a Legally Sufficient BiOp)*

193.    Plaintiffs incorporate by reference all preceding paragraphs.

194.    Pursuant to the ESA, where a BiOp results in a no jeopardy finding but finds that take is reasonably certain to occur, the BiOp must contain an ITS specifying the amount or extent of incidental take authorized, among other requirements. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). In the event that the amount of take specified in an ITS is exceeded, the ESA requires immediate re-initiation of formal consultation. 16 U.S.C. § 1536(o)(2); 50 C.F.R. §§ 402.14, 402.16.

195.    FWS's BiOp failed to require immediate and nondiscretionary reinitiation of formal consultation. The reinitiation notice in FWS's BiOp indicated formal consultation "may be required" if the extent of Level B harassment authorized for polar bears in the ITS is exceeded or if injurious or lethal polar bear take occurs.

196.    The ITS included in FWS's BiOp failed to account for Level A or lethal take of SBS polar bears, which is reasonably certain to occur as a result of the activities covered by the ITR.

197.    FWS's discretionary reinitiation notice and failure to account for all reasonably certain take renders the BiOp arbitrary, capricious, and not in accordance with the law, and adoption of the BiOp was done without observance of the procedures required by the ESA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 62 of 65

Case 3:21-cv-00209-JWS    Document 1    Filed 09/16/21    Page 62 of 65

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court grant the following relief:

1.      Declare that in issuing the ITR, FWS violated the MMPA and the APA;

2.      Declare that in issuing the final EA and FONSI, FWS violated NEPA and the APA;

3.      Declare that in issuing the BiOp, FWS violated the ESA and the APA;

4.      Declare that the invalid ITR, final EA, FONSI, and BiOp cannot serve as the basis for any future actions, including LOAs, and declare that the actions as set forth above are arbitrary, capricious, an abuse of discretion or not in accordance with law and without observance of procedure required by law;

5.      Vacate and set aside as unlawful any and all agency approvals and underlying analysis documents, including the ITR, final EA, FONSI, and BiOp, and any LOAs based on these unlawful actions;

6.      Enter appropriate injunctive relief;

7.      Retain continuing jurisdiction over this matter until Federal Defendants fully remedy these violations of law;

8.      Award Plaintiffs all reasonable costs and fees as authorized by law; and

9.      Grant such other relief as this Court deems just and proper.

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 63 of 65

Case 3:21-cv-00209-JWS   Document 1   Filed 09/16/21   Page 63 of 65

Respectfully submitted this 16th day of September 2021,

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Joanna Cahoon (1405034)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
bbrisson@trustees.org
jcahoon@trustees.org

*Attorneys for Plaintiffs*
*Alaska Wildlife Alliance, Alaska Wilderness*
*League, Defenders of Wildlife, Environment*
*America, and Sierra Club*

s/ Karimah Schoenhut (consent)
Karimah Schoenhut (pro hac vice pending)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Attorney for Plaintiff Sierra Club*

s/ Kristen Monsell (consent)
Kristen Monsell (pro hac vice pending)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7137
Fax: (510) 844-7150
kmonsell@biologicaldiversity.org

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                              Page 64 of 65

*Attorney for Plaintiffs Center for Biological
Diversity and Friends of the Earth*

COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
Case No. 3:21-cv-00209-JWS                                    Page 65 of 65