Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
James C. Feldman (Bar No. 1702003)
james.feldman@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

Attorneys for Alaska Oil and Gas Association

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA WILDLIFE ALLIANCE, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>U.S. FISH & WILDLIFE SERVICE, *et al.*,<br><br>                    Defendants,<br><br>    and<br><br>ALASKA OIL AND GAS ASSOCIATION, *et al.*,<br><br>                    Intervenor-Defendants. | No.: 3:21-cv-00209-SLG |

**OPPOSITION BRIEF BY ALASKA OIL AND GAS ASSOCIATION**
**(L.R. 16.3(c)(2))**

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

I.     INTRODUCTION ................................................................................. 1

II.    BACKGROUND .................................................................................... 5

       A.     Relevant MMPA Standards ...................................................... 5

       B.     Factual History ......................................................................... 8

       C.     AOGA's Petition and the Service's Conservative Take Analysis ............ 11

III.   STANDARD OF REVIEW ................................................................... 15

IV.    ARGUMENT ........................................................................................ 16

       A.     The Service's "Small Numbers" Determination Is Well-Supported
              and Consistent with Law ........................................................ 16

       B.     Plaintiffs' Arguments About Level A Harassment Should Be
              Rejected .................................................................................. 22

              1.     The Service Used a Reasonable Method for Evaluating
                     Whether Certain Types of Harassment Would Have Effects
                     on Annual Rates of Recruitment or Survival ................... 24

              2.     The Service's "Negligible Impact" Determination Is Well-
                     Supported and Consistent with Law ............................... 27

              3.     The Court Should Reject Plaintiffs' Attempt to Force the
                     Service to Authorize Level A Harassment ...................... 34

       C.     The Mitigation Measures Required by the Service Are Reasonable
              and Fully Explained ............................................................... 37

       D.     The Environmental Assessment Considers a Reasonable Range of
              Alternatives ............................................................................ 41

       E.     The Biological Opinion Complies with the ESA ...................... 43

       F.     Vacatur Is Not the Appropriate Remedy ................................. 45

V.     CONCLUSION .................................................................................... 48

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alaska Wilderness League v. Jewell*,
　116 F. Supp. 3d 958 (D. Alaska 2015) ............................................................... passim

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
　988 F.2d 146 (D.C. Cir. 1993) ........................................................................ 45

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
　273 F.3d 1229 (9th Cir. 2001) ................................................................... 23, 30

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
　688 F.3d 989 (9th Cir. 2012) ................................................................... 45, 46

*Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*,
　467 U.S. 837 (1984) ...................................................................................... passim

*Cook Inletkeeper v. Raimondo*,
　533 F. Supp. 3d 739 (D. Alaska 2021) ....................................................... 37

*Ctr. for Biological Diversity v. Kempthorne*,
　588 F.3d 701 (9th Cir. 2009) ....................................................................... passim

*Ctr. for Biological Diversity v. Salazar*,
　695 F.3d 893 (9th Cir. 2012) ....................................................................... passim

*Cuozzo Speed Techs., LLC v. Lee*,
　579 U.S. 261 (2016) ...................................................................................... 25

*Didrickson v. U.S. Dep't of Interior*,
　982 F.2d 1332 (9th Cir. 1992) ..................................................................... 37

*F.C.C. v. Fox Television Stations, Inc.*,
　556 U.S. 502 (2009) ...................................................................................... 20

*Friends of Se.'s Future v. Morrison*,
　153 F.3d 1059 (9th Cir. 1998) ..................................................................... 44

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

ii

*Gaule v. Meade*,
402 F. Supp. 2d 1078 (D. Alaska 2005) ....................................................... 37

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004) ................................................................... 17

*Humane Soc'y of U.S. v. Bryson*,
924 F. Supp. 2d 1228 (D. Or. 2013) ........................................................... 26

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ..................................................................... 45

*Kokechik Fishermen's Ass'n v. Sec'y of Commerce*,
839 F.2d 795 (D.C. Cir. 1988) ....................................................... 34, 35, 36

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ..................................................................... 27

*League v. Jewell*,
No. 3:15-CV-00067-SLG, 2015 WL 12516787 (D. Alaska July 23,
2015) ........................................................................................................... 47

*Mayor & City Council of Baltimore v. Trump*,
429 F. Supp. 3d 128 (D. Md. 2019) ........................................................... 24

*Morton v. Ruiz*,
415 U.S. 199 (1974) ................................................................................... 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..................................................................................... 15

*Mullins v. U.S. Dep't of Energy*,
50 F.3d 990 (Fed. Cir. 1995) ..................................................................... 24

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
545 F.3d 1147 (9th Cir. 2008) ................................................................... 42

*Nat. Res. Def. Council, Inc. v. Evans*,
279 F. Supp. 2d 1129 (N.D. Cal. 2003) ............................................... 17, 37

*Nat'l Wildlife Fed'n v. Espy*,
45 F.3d 1337 (9th Cir. 1995) ..................................................................... 45

iii

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ........................................................... 42

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*,
    947 F. Supp. 2d 1031 (D. Alaska 2013) ................................ 16, 22, 37

*Pac. Rivers Council v. U.S. Forest Serv.*,
    942 F. Supp. 2d 1014 (E.D. Cal. 2013) ........................................... 45

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*,
    818 F. Supp. 2d 214 (D.D.C. 2011) ........................................... 10, 47

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ...................................................... 15, 33

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ...................................................... 15, 28

*Sierra Club v. BLM*,
    786 F.3d 1219 (9th Cir. 2015) ......................................................... 20

*Tin Cup, LLC v. U.S. Army Corps of Eng'rs*,
    904 F.3d 1068 (9th Cir. 2018) ......................................................... 19

*Tongass Conservation Soc'y v. U.S. Forest Serv.*,
    No. 3:010-CV-00006-TMB, 2010 WL 11534489 (D. Alaska Mar. 8,
    2010) ........................................................................................... 27, 30

*United States v. LKAV*,
    712 F.3d 436 (9th Cir. 2013) ........................................................... 19

*United States v. Turkette*,
    452 U.S. 576 (1981) ......................................................................... 19

*United States v. Washington*,
    994 F.3d 994 (9th Cir. 2021) ........................................................... 25

*Wilderness Watch, Inc. v. Creachbaum*,
    225 F. Supp. 3d 1192 (W.D. Wash. 2016) ....................................... 44

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................... 15, 45

iv

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

16 U.S.C. § 1362(13) .................................................................................... 5

16 U.S.C. § 1362(18)(A)(i) ....................................................................... 5, 6

16 U.S.C. § 1362(18)(A)(ii) .......................................................................... 6

16 U.S.C. § 1371(a)(2) ................................................................................ 35

16 U.S.C. § 1371(a)(5) ........................................................................... 35, 36

16 U.S.C. § 1371(a)(5)(A) .................................................................. 1, 17, 35

16 U.S.C. § 1371(a)(5)(A)(i) .................................................................. passim

16 U.S.C. § 1371(a)(5)(A)(i)(I) ................................................................ 7, 18

16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa) ............................................................. 7

16 U.S.C. § 1371(a)(5)(D) ............................................................................ 1

16 U.S.C. § 1371(a)(5)(D)(i) ..................................................................... 6, 7

16 U.S.C. § 1371(a)(5)(D)(i)(I) .................................................................... 7

16 U.S.C. § 1371(a)(5)(D)(ii)(I) ................................................................... 7

16 U.S.C. § 1371(c) .................................................................................... 11

16 U.S.C. § 1373 ........................................................................................ 35

16 U.S.C. § 1374 ........................................................................................ 35

16 U.S.C. § 1386 ........................................................................................ 26

16 U.S.C. § 1387 ........................................................................................ 36

16 U.S.C. § 1536(a)(2) ............................................................................... 43

16 U.S.C. § 1536(b)(4) ............................................................................... 43

Pub. L. No. 100-711, 102 Stat. 4755 (1988) .............................................. 36

v

**Rules and Regulations**

40 C.F.R. § 1501.5(c)(2) ............................................................................. 42

50 C.F.R. § 18.27(b) ........................................................................... 6, 7, 33

50 C.F.R. § 18.27(c) ............................................................................. passim

50 C.F.R. § 18.27(e)(2) ...................................................................... 23, 33

50 C.F.R. § 18.34 .................................................................................. 11, 26

50 C.F.R. §§ 18.122-18.123 ...................................................................... 47

50 C.F.R. § 216.3 ........................................................................................ 26

50 C.F.R. § 402.14(i)(4) ............................................................................ 44

58 Fed. Reg. 60,402 (Nov. 16, 1993) ........................................................... 9

60 Fed. Reg. 42,805 (Aug. 17, 1995) ........................................................... 9

64 Fed. Reg. 4,328 (Jan. 28, 1999) ............................................................... 9

65 Fed. Reg. 5,275 (Feb. 3, 2000) ................................................................ 9

65 Fed. Reg. 16,828 (Mar. 30, 2000) ........................................................... 9

68 Fed. Reg. 66,744 (Nov. 28, 2003) ........................................................... 9

71 Fed. Reg. 43,926 (Aug. 2, 2006) .............................................................. 9

73 Fed. Reg. 28,306 (May 15, 2008) ..................................................... 10, 46

73 Fed. Reg. 76,249 (Dec. 16, 2008) .......................................................... 10

75 Fed. Reg. 76,086 (Dec. 7, 2010) ....................................................... 38, 40

76 Fed. Reg. 47,010 (Aug. 3, 2011) ................................................... 4, 9, 21

78 Fed. Reg. 11,766 (Feb. 20, 2013) ........................................................... 10

78 Fed. Reg. 35,364 (June 12, 2013) ..................................................... 21, 22

vi

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

78 Fed. Reg. 75,488 (Dec. 12, 2013) .......................................................... 22

80 Fed. Reg. 48,172 (Aug. 11, 2015) .......................................................... 36

81 Fed. Reg. 47,240 (July 20, 2016) ............................................................ 22

81 Fed. Reg. 52,275 (Aug. 5, 2016) .............................................................. 9

84 Fed Reg. 37,442 (July 31, 2019) ............................................................. 22

84 Fed. Reg. 46,788 (Sept. 5, 2019) ............................................................ 22

**Legislative History**

139 Cong. Rec. S15321-01 (Nov. 8, 1993) .................................................. 36

139 Cong. Rec. S15326 (Nov. 8, 1993) ...................................................... 36

140 Cong. Rec. S3288-01 (Mar. 21, 1994) ................................................. 36

140 Cong. Rec. S3293 (Mar. 21, 1994) ...................................................... 36

H.R. Rep. No. 97-228, *reprinted in* 1981 U.S.C.C.A.N. 1458 ......................... 17

H.R. Rep. No. 100-970, *reprinted in* 1988 U.S.C.C.A.N. 6154 ...................... 34

S. Rep. 103-220 (1994), *reprinted in* 1994 U.S.C.C.A.N 518 ....................... 36

**Other Authorities**

Joshua Partlow, *A 'carbon bomb' or desperately needed energy? Alaskan village holds key to Biden's climate policy*, The Washington Post (June 26, 2022) ............................................................................................... 3

List of Incidental Harassment Authorizations in Alaska, U.S. Fish & Wildlife Serv., https://www.fws.gov/node/265192 (last visited June 30, 2022) ................................................................................................... 39

# I. INTRODUCTION

Since 1993, the U.S. Fish and Wildlife Service (the "Service") has repeatedly promulgated multi-year regulations under the Marine Mammal Protection Act ("MMPA") to allow the unintentional, non-lethal take of small numbers of polar bears and Pacific walruses incidental to lawfully permitted oil and gas activities in the Beaufort Sea and nearshore areas of Alaska's North Slope. The Alaska Oil and Gas Association ("AOGA"), on behalf of its members, has voluntarily requested these regulations in an effort to establish a comprehensive, predictable, and effective regulatory framework for authorizing, mitigating, and monitoring incidental take.[1] The set of incidental take regulations ("ITR") challenged in this lawsuit is the 10th in the decades-long series of Beaufort Sea ITRs addressing incidental take from North Slope oil and gas activities.

Petitioning for an ITR is a substantial undertaking that requires extensive data production and analyses by North Slope operators and AOGA. The alternative to this regulatory program is for individual operators to obtain one-year incidental harassment authorizations ("IHAs") for their specific projects or annual activities, which is also allowed by the MMPA.[2] However, AOGA and its members have proactively chosen, over many decades, to utilize the MMPA's ITR process in the interest of efficiently

---

[1] *See* 16 U.S.C. § 1371(a)(5)(A).

[2] *See* 16 U.S.C. § 1371(a)(5)(D).

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

assessing activities over multi-year periods and developing a uniform suite of mitigation and monitoring measures that can be effectively and consistently used by operators across the region.

This regulatory program—which is unparalleled in the history of the MMPA—is demonstrably and unquestionably successful. Based on nearly 30 years of experience, monitoring, reporting, study, and analysis, the Service has determined that "the documented impacts of incidental take by Industry activity in the Beaufort Sea ITR region affected only small numbers of bears, were primarily short-term changes to behavior, and had no long-term impacts on individuals and no impacts on the [Southern Beaufort Sea] polar bear population, or the global population."[3] Moreover, the mitigation measures, as designed and improved over the decades, "have proven effective at reducing human-polar bear encounters and the risks to bears and humans when encounters occur."[4]

Despite this proven record of success, environmental advocacy organizations—including some of the Plaintiffs—have repeatedly challenged Arctic ITRs as a tactic to advance their policy goals of impeding or preventing oil and gas development activities

---

[3] BSITR0013781.

[4] BSITR0002391; *see Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 908-09 (9th Cir. 2012) ("*Salazar*") ("[T]he overall record supports the Service's conclusion that the mitigation and monitoring measures are effective." (referencing previous Beaufort Sea and Chukchi Sea ITRs)).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG        2

on Alaska's North Slope.[5] After the first seven Arctic ITRs went uncontested, Plaintiffs,

in 2007, began their series of challenges to ITRs issued for the Beaufort Sea and Chukchi

Sea regions, asserting a variety of MMPA, Endangered Species Act ("ESA"), and

National Environmental Policy Act ("NEPA") claims. In three prior lawsuits, the Alaska

District Court and the Ninth Circuit Court of Appeals rejected every claim asserted by

Plaintiffs.[6] Here, in this fourth attempt to advance their policy goals, Plaintiffs again lob

an assortment of MMPA, ESA, and NEPA claims that second-guess the Service's

judgment and misconstrue the law.

AOGA intervened in this case to defend the Beaufort Sea ITR program against

claims that are irreconcilable with applicable law, previous rulings by this Court and the

Ninth Circuit, and the extensive record supporting the Service's findings. Here, the

Service, in promulgating the challenged ITR, employed a methodology that *overestimates*

600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*
STOEL RIVES LLP

---

[5] For example, "'My hope is that Willow dies a death by a thousand cuts,' said Bridget Psarianos, a staff attorney at Trustees for Alaska which represented plaintiffs suing over Willow." Joshua Partlow, *A 'carbon bomb' or desperately needed energy? Alaskan village holds key to Biden's climate policy*, The Washington Post (June 26, 2022), https://www.washingtonpost.com/climate-environment/2022/06/26/fast-warming-alaskan-village-fate-bidens-climate-policy-could-be-decided/.

[6] *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009) ("*Kempthorne*") (upholding 2006-11 Beaufort Sea ITR); *Salazar*, 695 F.3d 893 (upholding 2008-13 Chukchi Sea ITR); *Alaska Wilderness League v. Jewell*, 116 F. Supp. 3d 958 (D. Alaska 2015) (upholding 2013-18 Chukchi Sea ITR), *vacated as moot by* 637 F. App'x 976 (9th Cir. 2015).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                3

the potential for polar bear harassment by North Slope activities.[7] The Service's

modeling analysis relies on numerous conservative and precautionary assumptions, and

thereby projects potential harassment events in excess of what has actually been observed

over decades of monitoring. This overestimation is not a new occurrence (in the past,

actual harassments have been far fewer than predicted)[8], and it is not an approach that

AOGA endorses. Nevertheless, it does show that the agency decisions challenged by

Plaintiffs are highly conservative.

Even with the precautionary estimates and analyses used by the Service, the

record demonstrates that the Service evaluated all of the data before it, considered and

transparently disclosed all of the results of its modeling in extraordinary detail, and

reached well-supported determinations that the authorized take would affect no more than

"small numbers" of polar bears and have no more than a "negligible impact." The record

also shows that the comprehensive suite of mitigation measures included in the ITR—

which builds upon previous ITR measures to include new requirements—will ensure the

"least practicable impact" on polar bears. Plaintiffs' challenges to these determinations

---

[7] *See* BSITR0017840 (AOGA comment letter).

[8] In the 2011-16 Beaufort Sea ITR, the Service authorized 150 annual Level B harassments (750 total), and, during that period, an average of 13.6 Level B harassments were observed each year (68 total). In the 2016-21 Beaufort Sea ITR, the Service authorized 68 annual Level B harassments (340 total), and, during that period, an average of 14.0 Level B harassments were observed each year (70 total). *See* BSITR0000751; BSITR0013793; 76 Fed. Reg. 47,010, 47,041 (Aug. 3, 2011).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          4

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

both misconstrue the MMPA and quibble with the Service's interpretations of data and the results produced by the Service's own conservative modeling. Plaintiffs' ESA and NEPA claims are similarly misguided and repeat arguments that have already been rejected in previous cases.

In the last challenge to a Beaufort Sea ITR, the Ninth Circuit "grant[ed] the Service great deference as it made a scientific prediction within the scope of its technical expertise."[9] This Court should grant the same deference and reach the same conclusion, upholding the Beaufort Sea ITR. AOGA respectfully requests that the Court deny Plaintiffs' motion for summary judgment and grant the cross-motions for summary judgment of the Federal Defendants, the State of Alaska, and AOGA.

## II. BACKGROUND

### A. Relevant MMPA Standards.

The MMPA generally prohibits the "taking" of marine mammals, which means to "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."[10] "Level A harassment" is defined as "any act of pursuit, torment, or annoyance which … has the potential to *injure* a marine mammal or marine mammal stock in the wild."[11] "Level B harassment" means "any act of pursuit, torment, or

---

[9] *Kempthorne*, 588 F.3d at 712.

[10] 16 U.S.C. § 1362(13).

[11] *Id.* § 1362(18)(A)(i) (emphasis added).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG 5

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

annoyance which … has the potential to *disturb* a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering."[12]

The MMPA contains various exceptions to the take prohibition that apply to commercial fisheries, non-fishing activities, research activities, and acts in defense of human life or property. Section 101(a)(5) of the MMPA provides the two primary mechanisms for authorizing marine mammal take *incidental* to non-fishing activities: (1) IHAs, which are direct authorizations of harassment incidental to a "specified activity" "for periods of *not more than 1 year*";[13] and (2) ITRs, which are regulations applicable to a "specified activity" under which the Service "shall allow, during periods of *not more than five consecutive years each*," incidental marine mammal take.[14] After an ITR is issued, the subsequent take authorizations are accomplished through the issuance of letters of authorization ("LOAs").[15] Certain statutory conditions apply to both IHAs and ITRs, including:

---

[12] *Id*. § 1362(18)(A)(ii) (emphasis added).

[13] *Id*. § 1371(a)(5)(D)(i) (emphasis added).

[14] *Id*. § 1371(a)(5)(A)(i) (emphasis added).

[15] 50 C.F.R. § 18.27(b).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG              6

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

- Both may only be issued "[u]pon request therefor by citizens of the United States" who engage in the "specified activity" (*i.e.*, they cannot be unilaterally issued by the Service);[16]

- Both may only result in the taking of "small numbers of marine mammals of a species or a population stock";[17] and

- Both must specify "other means of effecting the least practicable adverse impact on such species or stock and its habitat" as well as "monitoring and reporting" requirements.[18]

Additionally, the Service must find that the "harassment during each [one-year] period concerned" (for IHAs), or the "total of such taking during each five-year (or less) period concerned" (for ITRs), "will have a negligible impact on such species or stock."[19] For ITRs, the Service has defined "negligible impact" as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."[20]

---

[16] *Id*. § 1371(a)(5)(A)(i), (a)(5)(D)(i).

[17] *Id*. § 1371(a)(5)(A)(i), (a)(5)(D)(i).

[18] *Id*. § 1371(a)(5)(A)(i)(II)(aa), (a)(5)(D)(ii)(I).

[19] *Id*. § 1371(a)(5)(A)(i)(I), (a)(5)(D)(i)(I).

[20] 50 C.F.R. § 18.27(c).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          7

Through these mechanisms, the Service authorizes only *incidental take*, not the underlying activities. As the Ninth Circuit has explained, "the incidental take regulations do not authorize, or 'permit,' the actual activities associated with oil and gas exploration in the [ITR region]; they simply shield the proposed activities from take liability under the MMPA.... Other federal and state agencies are responsible for permitting oil and gas activities on waters and lands within their jurisdiction."[21]

## B. Factual History.

The Beaufort Sea ITR region encompasses lands on the North Slope and adjacent waters of the Beaufort Sea, extending from Point Barrow on the west to the boundary of the Arctic National Wildlife Refuge ("ANWR") on the east.[22] Only 7% of the ITR area is estimated to be affected by industry activities,[23] and no lands or waters within the boundaries of ANWR are included in the area.[24]

Since 1993, the oil and gas industry has requested, and the Service has issued, a series of nine ITRs (not including the present ITR) allowing the incidental take of small numbers of polar bears and Pacific walruses incidental to oil and gas exploration,

---

[21] *Salazar*, 695 F.3d at 916 (internal quotation marks and citations omitted).

[22] BSITR0002367.

[23] BSITR0002422.

[24] BSITR0002367, 2453.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          8

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

development, and production activities in the Beaufort Sea and adjacent North Slope.[25]

Based on the extensive mitigation and monitoring that has been employed over the

decades-long ITR program, the Service has found that the "[d]ocumented impacts on

polar bears by the oil and gas Industry during the past 40 years appear to be minimal."[26]

In fact, the collected data show that 94% of polar bear sightings near Beaufort Sea region

facilities result in no Level B harassment.[27] Out of the remaining 6% of all polar bear

sightings, approximately 14 polar bear Level B harassments are observed, on average,

each year.[28] These instances of harassment are limited to short-term behavioral changes

that do not have any consequence on polar bear survival and recruitment.[29] Instances of

Level A harassment of polar bears are "exceedingly rare"—only a single Level A

harassment was observed in the Beaufort ITR region during the 2012-18 time period, and

that event resulted from a non-industry activity associated with defense of human life.[30]

[25] *See* 58 Fed. Reg. 60,402 (Nov. 16, 1993); 60 Fed. Reg. 42,805 (Aug. 17, 1995); 64 Fed. Reg. 4,328 (Jan. 28, 1999); 65 Fed. Reg. 5,275 (Feb. 3, 2000); 65 Fed. Reg. 16,828 (Mar. 30, 2000); 68 Fed. Reg. 66,744 (Nov. 28, 2003); 71 Fed. Reg. 43,926 (Aug. 2, 2006); 76 Fed. Reg. 47,010; 81 Fed. Reg. 52,275 (Aug. 5, 2016).

[26] BSITR0002276.

[27] BSITR0000741.

[28] BSITR0000751.

[29] BSITR0002422.

[30] BSITR0002396.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                    9

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

Consistent with this history, when the Service listed the polar bear as a "threatened" species in 2008, it found that "these [incidental take mitigation] provisions under the MMPA have often proven to be beneficial to the conservation of marine mammals such as the polar bear."[31] It also determined that "[o]il and gas exploration, development, and production activities do *not* threaten the [polar bear] species throughout all or a significant portion of its range."[32] In its related "4(d) rule" for the polar bear, the Service performed a detailed evaluation of the Arctic ITR programs and concluded that the "[d]ata provided by the required monitoring and reporting programs in the Beaufort Sea and in the Chukchi Sea show that mitigation measures successfully minimized effects on polar bears."[33] The D.C. District Court agreed with the Service's conclusion, finding the ITR programs to be "necessary and advisable to provide for the conservation of the polar bear."[34]

---

[31] 73 Fed. Reg. 28,306, 28,314 (May 15, 2008).

[32] BSITR0008266 (emphasis added).

[33] 73 Fed. Reg. 76,249, 76,254 (Dec. 16, 2008); *see also* 78 Fed. Reg. 11,766, 11,772 (Feb. 20, 2013) (reissuing 4(d) rule and recognizing that mitigation measures employed by the oil and gas industry "have ensured that industry effects on polar bears have remained at the negligible level").

[34] *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 818 F. Supp. 2d 214, 233 (D.D.C. 2011).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

Subsistence harvesting is the greatest source of human-caused mortality for polar bears.[35] "From 2016 to 2020, the total reported removal of SBS polar bears in Alaska within and around the ITR region was 124 bears, all of which were associated with subsistence harvest by Alaska natives."[36] Since 1968, only three polar bears have died as a result of interaction with the North Slope oil and gas industry, all involving adult bears and acts in defense of human life (*i.e.*, not incidental Level A harassment).[37] Intentional take conducted in defense of human life is authorized under a different provision of the MMPA.[38]

**C.    AOGA's Petition and the Service's Conservative Take Analysis.**

Consistent with prior practice, AOGA initially submitted a draft ITR petition in December 2019, requesting that the Service develop a new Beaufort Sea ITR to supersede the 2016-21 ITR upon expiration.[39] After several rounds of meetings with the Service, coordination with AOGA's members, and revisions to the petition, on March 9,

---

[35] BSITR0002390.

[36] BSITR0018591.

[37] BSITR0013781.

[38] *See* 16 U.S.C. § 1371(c) (taking in defense of self or others); 50 C.F.R. § 18.34 (Guidelines for use in safely deterring polar bears).

[39] BSITR0000003. Plaintiffs mistakenly contend that the Service "unlawfully approved the incidental take by harassment of SBS polar bears from oil and gas activities in the 2016-2021 Beaufort Sea [ITR]." Dkt. 31 at 1. The 2016-21 ITR expired in August 2021.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                11

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

2021, AOGA submitted a final petition formally requesting that the Service promulgate a new ITR.[40] Like previous ITRs, the activities included in the petition cover all reasonably foreseeable oil and gas exploration, development, production, and associated support activities in the Beaufort Sea region, from August 2021 to August 2026.[41]

Based upon a detailed evaluation of thousands of polar bear sightings and behavioral responses recorded over the most recent decade of polar bear monitoring records, as well as a comprehensive assessment of anticipated industry activities over the next five-year period, AOGA's petition requested incidental Level B harassment authorization of 30 polar bears per year and a total of 150 bears over the 2021-26 period.[42] This estimate and request erred on the side of being conservatively high because, *inter alia*, (i) in only three years since 2009 have more than 20 annual Level B harassments of polar bears been documented, (ii) the average number of polar bear Level B harassment events observed annually is 14, and (iii) sighting instances that may not have resulted in biologically significant behavioral changes were conservatively categorized as Level B harassment for purposes of estimation.[43]

---

[40] *See* BSITR0000141 (June 2020 Second Draft Petition); BSITR0000613 (Final Petition); BSITR0002447 (final ITR noting revisions to the draft petition to reduce impacts on polar bears).

[41] BSITR0000624.

[42] *See* BSITR0000750-63.

[43] *See* BSITR0000762.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG            12

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

AOGA's petition did not request authorization for Level A harassment because it concluded that Level A harassment is unlikely to occur over the five-year period based upon an additional detailed evaluation of the observational record and a review of the most relevant scientific papers.[44] The assessment of the observational record includes a close examination of the only six instances of polar bear denning that have occurred in close proximity to industry facilities since 2009. This examination is summarized in the petition and assessed in detail in an appendix to the petition.[45] In none of the six instances did any harassment occur (much less Level A harassment). In five of the instances the bears successfully denned, and in the sixth instance the bear left the den of its own accord and did not birth cubs.[46]

As part of its evaluation of AOGA's petition, the Service employed a newly created predictive model to estimate annual take of polar bears for each of the five years of the ITR.[47] The Service's model is more conservative than the already-conservative methodology used in AOGA's petition to estimate incidental take.[48] For example, the Service's model "analyzed the most impactful scenario that was possible" and

---

[44] *See* BSITR0000763-71.

[45] *See* BSITR0000769-70 (Petition); BSITR0000853-77 (Appendix).

[46] *See* BSITR0000859-74.

[47] BSITR0002401-16.

[48] *See* BSITR0001829-32 (AOGA comment letter).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          13

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

conservatively assumed certain activities would occur each of the five years even though those activities will not occur each year.[49] The Service's model used the upper 99th percentile of each probability distribution (*i.e.*, to assume the highest possible risk) as well as data from case studies of polar bear disruptions associated with scientific research activities in which bears are intentionally disturbed and captured (in contrast to industry activities that *avoid* polar bears).[50] The Service's model also does not account for all mitigation measures in the ITR, which demonstrably reduce the probability of any disturbance to polar bears.[51]

On August 5, 2021, the Service issued the final ITR, effective for a five-year period through August 5, 2026.[52] Consistent with AOGA's petition, the final ITR authorizes only Level B harassment of polar bears and walruses (albeit in amounts more than AOGA requested). The Service also evaluated the potential for Level A harassment and concluded it was unlikely to occur (consistent with all previous ITRs).

---

[49] BSITR0002414.

[50] BSITR0017843-45.

[51] *See* BSITR0002430 ("The Service further notes that the mitigative effect of certain measures described in AOGA's request—i.e., avoidance of steep slopes and use of trained observers to clear potential denning areas prior to road construction—could not be reliably quantified and thus integrated into the Service's modelling analysis, but may further reduce the probability of den disturbance.").

[52] BSITR0002365-2457.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          14

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

# III.  STANDARD OF REVIEW

The Administrative Procedure Act ("APA") directs courts to "hold unlawful and set aside" an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[53] "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."[54] Additionally, APA review is highly deferential and the agency's decision is entitled to a presumption of regularity.[55] "This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise."[56] Courts also defer to the agency's reasonable interpretations of its statutory mandates.[57]

---

[53] 5 U.S.C. § 706(2)(A).

[54] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[55] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

[56] *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

[57] *Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                    15

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main (206) 624-0900 Fax (206) 386-7500

# IV. ARGUMENT

**A.** **The Service's "Small Numbers" Determination Is Well-Supported and Consistent with Law.**

Plaintiffs' challenge to the Service's "small numbers" determination hinges on the premise that the Service *had no choice and was required by law* to sum the expected amount of incidental take over the entire five-year period of the ITR in order to determine whether the "small numbers" requirement was satisfied.[58] As explained below, this argument fails for many reasons.

The Service found that its (highly conservative) estimate of 92 annual polar bear Level B harassments during the five-year period—which equates to 10% of the estimated stock size—constitutes a "small number."[59] This Court previously upheld the National Marine Fisheries Service's ("NMFS") determination that taking 10% of the Cook Inlet beluga whale population in a single year under an IHA is a "small number."[60] Plaintiffs do not contend that 10% is not a "small number." Rather, they quibble with the method

---

[58] Dkt. 31 at 11-12.

[59] BSITR0002422; *see also* BSITR0002429 (same).

[60] *See Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1053 (D. Alaska 2013) ("Mathematically speaking, 10% represents a relatively limited or small portion of 100%.").

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG            16

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

used by the Service to make its "small numbers" determination. But "[a]n agency's scientific methodology is owed substantial deference...."[61]

The MMPA does not define the term "small numbers" or dictate how it should be applied.[62] As the Ninth Circuit explained, "Congress recognized 'the imprecision of the term "small numbers," but was unable to offer a more precise formulation because the concept *is not capable of being expressed in absolute numerical limits*.'"[63] Accordingly, the Ninth Circuit extends *Chevron* deference to an agency's reasonable interpretation of "small numbers."[64] Here, the Service provided a logical, rational explanation supporting its method of assessing "small numbers" and its determination:

> The SBS population estimate … is calculated using a number of annual metrics, including annual survival probabilities, annual number of dens, and annual denning success. The resulting value is an estimate of the number of individuals in the population in any given contemporary year. Appropriately, the Service has divided annual take estimates by the annual population estimate, to calculate a percentage of the population potentially taken for its small numbers determination. This approach best enables the Service to assess whether the number of animals taken is small relative

---

[61] *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004), *superseded on other grounds by regulation as stated in Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1260 (9th Cir. 2017).

[62] *Nat. Res. Def. Council, Inc. v. Evans*, 279 F. Supp. 2d 1129, 1147 (N.D. Cal. 2003); 16 U.S.C. § 1371(a)(5)(A).

[63] *Salazar*, 695 F.3d at 906 (emphasis in original) (quoting H.R. Rep. No. 97-228, *reprinted in* 1981 U.S.C.C.A.N. 1458, 1469).

[64] *Id.* at 907.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                    17

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

> to the species or stock. Consideration of annual estimates tracks with the use of "each" in 16 U.S.C. 1371(a)(5)(A)(i) and the use of annual LOAs to authorize the incidental take. Comparing the aggregate number of takes over 5 years with a population estimate specific to 1 year, as commenter suggests doing, is a less suitable comparison…. The Service's "small numbers" determination here is consistent with applicable law, policy, and longstanding practice.[65]

This explanation is reasonable and entitled to deference. Given that the Service was not even required to quantify the number of expected takes to support its "small numbers" determination,[66] this approach is hardly arbitrary. On this basis alone, the Court should deny Plaintiffs' claim.[67] The following additional reasons support such a denial.

*First*, the MMPA's "total take" language seized upon by Plaintiffs references the "negligible impact" standard, *not* the "small numbers" phrase that appears in the preceding statutory paragraph.[68] If Congress intended for the Service to calculate the "total" take over the five-year period when evaluating "small numbers," it would have

---

[65] BSITR0002428.

[66] *Id*. ("Nor is there anything in Section 101(a)(5)(A) that requires the Service, when promulgating incidental take regulations, to quantify or estimate the number of mammals that would be taken.").

[67] *See Kempthorne*, 588 F.3d at 712 ("Again, we grant the Service great deference as it made a scientific prediction within the scope of its technical expertise.").

[68] *Compare* 16 U.S.C. § 1371(a)(5)(A)(i)(I) *with id*. § 1371(a)(5)(A)(i).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                18

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

said so.[69] And, in any event, the Service must still consider "*annual* rates of recruitment or survival" when determining whether the "total" take authorized meets the separate "negligible impact" standard.[70]

*Second*, Plaintiffs' construction of the statute makes no sense. If the Service were required to determine "small numbers" by summing the estimated harassment across all five years of an ITR, applicants could bypass that requirement by seeking five consecutive one-year IHAs, which is lawful under the MMPA. Accepting Plaintiffs' interpretation would mean that Congress—for no apparent reason—placed more stringent requirements on "small numbers" for ITRs than for IHAs, but then created an obvious loophole to avoid that more stringent requirement. Courts reject statutory interpretations that lead to such absurd results.[71]

*Third*, the phrase "during periods *of not more than* five consecutive years each"—also seized upon by Plaintiffs—says nothing about *how* the Service must assess whether

---

[69] *See Tin Cup, LLC v. U.S. Army Corps of Eng'rs*, 904 F.3d 1068, 1073 (9th Cir. 2018) ("When Congress uses particular language in one part of a statute and omits it elsewhere, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and citation omitted)).

[70] 50 C.F.R. § 18.27(c) (emphasis added).

[71] *See United States v. Turkette*, 452 U.S. 576, 580 (1981) ("In determining the scope of a statute … absurd results are to be avoided…."); *United States v. LKAV*, 712 F.3d 436, 444 (9th Cir. 2013) ("We must avoid [a statutory] interpretation that would produce absurd results." (internal quotations and citation omitted)).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          19

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

"small numbers" of animals are taken during that period.[72] If Plaintiffs' formulation were true, then the Service could issue a series of one-year ITRs to bypass a requirement that take must be summed over a longer multi-year ITR. Again, this construction of the statute would lead to an absurd result.

*Fourth*, Plaintiffs make a last-ditch attempt to characterize the Service's interpretation and application of the MMPA as a "reversal in policy" subject to the standards in *F.C.C. v. Fox Television Stations, Inc.*[73] But the Service's *interpretation* of the MMPA is viewed through the *Chevron* framework,[74] and is not a "change in a published regulation or official policy" subject to the *Fox* framework.[75] In any event, Plaintiffs' so-called "change in policy" is just a mischaracterization of the Service's prior polar bear ITRs.

As the Service states, it "has always relied on *annual* estimates based on encounters during previous years and the proportion of those individuals that experienced take by Level B harassment."[76] Indeed, the language cited by Plaintiffs from the 2016 Beaufort Sea ITR appears nearly verbatim in the 2021 ITR, despite what Plaintiffs' claim

---

[72] 16 U.S.C. § 1371(a)(5)(A)(i) (emphasis added).

[73] 556 U.S. 502 (2009); Dkt. 31 at 16-20.

[74] 467 U.S. at 843.

[75] *Sierra Club v. BLM*, 786 F.3d 1219, 1226 (9th Cir. 2015).

[76] BSITR0002428 (emphasis added).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

is a "reversal in policy" in the 2021 ITR.[77] Also like the 2021 ITR, the 2016 ITR

repeatedly used annual metrics to reach the "small numbers" determination.[78] Similarly,

in the 2011 Beaufort Sea ITR, the Service's "small numbers" finding is based on the

Service's determination that previous takes "average[d] 66 occurrences *per year*"

(intentional deterrence and incidental Level B harassment combined) and that takes

during the 2011-16 period "will not exceed 150 *per year*."[79] The Service also based its

2013-18 Chukchi Sea ITR on estimated annual take: "The estimated total Level B

incidental take for polar bears is expected to be *25 animals per year*.... This number is

less than 1 percent of the estimated combined populations of the CS and SBS polar bear

stocks (approximately 2,000 and 1,500, respectively)."[80] The Chukchi ITR's "small

numbers" finding explained that "[o]verall, *these takes (25 annually)* are not expected to

result in adverse effects that will influence population-level reproduction, recruitment, or

---

[77] *Compare* Dkt. 31 at 17-18 (quoting 2016-21 ITR), *with* BSITR0002422 ("We conclude that over the 5-year period of this ITR, Industry activities will result in a similarly small number of incidental harassments of polar bears.").

[78] *See* BSITR0013793 (small numbers finding relying on annual observations and estimated takes "per year"); BSITR0013775 (considering Alaska native subsistence harvest of 36 to 20 SBS polar bears annually).

[79] 76 Fed. Reg. at 47,041 (emphasis added); *see also id.* at 47,039 (concluding only small numbers of polar bears will be taken based on the *annual* distribution and abundance of polar bears in the Beaufort Sea ITR region).

[80] 78 Fed. Reg. 35,364, 35,400-01 (June 12, 2013) (emphasis added).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                21

survival."[81] Finally, Plaintiffs ignore that the Service's sister agency, NMFS, also calculates "small numbers" in ITRs using *annual* take as a percentage of the population.[82] Plaintiffs' "reversal in policy" arguments should therefore be rejected.

In sum, in the absence of statutory direction, the Service, as the expert agency, may determine whether it will evaluate "small numbers" on an annual basis or by any other rational method. The Service's reasoned application here is fully consistent with the MMPA and prior case law, and is entitled to deference.[83]

## B.    Plaintiffs' Arguments About Level A Harassment Should Be Rejected.

Plaintiffs assert a series of three arguments that collectively amount to a challenge to the Service's determinations regarding the potential for Level A harassment.[84] In asserting these arguments, Plaintiffs do not dispute that the Service used the "best

---

[81] *Id.* at 35,401 (emphasis added). Plaintiffs' arguments about the 2013 Chukchi ITR misleadingly rely on a response to comment taken out of context, not the actual findings made by the Service.

[82] *See* 84 Fed Reg. 37,442, 37,491 (July 31, 2019) (Cook Inlet ITR); 84 Fed. Reg. 46,788, 46,817 (Sept. 5, 2019) (ITR for Alaska Fisheries Science Center); 81 Fed. Reg. 47,240, 47,269 (July 20, 2016) (Cook Inlet ITR); 78 Fed. Reg. 75,488, 75,503 (Dec. 12, 2013) (Beaufort Sea ITR).

[83] *See Salazar*, 695 F.3d at 907-08 (upholding "small numbers" finding); *Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1052 (same); *Alaska Wilderness League*, 116 F. Supp. 3d at 970 (finding the Service "presented a reasoned analysis for its small numbers determination based on the record before it").

[84] Dkt. 31 at 20-33.

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

available scientific information."[85] They do not identify any information that the Service did not consider, including the information they provided from their contracted consultant, which was rationally addressed by the Service in its responses to comments. Plaintiffs do not dispute that in *none* of the previous nine Beaufort Sea ITRs (or the three Chukchi Sea ITRs) did the Service see fit to authorize Level A harassment. Nor was that decision challenged in any of Plaintiffs' three previous (unsuccessful) challenges to prior ITRs.

Plaintiffs ultimately just disagree with the Service's rational interpretations of the MMPA and its own regulations (such as the definition of "negligible impact"), its choice of methods for evaluating indisputably technical and scientific information, and its interpretation of the results of its own modeling and methods. But the Service is entitled to deference both when it reasonably interprets and administers a statute and its own implementing regulations and "when the agency is making predictions, within its area of special expertise, at the frontiers of science."[86] Plaintiffs' arguments should be rejected.

---

[85] 50 C.F.R. § 18.27(e)(2).

[86] *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (internal quotation marks and citation omitted).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                23

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

1.     **The Service Used a Reasonable Method for Evaluating Whether Certain Types of Harassment Would Have Effects on Annual Rates of Recruitment or Survival.**

Plaintiffs contend that the Service's consideration of "serious" and "non-serious" Level A harassment was an unlawful effort to "conceal the high probability of Level A harassment occurring."[87] Initially, Plaintiffs provide no evidence of the Service's supposed plot to "conceal" information. "[M]ere allegations of bad faith are inadequate to overcome the presumption of regularity accorded to agency action."[88] Besides, the facts contradict Plaintiffs' accusation. In the proposed and final rules, the Service "provided all of the output data from the simulations as part of the proposed rule to be transparent and allow commenters to see for themselves where take comes from."[89] Transparently disclosing all modeling methods, analyses, and results in great detail is not "concealing" information.[90]

Plaintiffs' baseless allegation aside, their complaint merely disagrees with the Service's interpretation and application of the MMPA and its own regulations. Plaintiffs claim the Service cannot distinguish between types of Level A harassment because the MMPA does not expressly do so and that "agencies 'are not free to add text to a statute

---

[87] Dkt. 31 at 20.

[88] *Mayor & City Council of Baltimore v. Trump*, 429 F. Supp. 3d 128, 138 (D. Md. 2019) (citing *Mullins v. U.S. Dep't of Energy*, 50 F.3d 990, 993 (Fed. Cir. 1995)).

[89] BSITR0002427.

[90] BSITR0002397-2416.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          24

that is not there.'"[91] But Plaintiffs omit the context for this quote. The case cited by

Plaintiffs actually states that *courts* (not agencies) may not "add text to a statute."[92]

*Agencies*, on the other hand, are routinely called upon to fill gaps in statutes left

implicitly or explicitly by Congress.[93] This is a basic tenet of administrative law.[94]

Here, in the absence of a statutory definition for "negligible impact," the Service

implemented a regulation (not challenged by Plaintiffs) defining "negligible impact" as

"an impact resulting from the specified activity that cannot be reasonably expected to,

and is not reasonably likely to, adversely affect the species or stock through effects on

annual rates of recruitment or survival."[95] In its evaluation of AOGA's petition, the

Service analyzed potential effects on "annual rates of recruitment or survival" by

considering the potential for both "non-serious" and "serious" Level A harassment

because "[n]ot all Level A harassment events affect annual rates of survival."[96]

---

[91] Dkt. 31 at 21 (quoting *United States v. Washington*, 994 F.3d 994, 1016 (9th Cir. 2021)).

[92] *Washington*, 994 F.3d at 1016 (court's use of "we," not "agencies").

[93] *Chevron*, 467 U.S. at 843-44 (citing *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).

[94] *Id.* at 843 ("[T]he question for the court is whether the agency's answer is based on a permissible construction of the statute"); *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 276-77 (2016).

[95] 50 C.F.R. § 18.27(c).

[96] BSITR0002430, 2396.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          25

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

Categorizing "serious" Level A harassment "as an injury that is likely to result in mortality" (and thus affect "annual rates of recruitment or survival") is not novel.[97] The term "serious injury" repeatedly appears in the MMPA and is a specific metric that both the Service and NMFS must address as part of the annual stock assessment reporting process.[98] It is also a specific term used in the regulatory guidelines for safely deterring polar bears.[99] NMFS has defined the term by regulation—"[s]erious injury means any injury that will likely result in mortality"[100]—and has also used this criterion when evaluating "negligible impact" for purposes of issuing ITRs.[101] Moreover, courts have upheld the use of comparable measures in similar circumstances.[102]

Although Plaintiffs' consultant would have preferred the Service to lump together different types of impacts, the Service's more-informed approach allowed for a refined evaluation of the types of effects that either would or would not affect "annual rates of recruitment or survival." "[A]n agency must have discretion to rely on the reasonable

---

[97] BSITR0002430.

[98] *See* 16 U.S.C. § 1386.

[99] *See* 50 C.F.R. § 18.34.

[100] 50 C.F.R. § 216.3.

[101] *See* BSITR0015685-86 (ITR for Liberty Project).

[102] *See, e.g.*, *Humane Soc'y of U.S. v. Bryson*, 924 F. Supp. 2d 1228, 1244-46 (D. Or. 2013) (upholding NMFS's use of "significant negative impact" criterium even though it is undefined in the ESA and MMPA).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                26

opinions of its own qualified experts...."[103] The Service's method for evaluating the potential for both "serious" and "non-serious" Level A harassment is reasonable and entitled to deference.

## 2. The Service's "Negligible Impact" Determination Is Well-Supported and Consistent with Law.

Plaintiffs next allege that the Service "refused to consider" and "failed to evaluate" potential impacts from serious and non-serious Level A harassment in reaching its "negligible impact" determination.[104] But the Service plainly did "consider" and "evaluate" potential Level A harassment effects, as evidenced by the pages of modeling analyses and reporting in the Final Rule—*i.e.*, the very results Plaintiffs use as the basis for their claim.[105] "A negligible impact finding is arbitrary and capricious under the MMPA only if the agency[, inter alia,] … entirely failed to consider an important aspect of the problem…."[106] Here, there is no aspect of the problem that was not considered by the Service, and Plaintiffs' challenge to the Service's well-supported and reasoned "negligible impact" finding should be denied on this basis alone.

---

[103] *Tongass Conservation Soc'y v. U.S. Forest Serv.*, No. 3:010-CV-00006-TMB, 2010 WL 11534489, at *2 (D. Alaska Mar. 8, 2010) (quoting *Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008)), *aff'd*, 385 F. App'x 708 (9th Cir. 2010).

[104] Dkt. 31 at 23.

[105] BSITR0002397-2416.

[106] *Kempthorne*, 588 F.3d at 710 (brackets and ellipses in original; internal quotation marks and citation omitted).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                27

Nonetheless, Plaintiffs' contention is just a disagreement with the Service's scientific assessment and interpretation of the results of its own model. Plaintiffs believe the Service should have concluded there would be one annual polar bear Level A harassment whereas the Service determined it was more likely there would be zero annual Level A harassments. Plaintiffs' argument reflects a classic disagreement with an expert agency's technical assessments and determinations for which "traditional deference to the agency is at its highest."[107] Plaintiffs' argument should also be rejected for this and the following reasons.

Plaintiffs' claim centers on the Service's assessment of the potential impacts of industry activities on denning bears and their cubs. This topic is not new to the Service or the courts. In its opinion upholding the 2006 Beaufort Sea ITR, the Ninth Circuit explained:

> [F]rom 1993 to 2004, there were more than 700 sightings of polar bears related to industrial activities. More recently, sightings have increased. Production facilities may negatively affect denning females, with industrial noise causing females to abandon their dens prematurely and endanger their offspring. However, industrial noise-producing activity may need to be very close to the den to cause such a response, and bears may even acclimate to such noises. The Service found that the impact would likely be consistent with that during previous periods of regulation. The impact would be negligible....
>
> ....

---

[107] *Locke*, 776 F.3d at 994.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                28

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

> [T]he seriousness of industrial disturbance impacts is subject to legitimate scientific dispute.[108]

In the present ITR, the Service evaluated these potential effects and reached a negligible impact determination based on multiple factors and lines of evidence—*e.g.*, "the best scientific information available, the results of Industry monitoring data from previous ITRs, the review of the information generated by the listing of the polar bear as a threatened species and the designation of polar bear critical habitat, the results of [its] modeling, and the status of the species and stocks."[109] Plaintiffs single out, and disagree with, one of the factors considered by the Service—the results of its modeling.

The crux of Plaintiffs' disagreement is that they think the Service should have used the statistical *mean* result of the model, which showed a potential for 1.2 annual Level A polar bear harassments, instead of the statistical *median* result of the model, which showed 0.0 annual Level A polar bear harassments. But the Service explained that a heavy skew in the data—showing a "high number of iterations where 0 take is estimated"[110]—"led to a mean value that is not representative of the most common model result."[111] The Service further explained:

---

108 *Kempthorne*, 588 F.3d at 706, 711 (deferring to Service and upholding ITRs).

109 BSITR0002423.

110 BSITR0002427.

111 BSITR0002414.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                29

We disagree that the mean is the appropriate metric to
consider when estimating the expected level of take
associated with the proposed activities. Means are the
appropriate measure of central tendency when data are
normally distributed or some other symmetric distribution. In
these cases, the mean and median are nearly the same.
However, when the data are significantly skewed, as our
results are, the median is a more appropriate informative
measure of the central tendency in the data.[112]

Although Plaintiffs would have interpreted the data differently, the Service is the expert

agency, its explanation is rational, and it is entitled to deference on this technical issue.[113]

All of Plaintiffs' Level A arguments hinge on this single statistical disagreement and

should therefore be denied.

Plaintiffs next argue, relying solely on the mean 46% probability of Level A

harassment occurring in each year of the ITR, that the Service misapplied its regulatory

definition for "negligible impact" because this percentage reflects a "reasonably likely"

occurrence.[114] But this argument continues to ignore the fact that the Service determined

the *median* modeling result was more representative than the mean when predicting the

likelihood of Level A harassment. Plaintiffs also ignore the other factors considered by

---

[112] BSITR0002427.

[113] *See Ariz. Cattle Growers'*, 273 F.3d at 1236 ("Deference is particularly
important when the agency is making predictions, within its area of special expertise, at
the frontiers of science." (internal quotation marks and citation omitted)); *Tongass
Conservation Soc'y*, 2010 WL 11534489, at *2 ("[A]n agency must have discretion to
rely on the reasonable opinions of its own qualified experts….").

[114] Dkt. 31 at 23.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                30

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

the Service in reaching its conclusion, such as the lack of observed Level A harassment over many years of monitoring reports,[115] the fact that the model does not consider the beneficial effects of mitigation measures that "may further reduce the probability of den disturbance,"[116] and the fact that the model represents the "most impactful scenario that was possible" by relying on certain conservative assumptions.[117] Moreover, Plaintiffs misconstrue the Service's regulation in contending that it required the Service to determine whether "take is 'reasonably likely' to occur" based on a single metric (mean probability). In contrast, the Service properly considered all available information to make a reasoned determination that, as the regulation states, the anticipated "impact" "is not reasonably likely to adversely affect ... annual rates of recruitment and survival."[118]

Next, Plaintiffs—having relied on the Service's "negligible impact" definition (albeit a misconstrued version) to advance their "reasonably likely" argument—argue that the regulation's rationale "violates the plain language of the MMPA."[119] They contend

---

[115] *See* BSITR0002423, 2396, 2433.

[116] *See* BSITR0002430 ("While the Service is always concerned with any potential for mortality to cubs, it has worked with the applicant to integrate numerous mitigation measures to further reduce the potential for such events, and it does not reasonably expect such events to affect annual rates of recruitment or survival."); BSITR0002450 ("ITRs establish important mitigation measures and provide significant conservation benefits to polar bears….").

[117] BSITR0002414.

[118] Dkt. 31 at 23 (citing 50 C.F.R. § 18.27(c)); *see* Dkt. 38 at 24-28.

[119] Dkt. 31 at 27-28.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                 31

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

that the Service was required by the MMPA to sum the mean results of its model over the entire five-year period to make its "negligible impact" determination.[120] But Plaintiffs have asserted no claim challenging the Service's "negligible impact" definition, which requires the Service to consider whether the anticipated impact is "reasonably likely to[] adversely affect ... *annual* rates of recruitment or survival."[121] The MMPA does not dictate *how* the Service must evaluate "negligible impact," and the Service's (unchallenged) regulatory definition reasonably answers that question. For all of the reasons explained by the Federal Defendants, the Service reasonably applied its own regulation and was not required to myopically premise its "negligible impact" determination on a single summed metric over all five years.[122]

Leaving no stone unturned, Plaintiffs also criticize the Service's scientific assessment of situations giving rise to potential non-serious Level A harassment, arguing that the Service somehow "flipped the burden of proof" by candidly recognizing that there are "currently no data to support that an early departure from the den itself leads to reduced survival."[123] But the Service thoroughly addressed all of the best available

---

[120] *Id.*

[121] 50 C.F.R. § 18.27(c) (emphasis added).

[122] *See* Dkt. 38 at 28-31.

[123] BSITR0002436; *see also* BSITR0002437-38 ("[N]o studies have demonstrated that cub size influences when a disturbance elicits an early emergence, and no studies

(continued . . .)

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                    32

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

scientific information on this issue, explained its conclusions, and reasonably responded to comments.[124] Additionally, ITRs are "established based on the best available scientific information" and "[a]s new information is developed, through monitoring, reporting, or research, the regulations may be modified, in whole or in part, after notice and opportunity for public review."[125] The Service was not obligated to conduct a multi-year study to collect more data before issuing the ITR, as Plaintiffs imply.[126]

Ultimately, Plaintiffs disagree with the Service's interpretation of its own modeling results and the best available scientific information, and the application of its own regulation. Their fixation on a specific statistic also fails to recognize the other results of the model (*e.g.*, the median results) and the fact that the modeling was just one of many factors considered by the Service in reaching its "negligible impact" determination.[127] The Service's "negligible impact" determination is consistent with all

---

have evaluated the relationship between cub size at emergence and survival probability in a manner that would allow us to refine our treatment of early emergences.").

[124] BSITR0002436-38, 2440, 2445.

[125] 50 C.F.R. § 18.27(e)(2); 50 C.F.R. § 18.27(b).

[126] *Jewell*, 747 F.3d at 602 ("[W]here the information is not readily available, we cannot insist on perfection: [T]he best scientific … data available, does not mean the best scientific data possible." (brackets and ellipsis in original; internal quotation marks and citation omitted); *see also* Dkt. 38 at 32-33.

[127] BSITR0002423.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          33

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

of the best available information, is fully and rationally explained, and is entitled to deference.

### 3. The Court Should Reject Plaintiffs' Attempt to Force the Service to Authorize Level A Harassment.

Finally, Plaintiffs argue that the Service was legally prohibited from issuing the Beaufort ITR because "the MMPA prohibits the authorization of take from an activity when it will cause other, unauthorized take."[128] This argument is premised on Plaintiffs' erroneous belief that Level A polar bear harassment from the activities addressed in the Beaufort ITR is "sufficiently 'certain'" to occur.[129] As set forth above, the Service rationally and lawfully determined that such harassment is *unlikely*. This third claim should be denied on that basis.

Plaintiffs' argument is also fatally flawed because it relies solely on the D.C. Circuit decision in *Kokechik Fisherman's Association*[130]—a case that was promptly *abrogated* by Congress within months after it was issued.[131] *Kokechik* involved a permit issued by NMFS pursuant to 16 U.S.C. §§ 1371(a)(2), 1373, and 1374—as those MMPA provisions existed in 1988—allowing a group of Japanese commercial fishermen to take

---

[128] Dkt. 31 at 32.

[129] *Id.*

[130] *Kokechik Fishermen's Ass'n v. Sec'y of Commerce*, 839 F.2d 795, 810-02 (D.C. Cir. 1988).

[131] *See* H.R. Rep. No. 100-970, at 18-20, 37-38, *reprinted in* 1988 U.S.C.C.A.N. 6154, 6159-61, 6178-79.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                34

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Dall's porpoises.[132] The record showed that the fishery would also take up to 450 fur seals annually, but NMFS did not authorize any fur seal take and the fur seal population was depleted.[133] In what it described as "a question of pure statutory interpretation," the court held the permit to be unlawful because the standards of 16 U.S.C. §§ 1371(a)(2), 1373, and 1374, along with other related provisions, prevented NMFS from authorizing a commercial fishery to take one species and not another species that it would otherwise indisputably take.[134] In so doing, the court recognized that these stringent standards could have been avoided if 16 U.S.C. § 1371(a)(5) —the MMPA provision applicable to AOGA's petition[135]—applied to commercial fisheries.[136] But the court held that "[i]f the Secretary believes the Act needs amendment, then it is Congress he must address."[137]

Congress did just that by promptly enacting a five-year interim exemption for commercial fisheries to allow time for a permanent solution to the *Kokechik* decision to be developed.[138] In 1994, Congress enacted a permanent replacement to the statutory

---

[132] *Kokechik*, 839 F.2d at 797-98.

[133] *Id.* at 801.

[134] *Id.* at 799-802.

[135] 16 U.S.C. § 1371(a)(5)(A) existed in 1988 in substantively the same form as it currently exists.

[136] *Kokechik*, 839 F.2d at 802.

[137] *Id.*

[138] Pub. L. No. 100-711, 102 Stat. 4755 (1988).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

provisions at issue in *Kokechik*, which established a new statutory scheme governing the incidental take of marine mammals in commercial fisheries.[139] Having addressed statutory provisions that the court expressly distinguished from the provision applicable here, 16 U.S.C. § 1371(a)(5), and which were subsequently removed and replaced by Congress, *Kokechik* is inapposite.

Setting aside the inapplicability of *Kokechik*, Plaintiffs are, in effect, seeking to force the Service to affirmatively authorize a certain type of take that was neither requested by AOGA nor found to be likely by the Service.[140] Section 101(a)(5)(A) of the MMPA only allows for the authorization of take "[u]pon request therefor by citizens of the United States."[141] Although Plaintiffs may challenge *affirmative* authorizations of incidental take issued by the Service (upon request) under the APA, they may not engage in "citizen enforcement of the Act" by using the APA as a guise for forcing the

---

[139] *See* 16 U.S.C. § 1387 (Taking of marine mammals incidental to commercial fishing operations); *see, e.g.*, 140 Cong. Rec. S3288-01, S3293 (Mar. 21, 1994); 139 Cong. Rec. S15321-01, S15326 (Nov. 8, 1993); S. Rep. 103-220, at 3 (1994), *reprinted in* 1994 U.S.C.C.A.N 518, 520; 80 Fed. Reg. 48,172, 48,173 (Aug. 11, 2015) (discussing effect of *Kokechik*).

[140] *See* BSITR0000763 ("Consistent with previous Petitions and ITRs, AOGA does not anticipate, and is not requesting that the 2021 ITRs authorize, Level A harassment of polar bears."); BSITR0002427.

[141] 16 U.S.C. § 1371(a)(5)(A)(i).

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

authorization of take that was never requested "by citizens of the United States" or found to be likely.[142] Plaintiffs' attempt to do so here should be rejected.

## C. The Mitigation Measures Required by the Service Are Reasonable and Fully Explained.

In a reprise of arguments rejected in other lawsuits, Plaintiffs are again dissatisfied with the ITR's mitigation measures. This time, Plaintiffs contend that the Service should have required (i) later start dates for seismic surveys and (ii) expanded exclusion zones around *all* potentially suitable polar bear denning habitat regardless of whether polar bear dens are present.[143] These arguments should be rejected for the following reasons.

*First*, courts have routinely found that agency determinations on the appropriateness of mitigation measures fall squarely within the agency's area of special expertise.[144] Indeed, the Ninth Circuit has twice rejected challenges to Arctic ITR mitigation measures, finding that the "the overall record supports the Service's

---

[142] *See Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1338 (9th Cir. 1992) (noting "that the MMPA does not provide for citizen enforcement of the Act"); *Nat. Res. Defense Council, Inc. v. Evans*, 279 F. Supp. 2d 1129, 1142 (N.D. Cal. 2003) ("Citizens challenging actions done under the MMPA must sue under the APA.").

[143] Dkt. 31 at 35-36.

[144] *See Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1060 ("[T]he record reflects that the agency did consider additional time-area restrictions and exercised its expertise to determine that they were not necessary."); *Gaule v. Meade*, 402 F. Supp. 2d 1078, 1087 (D. Alaska 2005) (with respect to mitigation measures, "[t]he Court is not here to substitute its judgment for that of the agency"); *Cook Inletkeeper v. Raimondo*, 533 F. Supp. 3d 739, 761 (D. Alaska 2021) (upholding ITR mitigation measures); *Alaska Wilderness League*, 116 F. Supp. 3d at 967 (same).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          37

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

conclusion that the mitigation and monitoring measures are effective."[145] Plaintiffs'

claims here are no different in form than their previous, failed claims.

*Second*, Plaintiffs' assertion that the Service relied on "a 'suite' of less protective

mitigation measures" is belied by the record.[146] The current ITR contains the same

measures as previous ITRs that have been routinely upheld by this Court and the Ninth

Circuit and "have proven to be highly successful in providing for polar bear conservation

in Alaska."[147] Contrary to Plaintiffs' suggestions, these measures *do* include spatial and

temporal restrictions that are proven to work, such as one-mile exclusion buffer zones

around known occupied polar bear dens for the duration of the denning season and

restrictions prohibiting vessels from transiting to the Beaufort Sea prior to July 1 in order

to minimize impacts to walruses and subsistence hunters.[148] The ITR also contains new,

---

[145] *Salazar*, 695 F.3d at 908; *see also Kempthorne*, 588 F.3d at 712 ("[T]he EA provides convincing reasons to believe that incidental take regulations will ameliorate the impact of takes. LOAs include mitigating guidelines that minimize disturbances to, among other things, denning females.").

[146] Dkt. 31 at 38.

[147] BSITR0008266; *Salazar*, 695 F.3d at 908 (quoting same); *see, e.g.*, 75 Fed. Reg. 76,086, 76,118-19 (Dec. 7, 2010) ("These mitigation measures are implemented to limit human-bear interactions and disturbances to bears and have ensured that industry effects on polar bears have remained at the negligible level."); *see supra* § II.B.

[148] BSITR0002455-56, 2451; *see* BSITR0002278 (noting the ITRs "impose certain mitigation and monitoring requirements such as spatial and temporary restrictions and AIR surveys"); *see* BSITR0000860-74 (documenting effectiveness of measures in six known instances of polar bear denning near facilities).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                    38

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

more stringent measures, such as enhanced polar bear den detection protocols, requiring up to *three* aerial infrared surveys to locate polar bear dens.[149]

*Third*, the sole basis for Plaintiffs' proposed measures is a *draft* IHA that was *never issued* for a proposed Kaktovik Iñupiat Corporation seismic survey in ANWR's Coastal Plain.[150] Moreover, ANWR is very different than the Beaufort ITR region. For example, ANWR contains a much higher density of denning bears than the Beaufort Sea ITR region.[151] Numerous peer-reviewed studies—including those authored by scientists cited by Plaintiffs—observe higher proportions of polar bear denning habitat and actual polar bear dens in ANWR than in the rest of the mainland coast on the North Slope.[152] Additionally, as the Service explained in detail, imposing measures for a specifically identified seismic survey in a relatively smaller region with higher polar bear den density is a far different task than creating practicable measures for a multi-year programmatic

---

[149] BSITR0002455, 2443.

[150] *See* Dkt. 31 at 35-39; BSITR0016622, 16626-29, 16650, 16655. The Service has not issued an IHA for any seismic surveys in ANWR. *See* List of Incidental Harassment Authorizations in Alaska, U.S. Fish & Wildlife Serv., https://www.fws.gov/node/265192 (last visited June 30, 2022).

[151] BSITR0018580 ("ANWR and its Coastal Plain serves [sic] as high-density denning areas," and "are not included in the [Beaufort Sea] ITR region."); *see also* BSITR0002385 (noting prevalence of maternal polar bear dens in the 1002 area of ANWR's Coastal Plain).

[152] *See* BSITR0004747 ("Polar bears denned on ANWR and the 1002 area more frequently than would have been expected if they denned uniformly along the mainland coast."); BSITR0007251-52, 4765-67.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG            39

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

ITR addressing a variety of activities (including potential seismic surveys of uncertain timing or location) spread across a large area with existing infrastructure and facilities.[153]

*Fourth*, Plaintiffs' criticism of the ITR term providing that the Service "retains discretion to impose *additional mitigation measures* on an activity-specific basis through the LOA process" is baseless.[154] This Court already rejected this argument in *Alaska Wilderness League*, holding that the Service can impose additional mitigation measures through the LOA process.[155]

*Finally*, the Service fully explained why a one-mile buffer around *all* potentially suitable polar bear denning habitat (as opposed to known or putative dens) is impracticable.[156] Indeed, the terrestrial denning habitat designated as "critical habitat" alone spans over 5,600 square miles.[157] And with respect to survey start dates, the Service "worked with the applicant to identify areas of high denning density and incorporate[d]

---

[153] *See* BSITR0001002, 2414, 2392-93, 0630.

[154] BSITR0002448 (emphasis added).

[155] 116 F. Supp. 3d at 967.

[156] *See* BSITR0002424 ("One mile buffer around all known polar bear denning habitat is not practicable as many existing operations occur within denning habitat and it would not be able to shut down all operations based on other regulatory and safety requirements."); *see also* BSITR0002448 ("Proper denning habitat requires the creation of snow drifts, which can differ from year-to-year as it is based on terrain and weather conditions. The ability to identify areas in which these snow drifts may occur each year prior to operations is not practicable."); *see also* BSITR0015451.

[157] 75 Fed. Reg. at 76,121.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          40

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

later start dates for seismic activity in this region,"[158] in this case, no earlier than January 1, but potentially later depending upon when the third aerial infrared survey is completed.[159]

In sum, the Service's well-considered judgment on the scope of appropriate mitigation measures is a decision falling squarely within the agency's technical expertise. The Court should decline Plaintiffs' invitation to second-guess measures that will "reduce interactions between project activities [and] polar bears"[160] and "have proven to be highly successful in providing for polar bear conservation in Alaska."[161]

## D. The Environmental Assessment Considers a Reasonable Range of Alternatives.

Plaintiffs repackage their mitigation arguments to assert that the Service's Environmental Assessment ("EA") failed to consider a reasonable range of alternatives under NEPA because it did not evaluate an alternative with Plaintiffs' preferred measures.[162] This argument was already rejected by the Ninth Circuit in Plaintiffs' prior unsuccessful challenge to the Chukchi Sea ITR, where they argued that "the EA fails to

---

[158] BSITR0002447.

[159] BSITR0002412; *see* BSITR0002455 (a third AIR survey must be completed between December 15 and January 15 prior to any seismic survey activity).

[160] BSITR0002277.

[161] BSITR0008266; *Salazar*, 695 F.3d at 908 (quoting same).

[162] Dkt. 31 at 39-40.

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

analyze other reasonable alternatives, such as imposing additional mitigation measures recommended by Service scientists, or excluding key habitat areas from the geographic scope of the regulations."[163] The argument should be rejected, just as it was in *Salazar*.[164] Moreover, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS."[165] An EA need only "[b]riefly discuss" reasonable alternatives,[166] and the Ninth Circuit routinely upholds EAs that consider only two alternatives.[167] Here, as in past cases, the Service "adequately developed and analyzed its proposed mitigation measures in the EA to a reasonable degree as required by law."[168] Plaintiffs' NEPA claim should therefore be rejected.

---

[163] *Salazar*, 695 F.3d at 916.

[164] *See id.*; *see also* BSITR0018579, 18588-89 (Service's explanations for rejecting alternatives suggested by Plaintiffs).

[165] *Salazar*, 695 F.3d at 915 (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005))

[166] 40 C.F.R. § 1501.5(c)(2); *Salazar*, 695 F.3d at 916 ("[A]n EA need only include a 'brief discussion[ ]' of reasonable alternatives…." (brackets and citation omitted)).

[167] *See Salazar*, 695 F.3d at 915-16 ("The Service's EA in this case analyzes two alternatives: a no-action alternative and the proposed incidental take regulations…. We have previously upheld EAs that gave detailed consideration to only two alternatives.") (citing *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154 (9th Cir. 2008)); *see also Native Ecosystems*, 428 F.3d at 1246.

[168] *Alaska Wilderness League*, 116 F. Supp. 3d at 971 (internal quotation marks and citation omitted); *see also Salazar*, 695 F.3d at 916 ("[T]he Service's alternatives analysis here is not arbitrary and capricious.").

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          42

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**E.      The Biological Opinion Complies with the ESA.**

Plaintiffs contend that the Service's Biological Opinion ("BiOp") violates the ESA by allegedly (i) failing to account for Level A harassment that was reasonably certain to occur, and (ii) allowing the Service to reinitiate consultation at its discretion.[169] Both of these claims are without merit.

As addressed in Section IV.B, *supra*, the Service's determination that Level A harassment is *not* likely to occur is well-supported, fully explained, and entitled to deference. For this reason alone, Plaintiffs' first ESA claim should be denied. Additionally, Plaintiffs' claim misunderstands the "agency action" considered by the BiOp. Here, the "agency action" is the Service's issuance of the ITR, not the authorization of any activities that may receive a take authorization under the ITR.[170] The ITR does not authorize any Level A harassment and, accordingly, Level A harassment cannot be specified in the ITS as an "impact" of the "agency action."[171]

Plaintiffs' second ESA claim fares no better as the BiOp and regulations make clear that reinitiation of consultation is not discretionary. Plaintiffs argue to the contrary

---

[169] Dkt. 31 at 41-43.

[170] *See* BSITR0002428 ("No Level A harassment or lethal take is estimated as a result of the proposed activities, and none is authorized by this ITR."); BSITR0002423 ("This regulation does not authorize lethal take, and we do not anticipate any lethal take will occur."); BSITR0002333-24 (ITS).

[171] *See* 16 U.S.C. § 1536(a)(2), (b)(4).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                    43

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

by cherry-picking the phrase "may be required" from the BiOp. But Plaintiffs overlook the fact that the ESA implementing regulations already *require* reinitiation of consultation if the amount of take specified in the ITS is exceeded during the course of the action.[172] And Plaintiffs ignore the context of the "may be required" language, as the very same page of the BiOp unequivocally requires that the Service "*shall* reinitiate section 7 consultation within 7 days" in the event that the amount of authorized take is exceeded.[173] The BiOp also states that reinitiation is "non-discretionary" when take is exceeded.[174] Plainly, both the regulations and the BiOp require reinitiation of consultation if the amount of incidental take specified in the ITS is exceeded. Plaintiffs' arguments should be rejected.[175]

---

[172] *See* 50 C.F.R. § 402.14(i)(4) ("If during the course of the action the amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this Section, is exceeded, the Federal agency must reinitiate consultation immediately.").

[173] BSITR0002335 (emphasis added).

[174] *Id.*

[175] *See Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) ("[W]e may not fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies…." (ellipsis in original; internal quotation marks and citation omitted)); *Wilderness Watch, Inc. v. Creachbaum*, 225 F. Supp. 3d 1192, 1207 (W.D. Wash. 2016) (refusing to "engage in a 'magic words review,' where the propriety of the Park Service's analysis hinges on whether it included the correct words in its [Minimum Requirements Worksheets], rather than whether its analysis carried the substantive weight arbitrary and capricious review demands"), *aff'd*, 731 F. App'x 709 (9th Cir. 2018).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          44

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**F.    Vacatur Is Not the Appropriate Remedy.**

Plaintiffs request that the Court vacate "the ITR, and all LOAs issued pursuant to it, as well as the EA, FONSI, and BiOp."[176] If this Court finds any merit in Plaintiffs' claims, AOGA respectfully requests the opportunity to address the scope of the appropriate remedy more fully through supplemental briefing. It is not feasible to fully address what may be an appropriate remedy without knowing to what extent and on what basis the Court may find any merit in Plaintiffs' contentions.

In any event, vacatur is not warranted in this case. Although an agency action that is held to be unlawful can be set aside under the APA,[177] vacatur is "a species of equitable relief," and "courts are not mechanically obligated to vacate agency decisions that they find invalid."[178] "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[179] The Ninth Circuit has made clear that in considering whether

---

[176] Dkt. 31 at 44.

[177] 5 U.S.C. § 706(2)(A).

[178] *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has power to do so, *it is not required to set aside every unlawful agency action*." (emphasis added)); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.").

[179] *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 993 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG              45

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main (206) 624-0900 Fax (206) 386-7500

vacatur is appropriate, courts should consider economic and other practical concerns.[180] The unifying principle of these applicable precedents is that the remedies awarded must be tailored to the circumstances and equities of each case.

As a general matter, vacatur is not warranted here because the violations alleged by Plaintiffs are curable on remand and the overbroad relief requested by Plaintiffs could have highly disruptive consequences. The ITR applies broadly to North Slope exploration, development, production, maintenance, and transportation activities.[181] Vacatur of the ITR could significantly disrupt *all* of these activities, particularly considering that North Slope operators have been relying upon the ITR program's incidental take authorizations and associated mitigation and monitoring measures for decades. Throwing the product of decades of work by the Service and industry out the window, as Plaintiffs request, could have very significant and adverse consequences— both to industry operators and to polar bears. The ITR is *protective* of wildlife. Its measures have "proven to be beneficial to the conservation of marine mammals such as the polar bear"[182] and "highly successful in providing for polar bear conservation in

---

[180] *Id.* at 994 ("[I]f saving a snail warrants judicial restraint, so does saving the power supply." (citation omitted)).

[181] BSITR0002365.

[182] 73 Fed. Reg. at 28,314.

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          46

Alaska."[183] And they are "necessary and advisable to provide for the conservation of the polar bear."[184] Plaintiffs' request to vacate these beneficial measures is contrary to *every single* agency and court conclusion reached about the Arctic ITRs.

Plaintiffs also seek vacatur of "all LOAs issued pursuant to" the ITR.[185] However, Plaintiffs have not asserted any claim challenging any LOA.[186] LOAs are separate agency actions supported by separate administrative records that are not presently before the Court.[187] Because the LOAs are not properly before the Court, Plaintiffs' request for vacatur of LOAs exceeds the scope of this administrative appeal. This Court has previously declined requests for relief related to LOAs in similar circumstances, and the same rationale applies here.[188]

---

[183] BSITR0008266; *Salazar*, 695 F.3d at 908 (quoting same).

[184] *In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d at 233.

[185] Dkt. 31 at 44.

[186] *See* Dkt. 1 ¶¶ 163, 174, 178, 186 (challenging ITR as arbitrary and capricious); *id.* ¶ 192 (challenging EA and FONSI); *id.* ¶ 197 (challenging BiOp).

[187] *See* BSITR0002454-55 (50 C.F.R. §§ 18.122-18.123's regulatory procedures for obtaining an LOA and criteria for evaluating requests for an LOA).

[188] *League v. Jewell*, No. 3:15-CV-00067-SLG, 2015 WL 12516787, at *2 (D. Alaska July 23, 2015) ("But the Court finds considerable merit to AOGA's argument that the invalidation of the LOA that Plaintiffs also seek at this time exceeds the scope of the administrative appeal that was argued by the parties and considered by this Court. This proceeding was focused only on the validity of the ITR. Accordingly, the Court declines to accord injunctive relief pending appeal with respect to the LOA for this reason.").

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

# V. CONCLUSION

The ITRs promulgated by the Service have provided a demonstrably successful framework for minimizing interactions between polar bears and the oil and gas industry for 30 years. Building on this success, the current Beaufort Sea ITR contains the most stringent mitigation measures of any Arctic ITRs issued to date. This fourth Arctic ITR lawsuit is just another attempt by Plaintiffs to impede the lawfully conducted or planned oil and gas activities to which they are opposed. The Service's decisions here are fully consistent with applicable law and rationally based upon an extensive administrative record, the best available science, and three decades of practical experience. For all of the reasons set forth above, AOGA respectfully requests that the Court deny Plaintiffs' motion for summary judgment and grant the Federal Defendants' and AOGA's cross-motions for summary judgment.

DATED:  July 1, 2022.

STOEL RIVES LLP

By: */s/ Ryan P. Steen*
    Ryan P. Steen (Bar No. 0912084)
    Jason T. Morgan (Bar No. 1602010)
    James C. Feldman (Bar No. 1702003)

    Attorneys for Alaska Oil and Gas
    Association

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 11,127 words, excluding items exempted by Local Civil Rule 7.4(a)(4), exceeds the local rule limit but complies with the modified word limit that AOGA has requested from the Court concurrent with the filing of this brief.

*/s/ Ryan P. Steen*
Ryan P. Steen

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG          49

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2022, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system.  Participants in this Case No. 3:21-cv-00209-SLG who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Ryan P. Steen*
Ryan P. Steen

115285934.6 0010627-00056

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA  98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Alaska Wildlife All., et al. v. U.S. Fish & Wildlife Serv., et al.*
Case No. 3:21-cv-00209-SLG                    50