**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

ALASKA WILDLIFE ALLIANCE, et al.,

Plaintiffs,

v.

U.S. FISH AND WILDLIFE SERVICE et al.,

Defendants.

Case No. 3:21-cv-00209-SLG-KFR

## REPORT AND RECOMMENDATION RE MOTIONS FOR SUMMARY JUDGMENT

The Court recommends Plaintiffs' Motion for Summary Judgment at Docket 31 be **DENIED**. The Court further recommends Defendants' Cross-Motions for Summary Judgment at Dockets 38 and 43 be **GRANTED**. Plaintiffs argue that Defendant United States Fish and Wildlife Service ("FWS") unlawfully authorized the incidental take by harassment of Southern Beaufort Sea ("SBS") polar bears from oil and gas activities in the 2021-2026 Beaufort Sea Incidental Take Regulation (hereinafter "2021 BSITR") in violation of the Marine Mammal Protection Act ("MMPA"), and failed to conduct the necessary level of analysis under the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA"). The Court disagrees and finds FWS's 2021 BSITR issued pursuant to the MMPA, and its analysis under NEPA and the ESA, to be to be reasonable and supported by relevant evidence and precedent. The Court finds FWS's actions in this case not to be arbitrary and capricious.

1    **I.      Background**[1]

2            **a.  Factual Background**

3            The SBS polar bear population faces a threat to their existence due to climate

4    change, native subsistence harvest, scientific research, industrial activities,

5    including oil and gas development, defense of life, shipping, and placement of

6    orphaned cubs.[2] In 2008, FWS listed SBS polar bears as a threatened species under

7    the ESA and published protective measures that apply to the stock.[3] In 2011, FWS

8    designated critical habitat under the Endangered Species Act ("ESA") for polar bears

9    in Alaska, which included barrier island habitat, sea-ice habitat, and terrestrial

10   denning habitat.[4]   The SBS stock currently consists of about 907 bears and has

11   remained largely stable since 2006.[5]

12           FWS first issued regulations in 1993 authorizing the incidental take of

13   walruses and polar bears in connection with oil and gas exploratory activities in the

14   Beaufort Sea region for a period of five years.[6]   FWS issued an additional six

---

[1] The Background is limited to those facts necessary to decide the motions before the Court. The Court does not intend for the Background to constitute binding findings of fact should this matter proceed to trial.

[2] U.S. FISH & WILDLIFE SERV., POLAR BEAR: SOUTHERN BEAUFORT SEA STOCK ASSESSMENT (2021), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.fws.gov/sites/default/files/documents/polar-bear-southern-beaufort-sea-stock-assessment-report-may-2019.pdf.

[3] Doc. 1 at 26.  All reference to page numbers in filed documents are to the CM/ECF stamped page number printed in the document footer after filing, and not to the page number printed on the original document by the parties.

[4] Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States, 75 Fed. Reg. 76,086, 76,088–91 (Dec. 7, 2010); BSITR0002386.  Consistent with the briefing of the parties, all record references to the Beaufort Sea Incidental Take Regulations are abbreviated "BSITR."

[5] BSITR0002386.

[6] 58 Fed. Reg. 60,402 (November 16, 1993).

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and
Wildlife Service, et al.*
                                                      2
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 2 of 48

Incidental Take Regulations ("ITR/ITRs") for the Beaufort Sea.[7] The 2016 Beaufort Sea ITR was for a period of five years and expired on August 5, 2021.[8]



Figure 1—Map of the Beaufort Sea ITR region.

In December 2019, FWS received a request from the Alaska Oil and Gas Association ("AOGA") to promulgate an ITR under the MMPA to regulate the nonlethal and unintentional take by harassment of small numbers of walruses and polar bears incidental to oil and gas industry activities in the Southern Beaufort Sea.[9] In order to issue an ITR, an applicant must submit a request to FWS that conforms with eight specific MMPA requirements.[10] FWS reviews the request to determine if it is adequate and complete. If it is incomplete FWS notifies and works with the applicant until it is complete. At that point, FWS makes its preliminary determinations, initiates NEPA and the ESA processes, prepares the proposed rule, and publishes notice of it in the Federal Register for a 30–60-day public comment period. After the close of the comment period, FWS reviews and addresses public comments, finalizes ESA and NEPA compliance, makes

---

[7] 60 Fed. Reg. 42,805 (Aug. 17, 1995); 64 Fed. Reg. 4,328 (Jan. 28, 1999); 65 Fed. Reg. 5,275 (Feb. 3, 2000); 65 Fed. Reg. 16,828 (Mar. 30, 2000); 68 Fed. Reg. 66,744 (Nov. 28, 2003); 71 Fed. Reg. 43,926 (Aug. 2, 2006); 76 Fed. Reg. 47,009 (Aug. 3, 2011); 81 Fed. Reg. 52,275 (Aug. 5, 2016).

[8] 81 Fed. Reg. 52,275 (Aug. 5, 2016).

[9] BSITR002386. Plaintiffs do not dispute the regulations as they pertain to walruses.

[10] 50 C.F.R. § 18.27(d)(1).

1  final determinations, and prepares the final rule. FWS then publishes the final ITR
2  in the Federal Register, and it generally becomes effective after 30 days.[11]

3      AOGA submitted its complete request in March 2021.[12] On June 1, 2021, FWS
4  published its proposed ITR along with a draft Environmental Assessment.[13]  After
5  expiration of the 30-day comment period, FWS issued the final 2021 BSITR and EA
6  governing the non-lethal, incidental take of polar bears and Pacific walruses from
7  oil and gas activities in the Beaufort Sea nearshore areas of Alaska's North Slope on
8  August 5, 2021.[14]  Pursuant to its authority under the Administrative Procedures Act
9  ("APA"), FWS found good cause for immediate promulgation of the ITR.  The ITR
10 remains effective through August 5, 2026.

11     FWS determined that no more than 443 individual SBS polar bears would be
12 taken during the five-year 2021 BSITR.[15]  Dividing this total number over the five-
13 year ITR term, FWS concluded that up to 92 polar bears would be taken yearly by
14 Level B harassment, which, by FWS's calculation represented roughly 10% of the
15 estimated population of 907 polar bears in the SBS stock.[16]  FWS concluded that this
16 volume would impact no more than "small numbers" of the SBS polar bear stock.[17]

17     FWS anticipated only Level B harassment would occur in its small numbers
18 determination, and that that level of harassment would have a negligible impact on
19 the health, reproduction, or survival of SBS polar bears.[18] In assessing the amount
20 of Level A take anticipated, FWS broke down Level A harassment into two categories:
21 "serious," meaning impacts likely to result in mortality, and "non-serious," meaning

---

[11] U.S. Fish and Wildlife Service, "Incidental Take Authorizations for Marine Mammals," https://www.fws.gov/service/incidental-take-authorizations-marine-mammals.
[12] BSITR002366; BSITR000878-1141; BSITR00853-877.
[13] 86 Fed. Reg. 79082 (June 1, 2021); see also BSITR002365; BSITR0001731-1802.
[14] 86 Fed. Reg. 42982 (Aug. 5, 2021); see also BSITR002365-2457; BSITR002289; BSITR018535- 18601.
[15] BSITR002422.
[16] BSITR002429.
[17] BSITR002422.
[18] AOGA did not request or anticipate any Level A harassment.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*                    4

take resulting from encounters that might cause early den departure but would not likely to result in mortality, and concluded that no Level A take was likely.[19]

FWS also considered the means of effecting least practicable adverse impacts ("LPAI") on the SBS polar bears, and implemented a number of measure designed to disturbances to polar bear denning sites.[20] FWS also completed an EA assessing the impacts under NEPA of the 2021BSITR. Finally, FWS consulted on the impacts of the 2021 BSITR pursuant to the ESA and completed a Biological Opinion ("BiOp") that determined that the proposed activities would only have a negligible effect on the SBS polar bear stock, and was not likely to affect polar bear critical habitat.[21]

### b. Procedural Background

On September 16, 2021, Plaintiffs[22] filed suit against FWS, the United States Department of Interior, and Shannon Estenoz and Debra Haaland in their official capacities (collectively "Federal Defendants") alleging that the five-year 2021 BSITR, the accompanying Biological Opinion ("BiOp"), and the EA failed to comply with the MMPA, ESA, and NEPA.[23] Plaintiffs properly served Defendants.[24] Alaska Oil and Gas Association and the State of Alaska intervened as co-defendants.[25] Defendants answered the complaint.[26]

Plaintiffs seek declaratory and injunctive relief against Defendants for their decision to issue a five-year 2021 BSITR under the MMPA approving the AOGA petition to take SBS polar bears and Pacific walrus in the Beaufort Sea and adjacent northern coast of Alaska (North Slope). Plaintiffs argue these animals are protected

---

[19] BSITR0002438.
[20] *See e.g.* BSITR0002384, BSITR0002393; BSITR0002412; BSITR0002424; and BSITR0002455-56.
[21] BSITR0002333-34; BSITR0002332-33.
[22] Alaska Wildlife Alliance, Alaska Wilderness League, Center for Biological Diversity Defenders of Wildlife, Environment America, Friends of the Earth, and Sierra Club.
[23] Doc. 1.
[24] Doc. 12.
[25] Doc. 15 and Doc. 25.
[26] Docs. 16, 20, 26.

from "take" by the MMPA,[27] and polar bears are protected under the ESA as a threatened species.[28] Plaintiffs seek review under the Administrative Procedure Act ("APA").

On April 20, 2022, Plaintiffs filed a Motion for Summary Judgment.[29] Defendants responded in opposition asserting a cross-motion for summary judgment,[30] and Plaintiffs replied.[31] Defendants argue that the 2021 BSITR complies with the MMPA, NEPA, and ESA. Defendants ask the Court to uphold the 2021 BSITR, and grant summary judgment in Defendants' favor.[32]

The parties did not request oral argument. The Court deems the issues sufficiently briefed and oral argument is not necessary.[33]

## II. Jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers jurisdiction on federal courts to review an agency action.[34] An aggrieved party may seek review of an agency action in District Court pursuant to the APA.[35]

## III. Legal Standard

The APA governs a court's review of an agency's compliance with the MMPA, NEPA, and ESA.[36] A reviewing court can set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

[27] Doc. 1 at 3.
[28] *Id.*
[29] Doc. 31.
[30] Docs. 38, 41, 42.
[31] Doc. 46.
[32] Doc. 38.
[33] Inasmuch as the Court concludes the parties have submitted memoranda thoroughly discussing the law and evidence in support of their positions, it further concludes oral argument is neither necessary nor warranted with regard to the instant matter. *See Mahon v. Credit Bureau of Placer County Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999) (explaining that if the parties provided the district court with complete memoranda of the law and evidence in support of their positions, ordinarily oral argument would not be required).
[34] 5 U.S.C. § 702.
[35] 5 U.S.C. §§ 701–706.
[36] *Humane Soc'y v. Locke,* 626 F.3d 1040, 1047 (9th Cir. 2010).

law."[37] "Whether agency action is 'not in accordance with law' is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[38]

The Court follows the deferential two-step inquiry set out in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* in reviewing an agency's interpretation and application of statutes for which it is responsible.[39] First, the Court asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[40] Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[41]

A court cannot substitute its judgment for that of the administrative agency, therefore its review should be "searching and careful," but "narrow."[42] [D]eference to the agency's decisions is especially warranted when "reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise."[43] "Nevertheless, the agency must examine

---

[37] 5 U.S.C. § 706(2)(A).

[38] *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004); 5 U.S.C. § 706(2)(A) (1980).

[39] 467 U.S. 837, 843–44 (1984). Prior to undertaking the two-step *Chevron* inquiry, the Court must determine whether Congress intended "the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). This step is colloquially referred to as "Step Zero" of the *Chevron* analysis. *See, e.g., Oregon Rest. & Lodging v. Solis*, 948 F.Supp.2d 1217, 1222–23 (D. Or. 2013); *see also Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1216–18 (9th Cir. 2015).

[40] *Chevron*, 467 U.S. at 842–43.

[41] *Id.* at 843. The Supreme Court and the Ninth Circuit sometimes describe the statutory standard as "whether the agency's interpretation is reasonable." *See King v. Burwell*, 576 U.S. 473 (2015); *see also Alaska Wilderness League*, 788 F.3d at 1220–21.

[42] *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989).

[43] *Envtl. Defense Ctr., Inc. v. EPA*, 344 F.3d 832, 869 (9th Cir. 2003) (citing *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103, (1983) and *Chem. Mfrs. Ass'n v. EPA*, 919 F.2d 158, 167

---

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
7

Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 7 of 48

the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and choice made."[44] Courts may reverse an agency's decision only if the agency depended on factors that Congress "did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[45]

If an agency changes its policy, it is "obligated to supply a reasoned analysis for the change."[46] An agency change in position is arbitrary unless the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy.[47]

## IV. Discussion

Plaintiffs allege that FWS's 2021 BSITR and accompanying environmental review documents fail to comply with the MMPA, NEPA, and ESA.[48] Defendants disagree, arguing that the 2021 BSITR was properly issued and is in compliance with each of the statutes. The Court considers all pleadings by the parties and evaluates the arguments under each statute in turn.

### a. MMPA

#### i. Statutory and Regulatory Framework

"To prevent marine mammal species and population stocks from diminishing 'beyond the point at which they cease to be a significant functioning element in the

---

(D.C. Cir. 1990) ("It is not the role of courts to 'second-guess the scientific judgments of the EPA....'")).

[44] *Envtl. Defense Ctr.,* 344 F.3d at 869.

[45] *Ecology Ctr. v. Castaneda,* 574 F.3d 652, 656 (9th Cir. 2009).

[46] *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

[47] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *see also Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc).

[48] Doc. 31 at 11.

ecosystem,'" the MMPA generally prohibits the "take" of marine mammals. [49] The term "take" is defined broadly and means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."[50] "Harassment" is defined, in relevant part, to include any act of pursuit, torment, or annoyance which (1) "has the potential to injure a marine mammal or marine mammal stock in the wild" ("Level A harassment"), or (2) "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering" ("Level B harassment").[51] "Injury" is defined as "a wound or other physical harm."[52]

In the 2021 BSITR, FWS further broke down "Level A harassment" into two subcategories, "serious" and "non-serious." Neither of these subcategories are defined in the statute or its implementing regulations. For purposes of the 2021 BSITR, FWS defined "serious injury Level A harassment" as injurious take "that is likely to result in mortality."[53] "For dens where emergence was not classified as early, if an exposure occurred during the post-emergence period and bears departed the den site prior to their intended (i.e., undisturbed) departure date," FWS assigned a non-serious injury Level A harassment take for each cub that had to depart its den "less than 8 days after the emergence date."[54]

The MMPA includes several exceptions to its general taking prohibition. The exception at issue in this case allows for "the incidental, but not intentional, taking by citizens while engaging in [an activity such as oil exploration] ... of small numbers of marine mammals of a species or population stock" when the Secretary of the

---

[49] *Natural Resources Defense Council, Inc. v. Pritzker*, 828 F.3d 1125, 1129 (9th Cir. 2016) (quoting 16 U.S.C. § 1361(2)) (hereinafter "*Pritzker 1*"); *see also* 16 U.S.C. § 1371(a).
[50] *Id.* at § 1362(13).
[51] 16 U.S.C.A. § 1362(18).
[52] 50 C.F.R. 229.2.
[53] BSITR0002396.
[54] BSITR0002409.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
9
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 9 of 48

Interior "finds that the total of such taking ... will have a negligible impact on such species or stock...."[55] "Small numbers" is defined as "a portion of a marine mammal species or stock whose taking would have a negligible impact on that species or stock."[56] "Negligible impact" is defined as an impact that "cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."[57]

If FWS makes the required findings relating to "small numbers" and "negligible impact," it may, after notice and comment, issue ITRs that authorize incidental takes "during periods of not more than five consecutive year[s.]"[58] The regulations must

> set[] forth permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species of stock for subsistence users; and requirements pertaining to the monitoring and reporting of such taking.[59]

"The 'least practicable adverse impact' standard applies both to 'permissible methods of taking pursuant to' the activity causing incidental take and to 'other means' of reducing incidental take."[60] The "least practicable impact" requirement is a "stringent standard," and "'[a]lthough the agency has some discretion to choose among possible mitigation measures, it cannot exercise that discretion to vitiate this stringent standard.'"[61]

After an ITR is issued, citizens may apply for a letter of authorization ("LOA") that authorizes incidental takes of "small numbers of marine mammals incidental to

---

[55] *Id.* at § 1371(a)(5)(A)(i).
[56] 50 C.F.R. § 18.27(c).
[57] *Id.*; *see also* 54 Fed. Reg. 40,340 (citing 132 Cong. Rec. 16305 (Oct. 15, 1986)); *Natural Resources Defense Council, Inc. v. Evans*, 279 F.Supp.2d 1129, 1159 (N.D. Cal., 2003).
[58] 16 U.S.C.A. 1371(a)(5)(A)(i).
[59] *Id.* at (II); *see also Center for Biological Diversity v. Salazar*, 695 F.3d 893, 899 (9th Cir. 2012 (hereinafter "*CBD*").
[60] *Pritzker 1*, 828 F.3d at 1130 (citing *Evans*, 279 F.Supp.2d at 1142 (citation omitted)).
[61] *Id.*

a specified activity" consistent with the ITR.[62]  LOAs are issued after a non-public process if FWS determines that the proposed activity is one described in the ITR and concludes that the level of take caused by the activity will be consistent with the findings made in the regulation.[63] Notice of the issuance of a LOA must be published in the Federal Register within 30 days of its issuance.[64] The regulation also provides that LOAs will specify "any additional terms and conditions appropriate for the specific request."[65]

### ii. Plaintiffs' Arguments under the MMPA

Plaintiffs make five arguments under the MMPA. First, Plaintiffs argue that FWS's small numbers finding improperly segments its analysis into annual increments, an agency decision that failed to properly consider total authorized takes for the entire five-year period and which amounted to an impermissible policy reversal. Second, FWS's Level A harassment categories of "serious" and "non-serious" are contrary to the plain language of MMPA. Third, FWS's negligible impact finding improperly disregarded impacts of cub loss by serious Level A harassment and lethal take, and failed to consider impacts of "non-serious" Level A harassment. Fourth, FWS failed to account for Level A harassment or lethal take that was likely to occur. Finally, FWS's failure to consider timing and geographic restrictions on oil and gas activities was improper because it did not ensure the least practicable adverse impact to SBS polar bears.[66]

//

//

//

_____

[62] 50 C.F.R. § 18.27(d).  Citizens are defined, in pertinent part, as "individual U.S. citizens or any corporation or similar entity if it is organized under the laws of the United States[.]" *Id.* at § 18.27(c).
[63] *Id.* at § 18.27(f)(1–2).
[64] *Id.* at § 18.27(f)(3).
[65] *Id.*
[66] Doc. 31 at 16.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
11
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 11 of 48

**1. FWS's Small Numbers Finding Did Not Violate the MMPA and APA.**

    **a. FWS's Use of Annual Takes as Opposed to Five-Year Total Takes in Making its Small Numbers Finding Was a Reasonable Interpretation of the Statute.**

Plaintiffs argue that FWS's small numbers finding violates the MMPA because it segments its analysis into annual increments which fail to properly consider total authorized takes. Plaintiffs state that the 2021 BSITR allows the take of up to 443 individual SBS polar bears over the course of the ITR's five-year duration, which by Plaintiffs' calculation equates to 48.84%, or nearly half, of the estimated population of 907 SBS polar bears.[67] Plaintiffs assert that Defendants erred by basing their small numbers finding on an annual take rate of 10.4%, a number generated by dividing the 2021 BSITR's total takes of 443 by five to calculate the number of takes per year (92), and then considering that number against the total population of 907.[68]

Plaintiffs contend that FWS's decision to consider annual take in its small numbers determination, as opposed to total take is arbitrary and flouts Congress' clear intent.[69] Plaintiffs argue that the MMPA's plain language requires FWS to determine whether the total take authorized for the oil and gas activities across all five years constitutes a small number. Plaintiffs allege that FWS impermissibly divided that analysis into lesser one-year increments, which contravenes the plain language of the MMPA and makes the small numbers standard meaningless.[70]

Additionally, Plaintiffs allege that FWS impermissibly reversed its policy of considering total takes for the five-year 2021 BSITR period and instead switched to

---

[67] Doc. 31 at 20-21; *see also* BSITR0002386.
[68] BSITR0002422; BSITR0002429; *see also* Doc. 31 at 21.
[69] Doc. 31 at 20-21; BSITR0002422.
[70] Doc. 31 at 22.

an annual calculation without supplying a reasoned analysis for the change.[71] Per Plaintiffs, in issuing prior five-year ITRs, FWS considered the total take across all given years in making its small numbers determinations.[72] As evidence of this, Plaintiffs cite to the 2016-2021 Beaufort Sea ITR[73], the 2019-2024 Cook Inlet ITR[74], the 2013-2018 Chukchi Sea ITR[75], and the 2008-2013 Chukchi Sea ITR.[76]

Defendants argue that its "small numbers" finding is rational, permissible, and consistent with FWS's past practice in its Beaufort Sea ITRs since 2011; consistent with Congressional intent; and is a practice that has been previously upheld in *CBD*.[77] Defendants further state that there has been no policy reversal in this case, and Plaintiffs' reliance on prior ITRs as evidence of such a reversal is either factually incorrect or misplaced.[78]

Defendant Intervenor State of Alaska repeats the above arguments, and further contends that historical data suggests it is unlikely that 443 Level B harassment takes of unique SBS polar bears will occur.[79] In support of this conclusion they refer to 2014-2018 data illustrating that only 264 Level B harassments occurred out of the 1,698 bears encountered by industry, resulting in take of "only 15.5 percent of the observed bears."[80] Per the State of Alaska, these

---

[71] Doc. 31 at 25.
[72] Doc. 31 at 26-28.
[73] Final Rule, Marine Mammals; Incidental Take During Specified Activities, 81 Fed. Reg. 52,276–77, 52,304 (Aug. 5, 2016). ("We conclude that over the 5-year period of these ITRs, Industry activities will result in a similarly small number of Level B takes of polar bears."); *id.* at 52,306 ("Based on this information, we estimate that there will be no more than 340 Level B harassments takes of polar bears during the 5-year period of these ITRs.").  Courts take judicial notice of the Federal Register.  *See* 44 U.S.C. § 1507.
[74] Final Rule, Marine Mammals; Incidental Take During Specified Activities: Cook Inlet, Alaska, 84 Fed. Reg. 37,716 (Aug. 1, 2019).
[75] Final Rule, Marine Mammals; Incidental Take During Specific Activities, 78 Fed. Reg. 35,364, 35,415 (June 12, 2013).
[76] Final Rule, Marine Mammals; Incidental Take During Specific Activities, 73 Fed. Reg. 33,212 (June 11, 2008).
[77] Doc. 38 at 15-23; *see also* Doc. 43 at 24-28.
[78] Doc. 38 at 15-23; *see also* Doc. 43 at 28-30.
[79] Doc. 41 at 17-18.
[80] Doc. 41 at 13, 18-19; *see also* BSITR0002422.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
13
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 13 of 48

statistics necessarily include multiple takes of the same bear rather than each take affecting a different bear since the SBS stock's estimated population is 907, which they claim has remained constant since 2015, and many bears remain on sea ice and are never encountered by industry.[81] Defendant State of Alaska therefore concludes that FWS's small numbers finding is rational because current industry activities are expected to be similar to industry activities under past ITRs, which resulted in less take than anticipated, but were still considered "small numbers" at the outset.[82]

Plaintiffs' assertion that FWS's small numbers finding based on an annual accounting of potential Level B SBS polar bear takes violated the MMPA is without merit.  In this case, FWS considered, and rejected, a five-year analysis in favor of an annual accounting of SBS polar bear takes, reasoning that such an accounting "best enables the Service to assess whether the number of animals taken is small relative to the species or stock."[83]  This interpretation is consistent with the statute  and is not an unreasonable application of the law.  It is therefore entitled to deference by this Court.  The relevant statutory language governing "small numbers" contains no express provision for how this figure is to be determined, only that it may be for "periods of not more than five consecutive years each."[84]  Had Congress meant to absolutely require such granularity, it could have said so, as it has done in other statutes.[85]  When a "statute is silent or ambiguous on the precise question at issue,

---

[81] *Id.* at 18.

[82] *Id.* at 18.

[83] BSITR0002428.

[84] 16 U.S.C. § 1371(a)(5)(A)(i).

[85] *See* 16 U.S.C. 1386(a), (c) (requiring stock assessment reports to estimate the annual human-caused mortality and serious injury of the stock, and annual review of stock assessments when significantly new information is available that may indicate the stock assessment should be revised); 16 U.S.C. 1362(26) (defining "net productivity rate" as the annual per capita rate of increase in a stock resulting from additions due to reproduction, less losses due to mortality); 16 U.S.C. 1383a(l)(ii) (requiring MMC's recommended guidelines to govern the incidental taking of marine mammals in the course of commercial fishing operations, to the maximum extent practicable, to include as a factor to be considered and utilized in determining permissible Levels of taking "the abundance and

Order re Motions for Summary Judgment                14
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 14 of 48

1    *Chevron* commands that we accept the agency's interpretation so long as it is

2    reasonable, even if it is not the reading that we would have reached on our own."[86]

3         FWS's interpretation of the statute in this case was reasonable and creates "a

4    symmetrical and coherent regulatory scheme."[87]  As Federal Defendants argue,

5    FWS's interpretation avoids the illogical result that would occur under Plaintiffs'

6    reading; namely, a statutory scheme in which FWS could promulgate ITRs for five

7    one-year periods that each rely on an annual assessment, but not a single five-year

8    ITR that does the same.[88]  Furthermore, allowing an annualized assessment is

9    consistent with the mechanism that actually allows a take of small numbers of

10   marine mammals, the LOA, of which there could be multiple during the period of an

11   ITR so long as the "total of such taking during each five-year period or less.... will

12   have no more than a negligible impact on such species or stock."[89]

13        Moreover, as the Ninth Circuit held in *CBD*, FWS need not provide any number

14   in its small number calculation.[90]  In providing a quantifiable estimate of take in this

15   case FWS relied on "historical data, plus modeling,"[91] and concluded that based upon

16   past reported incidental take from 2014-2018 - an annual average of 53 Level B

---

annual net recruitment of such stocks"). 16 U.S.C. § 1387(f)(4)(B) (requiring that take reduction plans include "an estimate of the total number ... of animals from the stock that are being incidentally lethally taken or seriously injured *each yea*r during the course of commercial fishing operations, by fishery") (emphasis added).

[86] *CBD*, 695 F.3d at 893 (citing *Chevron*, 467 U.S. at 843 & n. 11).

[87] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959)).

[88] Doc. 38 at 17-18.

[89] BSITR0002365.  The Court also notes that FWS's annual accounting is consistent throughout the 2021 BSITR as applied to both polar bears and walruses.  However, yet Plaintiff does not challenge FWS's small numbers determination as it relates to walruses, which estimated a take of 15 walruses per year.  It is incongruous for Plaintiffs to argue that FWS misinterpreted the statute as it relates to SBS polar bears, but that the same methodology was not objectionable when applied to the SBS walrus population.

[90] *CBD*, 695 F.3d at 907 ("The Service need not quantify the number of marine mammals that would be taken under the regulations, so long as the agency reasonably determines through some other means that the specified activity will result in take of only "small numbers" of marine mammals.")

[91] Doc. 41 at 14.

harassments - a similarly small number of incidental harassments of polar bears would occur over the 2021 BSITR period.[92] Next, FWS considered results from its predictive modeling exercise, which estimated based upon the forecasted SBS polar bear population that "there will be no more than 443 Level B harassment takes of polar bears during the five-year ITR period, with no more than 92 occurring within a single year."[93]

FWS concluded that 92 Level B harassment takes within a single year was a small number. As FWS stated, this number was a conservative estimate because they "could not reliably calculate how many of the anticipated Level B harassments would accrue to the same animals,...[and therefore assumed] that each of the anticipated takes would accrue to a different animal."[94] In making its determination, FWS stated that they "consider[ed] whether the estimated number of marine mammals to be subjected to incidental take is small relative to the population size of the species or stock," and determined that the "incidental Level B harassment of no more than 92 polar bears each year is unlikely to lead to significant consequences for the health, reproduction, or survival of affected animals."[95]

FWS explained in response to comments that the "SBS population estimate...is calculated using a number of annual metrics, including annual survival probabilities, annual number of dens, and annual denning success."[96] FWS "divided annual take estimates by annual population estimate, to calculate a percentage of the population potentially taken for its small numbers determination" which "best enables FWS to assess whether the number of animals taken is small relative to the species or stock."[97] The Ninth Circuit previously upheld this proportional analysis.[98]

---

[92] BSITR002422.
[93] *Id.*
[94] BSITR0002427.
[95] BSITR002422-23; BSITR002427.
[96] BSITR0002428.
[97] *Id.*
[98] *CBD*, 695 F.3d at 905-07.

FWS's "small numbers" analysis further contrasted the limited geographic area impacted by industrial activities with the larger range of SBS polar bears, finding that "only seven percent of the ITR area is estimated to be impacted by the proposed industry activities" and "the area of industry activity will be relatively small compared to the range of [SBS] polar bears."[99]  The Ninth Circuit has expressly upheld an interpretation of the term "small numbers" which "focuses primarily on the location of the exploration activities in relation to the mammals' larger population."[100]  It was not improper for FWS to rely on similar metrics in this case.[101]

### b. FWS's Use of Annual Takes to Make its Small Numbers Finding Was Not a Policy Reversal.

Plaintiffs argue that the use of an annual accounting as opposed to a cumulative five-year total amounts to a policy "reversal" that "FWS failed to explain."[102]  The Court finds this argument to be without merit as it is not apparent FWS has changed its policy.  Two previous Beaufort Sea ITRs show this to be true.

In the 2011-2016 Beaufort Sea ITR – an ITR Plaintiffs failed to cite to despite its obvious similarities to the 2021 BSITR - FWS analyzed annual polar bear take observed during the preceding ITR period to estimate the total number of future takes by Level B harassment would not exceed 150 per year (out of a population of 900 polar bears), a figure it concluded was a "small number."[103]  In response to a

---

[99] BSITR0002422.

[100] *Ctr. for Bio. Diversity*, 695 F.3d at 907.

[101] The Court notes that FWS's small number calculation of approximately 10% in this case is similar to the annual calculation upheld by the District Court in *Native Village of Chickaloon v. National Marine Fisheries Service*, 947 F.Supp.2d 1031 (D. Alaska 2013).  In that case, the District Court held that Level B harassment, or taking, of up to 10% per year of the Cook Inlet beluga whale population – up to 30 animals per year out of a total population of approximately 284 animals  for up to three years constituted a "small number" of the population relative to the affected population size because "10% represent[ed] a relatively limited or small portion of 100%," and it was a figure supported by a "rational, albeit sparse, basis."  *Id.* at 1053.

[102] Doc. 31 at 16.

[103] 76 Fed. Reg. 47,010, 47,039-41, 47,045, 47,047 (Aug. 3, 2011).

comment to the 2011 Beaufort Sea ITR, which complained that FWS was "treating 'small numbers' as being relative to population size," FWS replied, "[t]he Service has determined that the anticipated number of polar bears... that are likely to modify their behavior as a result of oil and gas industry activity is small (150 takes *per year* for polar bears[.])"[104] And like the current 2021 BSITR, FWS based its small numbers findings on distribution patterns and habitat use of the polar bears in proportion to the footprint of the industry activity.[105]

FWS used the same method in the 2016-2021 Beaufort Sea ITR. In that ITR, FWS estimated up to 338 total takes of polar bears by Level B harassment over the five-year period, approximately 18 percent of the observed bears or 7.5 percent of the SBS population, which annualized to 68 polar bears per year.[106] FWS determined Level B take of up to 7.5% of the SBS polar bear population constituted small numbers, and repeated that percentage in rendering its small numbers determination by dividing the number of bears expected to be taken over the ITR term (338) by five, and then dividing the resulting estimate of annual take (68) by the annual population estimate (900).[107]

The 2013-2018 Chukchi Sea ITR also uses a similar annual small numbers calculation.[108] Like the 2021 BSITR, this ITR assessed the take of walrus and polar bears from oil and gas exploration in the Chukchi Sea, a body of water immediately west of the Beaufort Sea. As FWS stated in that ITR, "the estimated total Level B incidental take for polar bears is expected to be 25 animals *per year*[.]"[109]

---

[104] *Id.* at 47045 (emphasis added).
[105] BSITR002422-23.
[106] BSITR0013791.
[107] *Id.* at 13793.
[108] 78 Fed. Reg. 35,364 (June 12, 2013).
[109] *Id.* at 35400 (emphasis added); *see also id.* at 35401 ("Overall, these takes (25 annually) are not expected to result in adverse effects that will influence population-level reproduction, recruitment, or survival.")

As it relates to the other ITRs identified by Plaintiffs, the Court does not find that they are evidence of a policy reversal.  In the 2008-2013 Chukchi Sea ITR, FWS rendered a qualitative small numbers determination that did not estimate an aggregate number of polar bear takes across the five-year period.[110]  In the 2019-2024 Cook Inlet ITR, FWS did compare five years of aggregated take with the annual population estimates for two affected stocks.[111] However, this ITR involved a different species in a different location.  The Court does not find that this ITR is sufficient evidence of a policy reversal that would make FWS's action in this case arbitrary or require "a reasoned analysis for the change."[112]

The Court finds that FWS's small numbers finding is not arbitrary or capricious.  The Court finds FWS's interpretation of the MMPA and its annualized small numbers finding reasonable.  Furthermore, the Court sees no policy reversal in this annualized determination and finds it to be in accordance with prior ITRs.

### 2. FWS's Division of Level A Harassment into "Serious" and "Non-Serious" Harassment Was Not Contrary to the Plain Language of the MMPA.

Plaintiffs claim that FWS's division of Level A harassment into "serious" and "non-serious" subcategories should be rejected because it contravenes the plain language of the MMPA and fails to accurately consider the total likelihood of Level A harassment by concealing the high probability of Level A harassment occurring.[113] Plaintiffs argue that a distinction between "serious" and "non-serious" harassment does not exist under the statute or FWS's regulations, and the MMPA's plain language makes clear that any act with the potential to injure a marine mammal constitutes Level A harassment.[114]

---

[110] *See* 73 Fed. Reg. at 33,234; Doc. 38 at 22.
[111] Doc. 38 at 22.
[112] *Motor Vehicles Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 42.
[113] Doc. 31 at 29.
[114] *Id.*

Order re Motions for Summary Judgment                    19
*Alaska Wildlife Alliance, et al., v. U.S. Fish and*
*Wildlife Service, et al.*
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 19 of 48

In support of their arguments, Plaintiffs cite to 16 U.S.C. § 1371(a)(2), where the MMPA uses the term "serious injury," but only in the context of commercial fisheries. In Plaintiffs' view, this use of the term "serious injury" in another portion of the statute governing the issuance of ITRs means that Congress understood how to specify "serious injury" as a form of take, but declined to apply it outside of commercial fishing activities.[115] Plaintiffs argue that "agencies are not free to add text to a statute that is not there."[116]

Federal Defendants argue that FWS's consideration of different types of Level A harassment in its negligible impact analysis is consistent with the MMPA and Congressional intent.[117] Federal Defendants state, "[e]ven though the MMPA does not define sub-categories of 'Level A harassment,' the statute does not preclude FWS from using non-statutorily defined terms within its analysis, especially where the terms have a sound biological basis and pertain to MMPA compliance."[118] Defendants argue that Congress granted the agency discretion to determine "the potential severity of harm to the species or stock when determining negligible impact."[119] Federal Defendants claim it reasonably segregated the potential types of Level A harassment (serious and non-serious) in order to accurately determine whether or not the total take would have a negligible impact on the SBS polar bears because "[n]ot all Level A harassment events affect annual rates of recruitment or survival."[120]

Plaintiffs' argument that FWS was not permitted to define Level A harassment as either "serious" or "non-serious" is unavailing. Congress has not spoken directly

---

[115] *Id. citing Russello v. United States*, 464 U.S. 16, 23 (1983).

[116] *United States v. Washington*, 994 F.3d 994, 1016 (9th Cir. 2021).

[117] Doc. 38 at 23-26; Doc. 43 at 30-42.

[118] Doc. 38 at 23; 16 U.S.C. § 1362(18)(A)(i).

[119] Doc. 38 at 23; *see also* BSITR002423 (summarizing Congressional instruction on negligible harm inquiry at 132 Cong. Rec. S. 16305 (Oct. 15, 1986)).

[120] Doc. 38 at 24 (citing BSITR002430; BSITR002423; and BSITR—2396); *see also* Doc. 43 at 32-44.

to the issue of subdividing Level A harassment categories. As such, the Court must defer to FWS's reasonable interpretation of the statute.

FWS's regulations define "negligible impact" as "an impact resulting from the specified activity that cannot be reasonable expected to, and is not reasonably likely to, adversely affect the species or stock through effects on the annual rates of recruitment or survival."[121] In light of the finding FWS was required to make as it related to whether or not activities under the 2021 BSITR would have a negligible impact on SBS polar bears, determining whether those activities would lead to serious or non-serious injury was a reasonable action by FWS.

In evaluating levels of injury as serious or non-serious, FWS considered stages in the polar bear denning process where take by Level A harassment or lethal take might occur and differentiated between the likely biological responses of affected polar bears in each of those scenarios: den establishment, early in the denning period, late in the denning period, and after emergence from the den.[122] It used this information to formulate its modeling approach to quantifying take, including evaluating probable biological responses based on exposure to project-related disturbance.[123] Relying on scientific and biological bases, FWS analyzed how the timing of disturbances during the polar bear denning cycle effects the annual rates of recruitment or survival, and thus the negligible impact standard, determining that disturbances in the early denning period would likely lead to the death of polar bear cubs (serious injury Level A harassment), with harassment at other times likely to either not cause Level A harassment (den establishment period) or be not likely to lead to serious injury resulting in mortality (non-serious Level A harassment).[124] Based on its research, modeling approach, and review of "impacts of previous industry activities on ... polar bears," FWS noted that "Level A harassment" to bears

---

[121] 50 C.F.R. § 18.27(c).
[122] BSITR0002393.
[123] BSITR0002397.
[124] BSITR0002393-94; BSITR002434-37.

on the surface is extremely rare within the ITR region," with only one instance of Level A harassment occurring in the region from 2012-2018, arising from defense to human life while engaged in non-industry activity.[125]

The purpose of determining whether or not harassment was likely to be "serious" or "non-serious" was to assess whether such harassment would be likely to effect "annual rates of survival." This purpose is consistent with determining the impact of harassment. Moreover, the subcategorization in this case is consistent with other sections of the MMPA[126] and the categorization of serious injury has also been used by the National Marine Fisheries Service to evaluate negligible impacts.[127]

In the context of determining whether Level A harassment will have a "negligible impact" on SBS polar bear "recruitment and survival," FWS's interpretation is reasonable and is not, as Plaintiffs argue, "add[ing] text to [the MMPA] that is not there."[128] In drawing a distinction between "serious" and "non-serious" injury, FWS appears to be supported by well-accepted standard practices in the industry, a sound biological basis to the terms used which pertain to MMPA compliance, careful quantitative modeling, review of past observations, qualitative analysis, and overall sound scientific research.[129]

"Congress has made it clear that FWS has discretion in determining "the potential severity of harm to the species or stock when determining negligible impact.""[130] The Court finds that FWS did precisely that here and it, not the Court or

---

[125] BSITR0002396.
[126] *See* 16 U.S.C. § 1386.
[127] *See* BSITR0015685-86 (evaluating Liberty Project).
[128] Doc. 31 at 30. The Court notes that Plaintiffs apply this quote to "agencies." *Id.* However, the case relied on for this quote, *Washington*, 994 F.3d at 1016, as well as the case relied on by *Washington* for this language, *Arizona State Bd. For Charter Schools v. U.S. Dept. of Educ.*, 464 F.3d 1003 (9th Cir. 2006), make it clear that the language applies to the Courts and not to agencies.
[129] 16 U.S.C. § 13629(18)(A)(i).
[130] BSITR002423 (summarizing Congressional instruction on negligible harm inquiry at 132 Cong. Rec. S. 16305 (Oct. 15, 1986)); 68 FR 66744 (Nov. 28, 2003); 53 FR at 8474 (Mar. 15, 1988).

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
22

Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 22 of 48

Plaintiffs, is in the best position to determine the potential severity of harm to the SBS population. Therefore, as required by *Chevron*, the Court defers to FWS's well-reasoned expertise.[131] While there is no prior precedent evidencing subcategorization of Level A harassment used in this case, FWS reasonably interpreted the MMPA and supported that interpretation with sound logic and science.[132] Applying the *Chevron* standard, the Court must accept Defendant FWS's construction of the statute and finds FWS's construction not to be arbitrary or capricious.

### 3. FWS's Negligible Impact Finding Did Not Violate the MMPA and APA.

Plaintiffs allege that FWS's negligible impact findings violated the MMPA for two reasons, both of which relate to Defendants' sub-categorization of Level A harassment, which the Court finds *supra* was reasonable and not arbitrary and capricious.[133] First, Plaintiffs argue that FWS "refused to consider" the impacts of polar bear cub loss by serious Level A harassment and lethal take in any given year, and across the five-year term of the ITR.[134] Second, Plaintiffs allege FWS improperly "classified take that would impair cubs' fitness to survive as 'non-serious'" and arbitrarily failed to consider the impacts of that "non-serious" Level A harassment.[135] The result of these failures to consider by FWS, Plaintiffs allege, is a negligible impact finding that is arbitrary.

Federal Defendants counter that the MMPA does not specify a particular methodology that must be used "in determining whether the impacts of the

---

[131] *See Center for Biological Diversity v. Kempthorne*, 588 F.3d 701, 710 (9th Cir. 2009) (upholding the Service's "negligible impact" finding because the agency "made scientific predictions within the scope of its expertise, the circumstance in which we exercise our greatest deference") (hereinafter "*Kempthorne*").

[132] *Compare Humane Soc'y of U.S. v. Brown*, 924 F.Supp.2d 1228, 1244-46 (D. Or. 2013) (upholding use of NMFS use of undefined "significant negative impact" categorization).

[133] *See supra* Section IV(a)(ii)(2).

[134] Doc. 31 at 32.

[135] Doc. 31 at 38.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*

23

Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 23 of 48

authorized taking on the species or stock will be negligible," and that FWS "gave proper effect to the ordinary meaning of [the] regulatory definition of" negligible impact.[136]  As it concerns Plaintiffs' allegation that FWS did not consider the impacts of serious Level A harassment, Federal Defendants disagree, arguing that the record demonstrates that FWS did in fact consider all of the available data and that Plaintiffs disagreement with FWS's reasonable interpretation is not a basis to find FWS's negligible impact finding arbitrary.[137]  Federal Defendants further argue that its conclusions regarding the impacts of non-serious Level A harassment were supported by the "best available science," and were "manifestly based on evidence, not an absence thereof as Plaintiffs contend."[138]  Defendant-Intervenor State of Alaska adds that FWS claims that its approaches were conservative, in estimating the harassment rate from surface encounters FWS used the 99 percent quantile of its probability distributions, "meaning that there is a 99 percent chance that given the data, the actual harassment rate will be lower."[139]  Additionally, Defendant-Intervenor argues that FWS considered biological characteristics of the polar bear species, including the information generated by the species' listing and critical habitat designation, the wide distribution of SBS polar bear stock across a geographic range that exceeds the region covered by the 2021 BSITR, and numerous mitigation measure, including seasonal restrictions, early detection monitoring programs, den detection surveys for polar bears, and adaptive mitigation and management responses based on real-time monitoring information to limit disturbance of denning bears.[140]

//

//

---

[136] Doc. 38 at 26-27; *see also* Doc. 41 at 28-29; Doc. 43 at 37.
[137] Doc. 38 at 26-32; *see also* Doc. 41 at 30-31.
[138] Doc. 38 at 40.
[139] Doc. 41 at 30.
[140] Doc. 41 at 30-31; *see also* Doc. 43 at 40-41.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and
Wildlife Service, et al.*
24

Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 24 of 48

### a. FWS Adequately Considered Potential Injury or Mortality to Polar Bear Cubs.

Plaintiffs argue that Defendants FWS's negligible impact finding is arbitrary and capricious because the impact of Level A harassment or lethal take of newborn cubs is "reasonably likely" to occur, both annually and over the five-year 2021 BSITR.[141] Plaintiffs claim that "FWS's calculations show a 45% to 46% yearly probability of cub death by 'serious' Level A harassment or lethal take in each year of the five-year ITR," a 94% probability of cub death in at least one year of the ITR, and a 70% probability of a cub death occurring in at least two years.[142] Such high likelihoods, Plaintiffs argue, are inconsistent with FWS's conclusion that lethal Level A take was not reasonably likely to occur during the 2021 BSITR and would therefore have a negligible impact on SBS polar bears.[143]

FWS maintains that it reasonably applied its longstanding regulatory definition of "negligible impact," giving credence to the ordinary meaning of the regulatory definition and "reasonably determined that authorizing a finite number of Level B harassment of SBS polar bears would have a negligible impact on that stock."[144] FWS also asserts that its decision to employ the median probability of lethal Level A take – which was zero – as opposed the mean, which leads to Plaintiffs' higher probabilities, demonstrates that the probability of lethal Level A take was considered.[145] In addition, Plaintiffs assert that use of a median value as opposed to the mean was a valid and appropriate interpretation of the modeling data that warrants deference.[146]

---

[141] Doc. 31. at 32.
[142] Doc. 31 at 33.
[143] Doc. 31. at 33-35.
[144] 50 C.F.R. § 18.27(c); Doc. 38 at 26-27.
[145] Doc. 38 at 30.
[146] BSITR002427-28; Doc. 38 at 31.

The MMPA does not define the term "reasonably likely." The Court therefore applies a generally accepted meaning to the term. Likely means that there is "a strong tendency, reasonably expected."[147] "Reasonably" modifies likely, an adjective, to define the likeliness as reasonable under the circumstances.[148] Reasonably likely means "there is a real chance of an event occurring; it is not fanciful or remote," it is "more probable than not, based in reason or experience."[149] More probable than not means that upon consideration of all of the relevant evidence and materials, a preponderance of the evidence and materials supports the finding.[150]Proving a proposition by the preponderance of the evidence requires demonstrating that the proposition is more likely true than not true.[151]

Although generally lower percentages such as 10% and 12% have been found to be not reasonably likely percentages,[152] FWS's interpretation of "reasonably likely" gives effect to the ordinary meaning of the term "likely,"[153] and conforms with the Ninth Circuit's interpretation of a related act, the ESA, which does not mandate "specific quantitative targets."[154] FWS's interpretation is also consistent with other rules and situations whereby both FWS and the National Marine Fisheries Service ("NMFS"), with whom it jointly administers both the ESA and MMPA,

---

[147] Black's Law Dictionary (11th ed. 2019).

[148] *Id.*

[149] Law Insider "reasonably likely" definition, https://www.lawinsider.com/dictionary/reasonably-likely#:~:text=Reasonably%20likely%20means%20there%20is,based%20in%20reason%20or%20experience.

[150] Law Insider "more probably than not" definition, https://www.lawinsider.com/dictionary/more-probable-than-not#:~:text=Related%20Definitions&text=More%20probable%20than%20not%20means,and%20materials%20supports%20the%20finding.

[151] Cornell Law, "preponderance" definition, https://www.law.cornell.edu/wex/preponderance.

[152] *Evans*, 279 F.Supp.2d at 1159.

[153] *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 945 (D. Or. 2007) (explaining that agency's interpretation of "likely" in ESA context as "more likely than not" was consistent with dictionary definition); Doc. 38 at 33.

[154] *Alaska Oil and Gas Association v. Pritzker*, 840 F.3d 671, 684 (9th Cir. 2016) (hereinafter "*Pritzker 2*").

appropriately defined "likely" in related contexts as "more likely than not," "greater than 50% likelihood," and "probable."[155]

Using the discretion Congress conveyed to FWS in conducting its technical analysis, FWS relied on its best professional judgment and included qualitative analysis to understand "what effects are sufficiently uncertain as to not be reasonably likely."[156] The Court defers to the agency's profession judgment in this matter.[157]  The Court sees no evidence to suggest FWS misapplied the regulatory definition of "negligible impact."

Furthermore, contrary to Plaintiffs' assertions, FWS did not refuse to consider or evaluate the impact of serious Level A harassment on polar bear cubs, or the impact of non-serious harassment on that group.  Indeed, the record shows that FWS explored the potential for lethal or Level A harassment, but ultimately "anticipated no lethal or injurious take that would remove individual polar bears...from the population or prevent their successful reproduction."[158]

In reaching this conclusion, FWS relied on predictive modeling techniques to conclude that "the majority [54%] of [FWS's] model runs result in no serious injury Level A harassment or lethal takes and the median of such take in the model runs is

---

[155] *Kempthorne*, 588 F.3d at 710; *Pritzker 2*, 840 F.3d at 684 (Service interpretation of "likely" under ESA section 4 regarding listing of species); *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig. V. Salazar*, 709 F.3d 1, 14 (D.C. Cir. 2013) (finding that FWS interpreted statutory reference to "likely" as having its "ordinary meaning" or "dictionary definition" for purposes of ESA listing decision); *Lohn*, 645 F. Supp. 2d at 945 ("likely" is greater than 50%); *W. Watersheds Project v. U.S. Forest Serv.*, 535 F. Supp. 2d 1173, 1184 (D. Idaho 2007) (same); *see also Or. Cal. Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1037–38 (D. Colo. 2020) (upholding FWS's assessment of risk of take of whooping cranes).

[156] Doc. 38 at 34; *Kempthorne*, 588 F.3d at 710.

[157] *Envtl. Def. Ctr., Inc.*, 344 F.3d at 869 (agency's determination is entitled to "great deference" when evaluating "complex scientific data within the agency's technical expertise") (citing *Baltimore Gas & Elec. Co.*, 462 U.S. at 103; *Chem. Mfrs. Ass'n*, 919 F.2d at 167).

[158] Doc. 38 at 27; *compare Cook Inletkeeper v. Raimondo*, 533 F.Supp.3d 739, 754 (D. Alaska March 30, 2021) (finding arbitrary and capricious MNFS' take determination where agency failed to consider a source of Level B harassment.)

0.0."[159] FWS employed modeling techniques that predicted both potential injury or cub mortality annually and across the five-year span. In choosing to use a median probability (as opposed to the mean proposed by Plaintiffs), FWS explained that the median probability was the more appropriate informative measure of the central tendency in the data. This was so because, according to FWS, the mean distribution results were "non-normal and heavily skewed," as indicated by markedly different mean and median values and because the "median is less influenced by statistical outliers that are inconsistent with past observed impacts and what is reasonably expected to occur in the future."[160]

Plaintiffs' five-year probability calculations assume "that takes in one year do not influence the probability of takes in subsequent years (i.e. that the operators do not 'learn' to avoid takes in subsequent years)."[161] However, FWS contends that operators do learn and explained that it evaluates the probabilities of take annually to "give effect to the term 'annual' as it appears" in the regulations.[162] FWS's "median modeling result suggest[ing] that zero Level A harassment or lethal take is the most likely result in any given year, and the fact that Level A harassment to bears is extremely rare in the ITR region over many years of reporting history" also weighed heavily in favor of its negligible impact finding. [163]

Additionally, FWS focused on annual rates of recruitment and survival to remain consistent with the one-year duration of the LOAs necessary to authorize

---

[159] BSITR002423.

[160] BSITR0002427; BSITR0002414. FWS explained that the "heavily skewed nature of these distributions has led to a mean value that is not representative of the most common model result (i.e., the median value), which for both non-serious Level A and serious Level A/ Lethal takes is 0.0 takes. Due to the low (<0.29 for non-serious Level A/Lethal takes) probability of greater than or equal to 1 non-serious or serious injury Level A harassment/Lethal take each year of the proposed ITR period, combined with the median of 0.0 for each, we do not estimate the proposed activities will result in non-serious or serious injury Level A harassment or lethal take of polar bears."

[161] BSITR0017969; Doc. 38 at 36.

[162] *See* 50 C.F.R § 18.27(c); BSITR0002430.

[163] BSITR0002430.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
28
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 28 of 48

incidental take.[164] FWS reasoned that focusing on annual probabilities of injurious or lethal take sufficiently accounts for the "total" take in each of the given years contemplated by the 2021 BSITR.[165]

Defendants are correct that Plaintiffs do not allege that FWS did not consider data in making its negligible impact finding. Rather, Plaintiffs disagree with how FWS interpreted the data before it. However, this disagreement is not a basis upon which to find an agency's action arbitrary and capricious. "[U]nder the arbitrary and capricious standard, 'our deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology.'"[166]

In addition to reliance upon it model, FWS's determination was also in line with FWS's consideration of past observations and qualitative analysis.[167] FWS conclusion relied, in part, on "documented impacts of previous industry activities on...polar bears."[168] Because only one incident, unrelated to industry-activity, of Level A harassment occurred in the region from 2012-2018, FWS deemed that sufficient evidence in itself to support the conclusion that no Level A harassment to polar bears would occur in the current 2021 BSITR.[169]

---

[164] BSITR0002430.
[165] *Id.*
[166] *Colorado Wild, Heartwood v. U.S. Forest Service*, 435 F.3d 1204, 1217 (10th Cir. 2006 (citing *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 329 (5th Cir. 1988) (noting that we do not review an agency's decision as statisticians, but "as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality")); *see also Southern California Edison Co. v. F.E.R.C.*, 717 F.3d 177 (9th Cir. 2013) (denying after "highly deferential review" arbitrary and capricious challenge to Commission's rate increase that was based on median value over average because "the Commission's orders so long as [it] examined the relevant data and articulated a ... rational connection between the facts found and the choice made.")
[167] *See CBD*, 695 F.3d at 907 (noting that the "behavioral response observed [from prior interactions]" is a factor appropriately considered in a negligible impact finding).
[168] BSITR0002423.
[169] BSITR0002396, BSITR0002433, BSITR0002396.

Order re Motions for Summary Judgment    29
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 29 of 48

Though some of FWS's modeling prediction percentages inch close to 50%, FWS had a rational basis to decide that the median value was a valid and preferable measure that best summarizes its modeling results, and that using the mean, as Plaintiff would prefer, was a less accurate measure. Plaintiffs fail to persuade the Court that FWS's negligible impact finding lacks a discernible path of analysis, that the agency "entirely failed to consider an important aspect of the problem,"[170] or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[171] Ninth Circuit precedent grants its "greatest deference" to FWS's "scientific predictions within the scope of its expertise," as the Court likewise does here.[172]

Despite Plaintiffs' allegations to the contrary, the Court finds that FWS properly considered Level A harassment or lethal take in accordance with the MMPA, and properly applied the generally accepted meaning of "reasonably likely" in its negligible impact finding. "FWS, as the expert scientific agency, is owed deference in weighing its modeling results and in its negligible impact findings"[173] and the Court grants it such deference given the rational explanations FWS has provided for its determination. The Court finds that FWS's finding that the total take number would have a negligible impact on SBS polar bears was not arbitrary and capricious,

---

[170] *CBD*, 695 F.3d at 906; *see also Kempthorne*, 588 F.3d at 710 ("A negligible impact finding is arbitrary and capricious under the MMPA only if the agency, inter alia, ... entirely failed to consider an important aspect of the problem ...." (internal citations and quotation marks omitted)).

[171] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (1983).

[172] *Kempthorne*, 588 F.3d at 710–11; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603–04 (9th Cir. 2014) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.") (quoting *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *Pritzker 1*, 828 F.3d at 1139 (same); *Pritzker 2*, 840 F.3d at 679 (same).

[173] Doc. 38 at 30.

1  rather it is supported by analysis of its quantitative modeling, review of past

2  observations, and qualitative analysis of issues.[174]

3                       **b. FWS's Consideration of "non-serious" Level A**

4                       **Harassment Was Not Arbitrary.**

5       Plaintiffs contend that FWS failed to consider how the take authorized would

6  affect polar bears' recruitment or survival rates because FWS arbitrarily excluded

7  the impacts from "non-serious" Level A harassment in its negligible impact finding.

8  Plaintiffs cite to FWS's acknowledgement of the importance of the post-emergence

9  period for cubs to develop and survive, and that early departure from the den site,

10 curtailing that period, "may hinder the ability of cubs to travel, thereby increasing

11 the chances for cub abandonment or susceptibility to predation."[175]

12      Defendants claim that Plaintiffs wrongly conflate a potential reduction in

13 fitness with likely mortality, while ignoring other biological factors and data FWS

14 considered regarding the difference in effects of early den emergence and early den

15 site departure.[176] Per FWS, it utilized the best available science in its modeling of

16 estimated take and assigned a "serious" Level A harassment to all cubs subjected to

17 early den emergence and a "non-serious" Level A harassment to all cubs subjected

18 to early den site departure.[177] Defendants contend that Plaintiffs' assumption would

19 unduly overestimate impacts in a manner not supported by the "best scientific

20 evidence available" standard applicable to ITRs.[178]

21      FWS explained that in ultimately treating impact to post-emergence cubs as

22 "non-serious" Level A harassment it considered factors such as distribution and

23 habitat use patterns of polar bears, the well-documented impacts of previous

24 Industry activities on polar bears, and the extensive monitoring and mitigation

25 _____

26 [174] Doc. 38 at 29.
   [175] Doc. 31 at 39 citing BSITR002394.

27 [176] Doc. 38 at 40.
   [177] BSITR002394; BSITR0002438; BSITR002346.

28 [178] 50 C.F.R. § 18.27(b).

Order re Motions for Summary Judgment                    31
*Alaska Wildlife Alliance, et al., v. U.S. Fish and*
*Wildlife Service, et al.*

requirements imposed on LOA holders.[179] FWS's explanation and considerations for its classification are rational and sufficiently detailed.

FWS's responsibility is to "show that information exists in the administrative record to support a negligible impact finding" and to base its ITR findings on the "best scientific evidence available."[180] FWS met its burden by explaining why the best available science did not support the modeling assumption that a departure from a simulated den less than eight days after cub emergence would cause cub mortality and specified the information in the administrative record (i.e. data concerning the extreme rarity of any Level A harassment from prior ITR activities, the results of the predictive modeling exercise finding early departure unlikely to occur, the ITR's mitigation requirements, etc.) to support its finding of negligible impact. The Court therefore finds FWS's negligible impact findings to be rationally based on the "best scientific evidence available" and not arbitrary or capricious.

The Court finds that Defendant FWS properly considered impacts of cub loss by serious Level A harassment and lethal take, both annually and over the five-year 2021 BSITR. The Court further finds that FWS properly considered the impacts of "non-serious" Level A harassment in its evaluation. FWS's negligible impact finding in this case was not arbitrary and capricious.

**4. FWS's Authorization of Level B Harassment Did Not Violate the MMPA by Also Permitting Likely Level A Takes.**

Plaintiffs claim that Defendant FWS violated the MMPA by authorizing Level B harassment when it is "highly likely that the specified activities will also result in unauthorized Level A harassment or lethal take."[181] To support their argument, Plaintiffs cite to *Kokechik*, where the court found that allowing incidental taking of

---

[179] BSITR0002423-24. C.F.R. §§ 18.122-18.128.
[180] 54 Fed. Reg. at 40,343; 50 C.F.R. § 18.27(b).
[181] Doc. 31 at 40.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
Case 3:21-cv-00209-SLG-KFR    Document 53    Filed 02/06/23    Page 32 of 48
32

one protected marine mammal species knowing that other protected marine mammal species would be taken as a result was at odds with MMPA requirements[182] that prohibit FWS from authorizing only part of the take that will occur when the covered activities will cause other, unauthorized take.[183]

Defendants argue that Plaintiffs' reliance on *Kokechik* is misplaced and that its evaluation was proper considering AOGA did not request authorization of any Level A harassment or lethal take, and neither AOGA's petition nor FWS's subsequent analysis anticipated that any such take would occur.[184] Federal Defendants further argues that "Plaintiffs' argument that Level A harassment is actually likely to occur (contrary to FWS's specific findings) based solely on the combined mean probability of either a non-serious or serious Level A harassment" is unavailing because it "impermissibly supplants FWS's reasonable professional judgment that such take is not estimated to occur, based on the agency's entire record including both qualitative and quantitative analyses."[185]

The Court agrees with Defendant FWS that Plaintiffs' reliance on *Kokechik* is misplaced. In *Kokechik* the relevant issue was the agency's issuance of a permit that allowed for "the incidental taking of 1,750 Dall's porpoise during 1987 with a 5% yearly reduction over the following four years, and 45 northern fur seals annually."[186] The D.C. Circuit held that the Secretary's decision to disregard these incidental taking as "negligible" was improper, because "[t]he MMPA,...does not provide for a 'negligible impact' exception to its permitting requirements where incidental takings are not merely a remote possibility but a certainty."[187]

---

[182] *Kokechik Fishermen's Ass'n v. Secretary of Commerce*, 839 F.2d 795, 800 (D.C. Cir. 1988).
[183] *Id.* at 801-02.
[184] Doc. 38 at 41; *see also* Doc. 43 at 42-45.
[185] Doc. 38 at 42; *see also* BSITR002407; BSITR002423.
[186] 839 F.2d at 798.
[187] 839 F.2d at 802.

Shortly after its issuance, Congress abrogated the *Kokechik* decision, implementing a new statutory scheme governing the incidental take of marine mammals in commercial fisheries.[188]  Moreover, even if *Kokechik* remained viable, it would not apply in this case.  This is not a case in which unauthorized Level A takes of SBS polar are "sufficiently 'certain'" to occur as Plaintiffs assert.[189]  First and foremost, unlike in *Kokechik*, the applicant in this case has not requested permission for any Level A harassment and lethal take of any protected marine species.  Moreover, as detailed above, and contrary to Plaintiffs' assertions, such takings are not a certainty.  As FWS states, takes of SBS polar bears are "almost never observed in the Beaufort ITR region and are not predicted in the majority of FWS's modeling results."[190]

As detailed *supra*, FWS analyzed and explained its science-based, qualitative, and quantitative reasoning for evaluating the probability of Level A harassment of cubs in different factual settings (late denning period and pos-emergence period) and why cubs might suffer different injuries in those two different circumstances if disturbed. It used this rationale to ultimately determine that no Level A harassment of lethal take would occur.[191] For the reasons previously stated, the Court defers to FWS's expertise and finds that its evaluation of Level A harassment is not arbitrary and capricious.

**5. FWS's Least Practicable Adverse Impact Analysis Did Not Violate the MMPA.**

Plaintiffs allege that FWS failed to meet the MMPA's requirement to ensure the least practicable adverse impact ("LPAI") to SBS polar bears because FWS failed to consider restrictions on the timing and geographic scope of authorized activities

---

[188] *See* H.R. Rep. No. 100-970 at 18-20, *reprinted in* 1988 U.S.C.C.A.N. 6154, 6159-61, 6178-79.
[189] Doc. 31 at 41-42.
[190] Doc. 38 at 41. BSITR0002430.
[191] BSITR0002333; BSITR0002333.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
34
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 34 of 48

such as seismic exploration.[192] Plaintiffs argue that FWS did not properly consider their suggestion during the comment period that "FWS consider closing sensitive areas to new activities, restricting dates for seismic exploration, and imposing a buffer around suitable denning habitat."[193] Instead, Plaintiffs allege FWS "summarily stated spatial and temporal measures were impracticable due to unspecified 'regulatory and safety requirements'[194] without the required meaningful consideration or reasonable explanation that the MMPA requires.[195]

Federal Defendants argues that it did consider a range of restrictions during the administrative process and provided adequate reasoning and explanation for measures it did not accept or that were impracticable.[196] Federal Defendants also argues that Plaintiffs' argument is undermined by their "failure to explain how any additional, specific temporal or spatial restriction could be practically imposed on the activities contemplated in AOGA's Petition[.]"[197]

FWS is not obligated to accept all suggestions, rather an ITR must prescribe methods and means of effecting the "least practicable adverse impact ("LPAI") on such species or stock and its habitat."[198] "Practicable normally means that something is capable of being done, or practical and effective."[199] The MMPA requires practicable restrictions, but that limitation does not extend to categorically foreclosing, i.e., make impracticable, activities that must occur, if at all, in certain locations or at certain times of the year. A determination that an effective mitigation

---

[192] Doc. 31 at 42-50.
[193] Doc. 31 at 42 n. 152 (citing BSITR0018034, 18074–75 (Alaska Wilderness League ITR Comments); BSITR0017762–63, 17766–67 (Center for Biological Diversity ITR Comments); BSITR0017921–23 (Sierra Club ITR Comments)).
[194] Doc. 31 at 43 n. 153.
[195] Doc. 31 at 43.
[196] Doc. 38 at 43-44; *see also* Doc. 41 at 37-39; Doc. 43 at 46-47.
[197] Doc. 38 at 47.
[198] 16 U.S.C. § 1371(a)(5)(A)(i)(II).
[199] *Cook Inletkeeper*, 533 F. Supp. 3d at 759 (quoting *Pritzker 1*, 828 F.3d at 1134).

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and*
*Wildlife Service, et al.*
35

Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 35 of 48

1   measure is not practicable must be rationally articulated and supported by

2   "meaningful discussion."[200]

3       Plaintiffs argue that "FWS deemed timing and geographic restrictions

4   impracticable based on AOGA's unsupported assertions and conclusory statements

5   that it would not be possible to comply with them."[201]  The Court finds that the record

6   does not support this assertion.  Indeed, in this case, it appears as if FWS considered

7   numerous time and space restrictions.  As Defendants note, the 2021 BSITR includes

8   a number of mitigation measures designed to address some of Plaintiffs' suggestions

9   intended to protect denning bears, including: an increased number of polar bear den

10  surveys using aerial infrared imagery ("AIR"), a one-mile exclusion zone around all

11  known dens, restrictions on the timing and types of activities in the vicinity of dens,

12  human reconnaissance of denning habitat in advance of seismic surveys, and flight

13  restrictions around known polar bear dens.[202]  In addition, the ITR limits the overall

14  area of denning habitat that may be subject to seismic surveys in a given year,

15  "incorporates later start dates" for seismic surveys, with no surveys to occur until

16  the operator has completed three den surveys during the "ideal temporal window

17  for maternal denning surveys."[203]   In this case, FWS's explanations for the

18  restrictions it chose are reasonable and illustrate how it proactively applied the LPAI

19  standard through coordination with AOGA and in further analysis during the

20  rulemaking process.

21      FWS stated that it "also considered the use of additional time and space

22  restrictions for oil and gas activities to limit the impact on denning bears. These

23  restrictions were not determined to be practicable as they may interfere with human

24

25  _____

    [200] *Pritzker 1*, 828 F.3d at 1139 n. 12.

26  [201] Doc. 31 at 44.

    [202] BSITR002455-56; BSITR002424; BSITR002443.  *See Chickaloon*, 947 F. Supp. 2d at 1059-

27  1060 (upholding NMFS's LPAI analysis based in part on plaintiffs' failure to demonstrate
    any incorrect assumptions or oversights in the agency's analysis).

28  [203] BSITR 002448; BSITR002413; BSITR002455.

Order re Motions for Summary Judgment                         36
*Alaska Wildlife Alliance, et al., v. U.S. Fish and*
*Wildlife Service, et al.*
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 36 of 48

health and safety as well as the continuity of oil and gas operations."[204] As it concerns a one-mile buffer around all suitable denning sites, FWS explained that a uniform buffer "is not practicable as many existing operations occur within denning habitat and it would not be able to shut down all operations based on other regulatory and safety requirements."[205] FWS gave the example of existing facilities and roads near "potential denning habitat" that "must be utilized during winter to ensure the continuity of operations and protection of tundra and wetlands."[206] FWS also noted that requiring a one-mile buffer around all suitable polar bear habitat within the 20-million acre SBS ITR area would be impractical "prior to operations" as "denning habitat requires the creation of snow drifts, which can differ from year-to-year."[207] FWS need not impose restrictions on areas in which polar bear denning activity is unlikely.[208]

The record indicates that FWS considered, and rejected, additional mitigation measures. In response to a request for closing sensitive areas to new activities. FWS noted that it lacked the authority to impose blanket restrictions such as closing sensitive areas to new activities to achieve the LPAI.[209] Additional temporal and spatial restrictions were similarly considered and deemed not practicable.[210]

In addition to including numerous measures with the 2021 BSITR designed to achieve the LPAI, FWS's reliance on future mitigation measures through LOAs was not improper. Such a practice is consistent with a reasonable interpretation of the

---

[204] BSITR0001703.
[205] BSITR0002424.
[206] *Id*. ("One mile buffer around all known polar bear denning habitat is not practicable as many existing operations occur within denning habitat and it would not be able to shut down all operations based on other regulatory and safety requirements."
[207] BSITR0002448; *see also* BSITR0002447.
[208] *See Chickaloon*, 947 F.Supp.2d at 1031.
[209] BSITR002447 (noting that FWS does not approve or disapprove industrial activities).
[210] BSITR0002424.

MMPA and recognizes the many variables that be present when activity contemplated in the 2021 BSITR is undertaken.[211]

Plaintiffs argue that FWS imposed more stringent spatial and temporal restrictions in another Arctic region, thereby undermining FWS's assertion that such restrictions are not practicable for the SBS polar bears. However, as Defendants note, the proposed measures were in draft form, were unissued, and were intended to address a request by one company, for one season, in one region with a higher polar bear density and higher proportion of polar bear denning habitat. As FWS explained, the parameters of the one-year proposal are markedly different than the five-year 2021 BSITR at issue in this case, which involve unknown activities in unknown years across a large area with existing infrastructure and facilities.[212]

The Court finds that Plaintiffs have not established that it would be practicable to impose additional geographic and temporal restrictions relevant to SBS polar bears beyond those already imposed.[213] Plaintiffs argue that FWS did not consider reasonable alternatives, but do not articulate why the proposed exclusion zones and temporal restrictions are insufficient. Indeed, prior approved LPAIs which incorporate many of the same measure as the 2021 BSITR "have proven to be highly successful in providing for polar bear conservation in Alaska."[214]

The mitigation measures contained with the 2021 BSITR may not be precisely or entirely what Plaintiffs believe should be required in this case. However, the measures imposed, and the explanations offered for those rejected, are reasonable, rational, and sufficiently articulated, and the Court is not permitted to "substitute

---

[211] *Alaska Wilderness League v. Jewell*, 116 F.Supp.3d 958, 967 (D. Alaska July 2, 2015).

[212] *See* BSITR0001002, 2414, 2392-93, 0630.

[213] *See Cook Inletkeeper*, 533 F.Supp.2d at 760.

[214] BSITR0008266; *see also CBD*, 695 F.3d at 908; 75 Fed. Reg. 76,086, 76,118-19 (Dec. 7, 2010) ("These mitigation measures are implemented to limit human-bear interactions and disturbances to bears and have ensured that industry effects on polar bears have remained at the negligible level.")

its judgment [or Plaintiffs'] for that of the agency."[215]  The LPAI analysis in this case did not violate the MMPA.

### b. NEPA

NEPA requires that federal agencies prepare an EIS for any "major Federal actions significantly affecting the quality of the human environment."[216] An agency may first prepare a less exhaustive EA, which is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]."[217] If the agency concludes in an EA that the federal action will not have significant environmental impacts, it may issue a Finding of No Significant Impact ("FONSI") in lieu of preparing an EIS.[218] When evaluating an agency's decision not to prepare an EIS under NEPA, courts use an arbitrary and capricious standard that "requires it to determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant."[219]

Plaintiffs challenge FWS's EA for the 2021 BSITR for failing to consider a reasonable range of alternatives. Specifically, Plaintiffs alleges that in adopting the final 2021 BSITR, FWS improperly dismissed consideration of timing and geographic restrictions that could reduce impacts to polar bears. According to Plaintiffs, "[b]ecause FWS did not meaningfully consider these measures or reasonably explain

---

[215] *Gaule v. Meade*, 402 F.Supp.2d 1078, 1087 (D. Alaska 2005)

[216] 42 U.S.C. § 4332(2)(C).

[217] 40 C.F.R. § 1508.9(a).

[218] *Id.* §§ 1508.9(a)(1), 1508.13.

[219] *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005) (citations omitted). While many Ninth Circuit decisions treat the "hard look" requirement as another formulation of the arbitrary and capricious standard, some address it separately as a measure of the overall adequacy of an EA or EIS. *Compare In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior,* 751 F.3d 1054, 1068 (9th Cir. 2014) *with Klamath–Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,* 387 F.3d 989, 992–93 (9th Cir. 2004).

Order re Motions for Summary Judgment       39
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 39 of 48

1  why they were excluded from consideration, the agency violated the MMPA and

2  NEPA."[220]

3      Federal Defendants argue that Plaintiffs improperly "fault FWS for preparing

4  an EA that discusses in detail two alternatives – the proposed action and a no-action

5  alternative – claiming that FWS wrongly ignored alternatives involving more

6  restrictions on the timing and locations of industry activities."[221] Defendants claim

7  that "an agency's obligation to consider alternatives under an EA is a lesser one than

8  under an EIS,"[222] and that it does not inherently "violate[] the regulatory scheme"

9  for an EA to focus on "two final alternatives."[223] Rather, in Defendants' view, FWS's

10  consideration of two alternatives is in line with Ninth Circuit precedent.[224]

11      NEPA requires federal agencies to "study, develop, and describe appropriate

12  alternatives to recommended courses of action."[225] This provision applies whether

13  an agency is preparing an EIS or an EA.[226] However, as Defendants pointed out "an

14  agency's obligation to consider alternatives under an EA is a lesser one than under

15  an EIS."[227] "[W]hereas with an EIS, an agency is required to '[r]igorously explore

16  and objectively evaluate all reasonable alternatives,' with an EA, an agency only is

17  required to include a brief discussion of reasonable alternatives."[228]

18

19

---

20  [220] Doc. 31 at 44.

21  [221] Doc. 38 at 47.

[222] *CBD,* 695 F.3d at 915 (quoting *Native Ecosystems*, 428 F.3d 1233, 1246).

22  [223] *Id.* (quoting *Native Ecosystems*, 428 F.3d at 1246); *see also N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153–54 (9th Cir. 2008) (per curiam) (upholding EA

23  that evaluated two alternatives).

[224] Doc. 38 at 47.

24  [225] 42 U.S.C. § 4332(2)(E).

[226] *Native Ecosystems Council*, 428 F.3d at 1245; *see also Bob Marshall Alliance v. Hodel*, 852

25  F.2d 1223, 1228–29 (9th Cir. 1988) ("[C]onsideration of alternatives is critical to the goals

26  of NEPA even where a proposed action does not trigger the EIS process.").

[227] *Native Ecosystems*, 428 F.3d at 1246.

27  [228] *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)

(comparing 40 C.F.R. § 1502.14(a) with 40 C.F.R. § 1508.9(b)) (second alteration in

28  original).

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and
Wildlife Service, et al.*
40

1    The Court finds that FWS's alternatives analysis here is not arbitrary and
2    capricious. Rather, the decision to prepare an EA with two alternatives was
3    reasonable. The record demonstrates that FWS took a "hard look" at the
4    consequences of its actions, based its decision on a consideration of the relevant
5    factors, and provided a convincing statement of reasons to explain why the project's
6    impacts are insignificant.[229]

7        Reflecting on past SBS ITRs, AOGA's initial request included mitigation
8    measures previously identified as necessary to effect the least practicable adverse
9    impact on the SBS polar bears. As detailed above, FWS worked with AOGA
10   throughout the ITR process to identify additional effective and practicable mitigation
11   measures, including polar bear den detection surveys, observers, and interaction
12   plans.[230] After reviewing comments, FWS added an additional restriction to the ITR
13   to minimize potential disturbance to polar bears – an area-wide minimum flight
14   altitude, subject to safety and operational constraints mandating that aircrafts fly
15   above 1.500 feet when safe and operationally possible.[231]

16       FWS was not wrong in its understanding that where only an EA is required,
17   as is the case here, evaluating two alternatives, the proposed activity and the no-
18   action alternative, complies with NEPA's requirement that the agency consider
19   alternatives.[232] Agencies are also not required to evaluate alternatives in an EA that
20   they explained were not feasible both in the EA and the final incidental take rule.[233]

21
22

---

[229] *Native Ecosystems Council,* 428 F.3d at 1239 (citations omitted). While many Ninth
Circuit decisions treat the "hard look" requirement as another formulation of the arbitrary
and capricious standard, some address it separately as a measure of the overall adequacy of
an EA or EIS. *Compare In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v.
U.S. Dep't of Interior,* 751 F.3d 1054, 1068 (9th Cir. 2014) *with Klamath–Siskiyou Wildlands
Ctr. v. Bureau of Land Mgmt.,* 387 F.3d 989, 992–93 (9th Cir. 2004).
[230] BSITR0002424. *See supra* Section IV(a)(ii)(5).
[231] BSITR0018588-89, BSITR 0002424.
[232] *CBD,* 695 F.3d at 915-16.
[233] *Id.*

Order re Motions for Summary Judgment                                    41
*Alaska Wildlife Alliance, et al., v. U.S. Fish and
Wildlife Service, et al.*
Case 3:21-cv-00209-SLG-KFR    Document 53    Filed 02/06/23    Page 41 of 48

Likewise, agencies are not required to evaluate alternatives that are not consistent with the proposed action's purpose.[234]

FWS concedes that commenters suggested further potential mitigation measures, which FWS considered but deemed impracticable and gave detailed reasoning as to why. The Court identified thirteen such examples of FWS responding to comments specifically related to least practical adverse impact under NEPA which were included in the final 2021 BSITR.[235] For example, commenters suggested grounding all flights if they must fly below 1,500 feet. FWS responded that "[r]equiring all aircraft to maintain an altitude of 1,500 ft is not practicable as some necessary operations may require flying below 1,500 ft in order to perform inspections or maintain safety of flight crew."[236] Commenters suggested requiring the use of den detection dogs. FWS explained that it was not practicable to require scent trained dogs to detect dens due to the large spatial extent that would need to be surveyed each year.[237] Commenters also suggested prohibiting driving over high relief areas, embankments, or stream and river crossings, to which FWS agreed that the denning habitat must be considered in tundra travel activities, but explained that "complete prohibition of travel across such areas is not practicable because it would preclude necessary access to various operational areas and pose potential safety concerns. Moreover, not all high relief areas, embankments, and stream and river crossing constitute suitable polar bear denning habitat."[238] Like the agency in *CBD*, FWS "initially considered other action alternatives, but explain[ed] in the EA

---

[234] *Wyoming v. U.S. Dept. of Agriculture*, 661 F.3d 1209, 1244 (10th Cir. 2011); *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1031; *see also BioDiversity Conservation Alliance*, 608 F.3d at 714–15 ("An environmental impact statement must study reasonable alternatives in detail.... The Bureau may eliminate alternatives that are 'too remote, speculative, impractical, or ineffective,' or that do not meet the purposes and needs of the project.") *but see Utah Envtl. Cong. v. Bosworth*, 439 F.3d at 1184 (stating that an agency cannot "define the project so narrowly that it foreclose[s] a reasonable consideration of alternatives."

[235] BSITR0002424-25.

[236] BSITR0002424.

[237] BSITR0002425.

[238] BSITR0002425.

Order re Motions for Summary Judgment                    42
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 42 of 48

why…they were not feasible."[239] FWS clearly considered alternatives, accepting one, and rejecting others with sufficient reasoning.[240]

In accordance with NEPA requirements, FWS sufficiently studied, developed, and described appropriate alternatives to recommended courses of action.[241] Here, as in *CBD*, FWS's consideration of two alternatives is sufficient. The Court finds that FWS "adequately developed and analyzed its proposed mitigation measures in the EA to a reasonable degree as required by law."[242] FWS's consideration of alternatives in the EA were not arbitrary or capricious and did not violate NEPA.

### c. ESA

The ESA provides for listing species as threatened or endangered, and it protects listed species in several ways.[243] The ESA contains both substantive and procedural requirements. Substantively, Section 9 of the ESA prohibits "take" of endangered species.[244] The ESA's definition of "take" resembles the MMPA's definition, though with notable differences. For example, whereas the MMPA requires only that harassment have the "*potential* to injure … or … disturb a marine mammal … by causing *disruption* of behavioral patterns,"[245] the ESA imposes a

---

[239] *CBD*, 695 F.3d at 916.

[240] *Compare* BSITR0000013 (original petition geographic scope), *with* BSITR0000624 (final petition excising portions of the scope adjacent to the Outer Continental Shelf); BSITR0000050 (original petition providing neither dates nor locations for any operations), *with* BSITR0000737, BSITR0000821 (identifying "general areas" where seismic surveys would occur, and committing to conduct multiple infrared surveys during specific time windows before conducting seismic surveys); *see also* BSITR000411 (email from AOGA removing numerous sites from the scope of its specified activities); BSITR002443 (observing in final ITR that there is "a short period of the winter when AIR surveys can reliably be done").

[241] 42 U.S.C. § 4332(2)(E).

[242] *Alaska Wilderness League*, 116 F.Supp.3d at 971 (internal quotation marks and citation omitted).

[243] 16 U.S.C. § 1533.

[244] 16 U.S.C. § 1538(a)(1)(B).

[245] 16 U.S.C. § 1362(18)(A)(i)-(ii) (emphasis added).

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
43
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 43 of 48

1    higher threshold - a "*likelihood* of injury to [a listed species] by annoying it to such

2    an extent as to *significantly disrupt* normal behavioral patterns."[246]

3        Procedurally, Section 7 of the ESA requires that federal agencies consult with

4    the FWS or NMFS for any agency action that "may affect" a listed species or its

5    critical habitat.[247] Formal consultation results in a BiOp that determines whether the

6    proposed action is likely to jeopardize the continued existence of a listed species or

7    adversely modify its critical habitat.[248] If the BiOp concludes that the action is not

8    likely to jeopardize the species, but is likely to result in some take, FWS provides an

9    Incidental Take Statement ("ITS") along with the BiOp.[249]

10       An ITS specifies the impact (i.e., the "amount or extent") of the incidental take

11   on the listed species, contains terms and conditions designed to minimize the impact,

12   and, in the case of marine mammals, specifies measures that are necessary to comply

13   with Section 101(a)(5) of the MMPA.[250] Take that complies with the terms and

14   conditions of an ITS is not a prohibited take under Section 9.[251] If the amount or

15   extent of take specified in the ITS is exceeded, the Service reinitiates Section 7

16   consultation to ensure that the "no jeopardy" determination remains in force.[252]

17           **i.  The BiOp Concluding that No Level A Harassment Was Likely**

18               **to Occur Did Not Violate the ESA.**

19       Because the 2021 BSITR authorized certain adverse effects on polar bears, a

20   species listed as threatened under the ESA, FWS consulted on the impact of those

21   effects pursuant to Section 7(a)(2) of the ESA in a BiOp.[253]  Plaintiffs argue that FWS

22   violated the ESA because its BiOp did not account for take that was reasonably

23

---

24   [246] 50 C.F.R. § 17.3 (emphasis added).
     [247] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).
25   [248] 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h).
     [249] 50 C.F.R. § 402.14(i).
26   [250] 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1).
27   [251] 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).
     [252] 50 C.F.R. §§ 402.14(i)(4), 402.16(a).
28   [253] BSITR0002289-357; Doc. 41 at 44.  16 U.S.C. § 1536(a)(2).

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and
Wildlife Service, et al.*                    44

Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 44 of 48

certain to occur and allowed for discretionary reinitiation of consultation. Specifically, Plaintiffs argue that the ITS in the BiOp failed to include Level A harassment and lethal take, and that the BiOp contains a defective retention notice.

Federal Defendants argue that it reasonably excluded Level A harassment and lethal take because the ITR does not allow any Level A harassment or lethal take, nor did it authorize the underlying conduct of oil and gas activities. Federal Defendants rely on 50 C.F.R. § 402.02, defining "effects of action" to argue that "take that is not anticipated is not 'reasonably certain to occur' and is not an 'effect of the action.'"

Despite Plaintiffs' continued objection to FWS's finding that no Level A harassment and lethal take are reasonably likely to occur, the Court reiterates its finding *supra* that FWS has a rational basis, supported by science and historical data, for its conclusion and finds it is entitled to deference.[254] Therefore, the Court finds that Defendant FWS's BiOp does not violate the ESA.

### ii. The Reinitiation Notice in this Case Was Not Defective.

Plaintiffs contend that FWS's BiOp contains a defective reinitiation notice that violates the ESA because it uses discretionary language, thereby failing to require immediate and nondiscretionary reinitiation of formal consultation.[255] Plaintiffs argue that the BiOp's statement that formal consultation "'may be required'" if the amount of Level B harassment authorized in the ITS is exceeded or if injury or lethal take of polar bears occurs [is] plainly inconsistent with the ESA's requirements."[256]

Federal Defendants counters that FWS has no mandatory duty to include any specific language in the reinitiation notice.[257] Defendant argues that Plaintiffs' complaints ignore FWS's obligations under the regulations.[258] Further, Defendants

---

[254] *See supra* Section IV(a)((ii)(3).
[255] Doc. 31 at 43.
[256] Doc. 31 at 52.
[257] Doc. 38 at 52; *see also* Doc. 50 C.F.R. §402.14(h),(i)(specifying contents of BiOp).
[258] Doc. 38 at 52; *see also* Doc. 41 at 46; Doc. 43 at 52 (citing generally to 50 C.F.R. §§ 402.14(h) and (i), which specify contents of the BiOp, and 50 C.F.R. §§ 402.16(a)(1) and 402.14(i)(4) which explain the duty to reinitiate consultation.)

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and*
*Wildlife Service, et al.*
45
Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 45 of 48

argue that its BiOp also repeats this obligation with text stating FWS "shall reinitiate section 7 consultation within 7 days if the amount of MMPA "Level B harassment takes" anticipated is exceeded or if a Level A harassment or injurious or lethal take of a polar bear occurs."[259]

The parties do not seem to disagree that reinitiation is in fact required, and is not discretionary. They seem to only dispute whether the requirement is sufficiently stated in the BiOp.  A review of the plain language of the BiOp confirms that it is.

The governing ESA regulation, 50 C.F.R. § 402.16.11, states, in relevant part,

> [r]einitiation of formal consultation *is required* and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:
>
> ...
> (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
> ..., or
>
> (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

In this case, the relevant portion of the BiOp reads as follows:

> Additionally, required monitoring and reporting will allow the Service to determine if/when the level of authorized take is exceeded, and whether subsequent reinitiation is necessary. The Services Marine Mammal's Management Office will provide annual reports on the amount of reported take, and ***shall reinitiate*** section 7 consultation within 7 days if the amount of MMPA "Level B harassment takes" anticipated is exceeded or if a Level A harassment or injurious or lethal take of a polar bear occurs. These mitigation measures are non-discretionary, and LOAs will be conditioned with these measures in order for the exemption in section 7( o )(2) of the ESA to apply. As provided in 50 C.F.R. § 402.16, re-initiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained ( or is authorized by law), and re-initiation may be required if:
>
> 1. The amount or extent of incidental take for listed species is exceeded (i.e., more than 92 Level B harassment in any given year, or any injurious or lethal take);

---

[259] Doc. 41 at 52; *see also* Doc. 43 at 46; Doc. 43 at 52 (citing BSITR0002334-35).

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
Case No. 3:21-cv-00209-SLG-KFR
46

2. New information reveals effects of the action that may affect listed species in a manner or to an extent not considered in this opinion;

3. The agency action is subsequently modified in a manner that causes an effect to listed species or critical habitat not considered in this opinion; or

4. A new species is listed or critical habitat is designated that may be affected by the action.[260]

The BiOp clearly states that FWS "[s]hall reinitiate section 7 consultation within 7 days in the event that the amount of authorized take is exceeded."[261] It is true that the BiOp does include the discretionary language complained of by Plaintiff, and FWS does not explain their reason for including the "may be required" language in the section immediately after its statement that it "shall reinitiate" consultation in the event of excessive authorized take. Nonetheless, the implementing regulations require reinitiation, a fact FWS clearly acknowledges in the BiOp, which accurately states the law - that reinitiation is "non-discretionary" when take is exceeded.[262] This language suffices under ESA. The Court finds that Defendants' reinitiation notice complies with the ESA.

## V. CONCLUSION

For the reasons stated above, the Court finds the 2021-2026 Beaufort Sea ITR complies with MMPA, NEPA, and ESA. The Court therefore recommends that Plaintiffs' Motion for Summary Judgment be **DENIED** and Defendants' cross-motions for summary judgment be **GRANTED**.

DATED at Anchorage, Alaska this 6th day of February 2023.

/s/ Kyle F. Reardon
KYLE F. REARDON
United States Magistrate Judge
District of Alaska

---

[260] BSITR0002335 (emphasis added).
[261] BSITR0002335 (emphasis added).
[262] BSITR0002335.

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
Case No. 3:21-cv-00209-SLG-KFR

47

Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 47 of 48

**NOTICE OF RIGHT TO OBJECT**

Under 28 U.S.C. § 636(b)(1), a district court may designate a magistrate judge to hear and determine matters pending before the Court. For dispositive matters, a magistrate judge reports findings of fact and provides recommendations to the presiding district court judge.[263] A district court judge may accept, reject, or modify, in whole or in part, the magistrate judge's order.[264]

A party may file written objections to the magistrate judge's order within 14 fourteen days.[265] Objections and responses are limited to five (5) pages in length and should not merely reargue positions previously presented. Rather, objections and responses should specifically identify the findings or recommendations objected to, the basis of the objection, and any legal authority in support. Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the district court's judgment.[266]

---

[263] 28 U.S.C. § 636(b)(1)(B).
[264] 28 U.S.C. § 636(b)(1)(C).
[265] *Id.*
[266] *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).

Order re Motions for Summary Judgment
*Alaska Wildlife Alliance, et al., v. U.S. Fish and Wildlife Service, et al.*
3:21-cv-00209-SLG-KFR
48

Case 3:21-cv-00209-SLG-KFR   Document 53   Filed 02/06/23   Page 48 of 48