TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

PETER BROCKER
JOHN H. MARTIN
Trial Attorneys
999 18th St., South Terrace Suite 370
Denver, CO 80202
peter.brocker@usdoj.gov
Tel: (202) 305-8636
john.h.martin@usdoj.gov
Tel: (303) 844-1383

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| ALASKA WILDLIFE ALLIANCE, et al., | )<br>)<br>) |
| Plaintiffs, | ) No. 3:21-cv-209-SLG-KFR<br>) |
| v. | )<br>) |
| U.S FISH AND WILDLIFE SERVICE, et al. | )<br>)<br>) |
| Defendants, | )<br>) |
| and | )<br>) |
| ALASKA OIL AND GAS ASSOCIATION et al., | )<br>)<br>) |
| Intervenor-Defendants | )<br>) |

**FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION RE MOTIONS FOR SUMMARY JUDGMENT**

Federal Defendants (hereinafter "FWS") request the Court adopt the Report and Recommendation, Dkt. No. 53 ("Report"), deny Plaintiffs' (hereinafter "AWA") Objections, Dkt. No. 57 ("Obj."), and grant summary judgment to Defendants. FWS incorporates by reference its prior response brief as support for this response to AWA's objections. Federal Defendants' Opposition Brief, Dkt. No. 38 ("US Br."). As a threshold response, the Objection should be denied because AWA's Objection repeats every argument made to the magistrate judge in their two prior merits briefs without explaining specific errors in the Report. *See, e.g., Montana Shooting Sports Ass'n v. Holder*, No. CV 09-147-M-DWM-JCL, 2010 WL 4102940, at *2 (D. Mont. Oct. 18, 2010) (explaining requirement for a proper objection).

## I. FWS' Small Numbers Finding Should Be Upheld.

### A. The Small Numbers Finding Complies with the MMPA.

AWA's statutory argument challenging FWS' small numbers determination reduces to the demand that the Marine Mammal Protection Act ("MMPA") can only be satisfied by comparing the number of takes that could occur across multiple years to a single year's population estimate. Obj. at 2. AWA cannot establish that its preferred reading of MMPA Section 1371(a)(5)(A)(i) is even a reasonable, let alone mandatory, reading of this provision. AWA's argument ignores factors that this Court has found relevant in statutory construction. Most notably, nothing in the statutory language at 16 U.S.C. § 1371(a)(5)(A)(i) prescribes or prohibits the use of any metrics or methods to evaluate "small numbers." Report at 14-15.

MMPA Section 1371(a)(5)(A)(i) does not define the term "small numbers," eschews "absolute numerical limits," and does not even require FWS to quantify the number of mammals that would be taken pursuant to regulation. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 905-06 (9th Cir. 2012) (quoting H.R. Rep. No. 97-228). Those principles rebut AWA's argument that the statute plainly requires FWS to compare a five-year cumulative summary of its estimated take to the Southern Beaufort Sea ("SBS") polar bear population for a one-year period. Congress instead granted FWS the discretion to craft a reasonable small numbers determination, refuting AWA's reliance on *Immigration and Naturalization Service v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987). Congress did not need to include the term "annual" in the statute to permit FWS' comparison of annual take estimates to annual population estimates in the small numbers determination. The more probative indicator of congressional intent is its use of the phrase "total of such taking" in the adjacent "negligible impact" requirement but not in the "small numbers" requirement. 16 U.S.C. § 1371(a)(5)(A)(i)(I).

MMPA Section 1371(a)(5)(A)(i) is a broad directive to FWS. FWS reasonably considered the estimated take levels from its predictive modeling on an overall basis, as well as how that take is distributed across the five years of incidental take regulation ("ITR") as compared to an annualized estimate of the SBS polar bears' current stock size. BSITR0002422-23. FWS also considered the ratio of overall polar bear observations to the smaller number of takes reported under prior ITRs and the finding that the specified industrial activities would occur in a very small portion of the stocks' range, thus limiting

*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
No. 3:21-cv-00209-SLG (D. Alaska) Page 2
Case 3:21-cv-00209-SLG-KFR Document 61 Filed 03/07/23 Page 3 of 12

the proportion of the stock potentially affected. *Id*. AWA misrepresents (Obj. at 4) FWS' finding as based solely on its calculation that 10.14% of the stock may be taken by harassment each year. FWS' comparison of predictive modeling results by year to the annual population estimate is one of three lines of analysis supporting FWS' small numbers determination.

AWA's demand that FWS compare five years of take to an annual population estimate is undeniably "less suitable" from a biological basis. BSITR0002428. Annual population estimates reflect the number of animals believed to exist at a single point in time; they do not forecast recruitment or mortality or other populations trends, and thus do not reflect the number of different individual animals that could exist within a given population over a multi-year period. *Id*. The fact that the annual population estimate is derived from review of multiple years of data does not change the temporal scope, meaning, or proper utilization of that estimate. BSITR0002386. Moreover, the legislative history recounted in *Salazar* provides no reason to think Congress intended any unusual metric when specifying five years as a maximum duration of ITRs.

AWA also ignores that the ITR does not directly allow any incidental take because incidental take is authorized only in a letter of authorization ("LOA"). 50 C.F.R. § 18.27(f). For this ITR, FWS limits LOAs to one-year terms. BSITR0002430. Thus, the reference in MMPA Section 1371(a)(5)(A)(i) to allow take "during periods of not more than five consecutive years each" need not refer to ITR, as an ITR is only the framework to establish permissible methods of taking and other requirements. The statutory

reference to "periods" is given meaning here when FWS issues LOAs, which are here limited to annual terms. AWA's citation (Obj. at 3-4) to 50 C.F.R. § 18.27(f)(2) is inapposite because that regulation applies only to FWS' issuance of a LOA, not issuance of an ITR.

AWA also has no persuasive response to FWS' point (discussed in the Report at 15) that its interpretation harmonizes the MMPA's two permissible means to authorize incidental harassment in either one-year authorizations or under regulations effective for up to five years. AWA does not address the incongruity that, under their construction, five sequential annual harassment authorizations might authorize a cumulative level of take that would not be permissible in a five-year ITR allowing the same activities. The Court should reject AWA's argument which is based on an unreasonable reading of an ambiguous statutory provision, and because it would lead to absurd results.

### B. The Small Numbers Finding Is Consistent with Agency Practice.

AWA argues unpersuasively that FWS cannot apply the same small numbers analysis applied in prior Beaufort Sea ITRs because it once said something slightly different in an unrelated ITR. Obj. at 5. FWS agrees that the Cook Inlet ITR for sea otters had cursory analysis to support its small numbers finding. But that cursory analysis concerned a different species in a different region, and a rule that did not present a debatable question about the small numbers finding. US Br. at 15; *see* 84 Fed. Reg. 37716, 37735 (Aug. 1, 2019) (total take amounted to one percent and 6.9 percent of the two relevant sea otter stocks). The Cook Inlet ITR did not announce any broad policy for

FWS and does not limit FWS' discretion on how best to interpret available science concerning polar bears. BSITR0002428. More pertinent here are the two prior Beaufort Sea ITRs and the prior Chukchi Sea ITR, all of which concern polar bears and render small numbers determinations in a manner consistent with what FWS did here. US Br. at 14-15. FWS was not required to depart from or justify its continued use of annual population estimates in its small numbers determination for polar bears just because less detailed metrics were sufficient in the Cook Inlet ITR for sea otters.

Moreover, the heightened standard of review under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) does not even apply to the statutory construction issue here. *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1226 (9th Cir. 2015) (distinguishing *Fox Television Stations* as limited to changes in regulations and official policy). Here FWS is not changing any formal policy or rule. Rather it considers the small numbers criterion using the best available information on a case-by-case basis. There are no reliance interests here or any change in agency fact-finding for the SBS polar bears that would require FWS to expressly discuss a changed policy. *Fox Television Stations*, 556 U.S. at 515.

AWA's efforts to show that FWS based its small numbers findings in other polar bear ITRs on a single comparison of the five-year total of estimated take to an annual population figure lacks merit. US Br. at 13-16. The 2013-2018 Chukchi Sea ITR is diligent in citing the annual levels of estimated take. *Id*. at 15. That ITR rested the small numbers finding (in part) on a calculation of the percentage of the polar bear population

that could be subjected to incidental harassment on an annual basis. 78 Fed. Reg. 35364, 35400-401, 35415 (June 12, 2013). AWA's attempted rewrite (Obj. at 6) of the 2016-2021 Beaufort Sea ITR is particularly misguided. Their own math undercuts their new theory as to how FWS calculated the percentage of the population estimated to be taken. AWA's calculation results in a percentage of 0.0756. This number would be rounded up to 7.6% by any reasonable person or FWS. FWS has not changed its position or been inconstant in its application of the small numbers criterion. FWS' application here is permissible and should be upheld.

## II. FWS' Negligible Impact Finding Is Reasonable.

AWA's objection to FWS' negligible impact analysis is a confusing blend of misleading statutory construction and challenge to FWS' technical analysis of potential Level A harassment. AWA ignores applicable regulatory standards, such as the definition of "negligible impact" at 50 C.F.R. § 18.27(c). AWA also fails to explain how the statutory definition of Level A harassment obligates FWS to structure and construe its predictive modeling in the way AWA demands, as opposed to the way it deemed most probative for assessing the probability for adverse impacts to annual rates of recruitment and survival. FWS applied its expertise to analyze the potential for four scenarios to occur during the polar bear denning process. AWA would override FWS' analysis with their own arbitrary estimates of Level A harassment that ignore key biological distinctions cited by FWS. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1148 (9th Cir. 2016) ("Mere differences in opinion . . . are not sufficient

grounds for rejecting the analysis of agency experts."). FWS addressed AWA's various arguments about the agency's choices in developing and interpreting the results of its predictive modeling. US Br. at 16-25. FWS addressed all relevant factors in its analysis and in its conclusion that the industrial activities specified in the ITR are not estimated to cause any Level A harassment. BSITR0002396.

AWA also objects (Obj. at 10-13) that FWS misapplied the concept of "reasonably likely" as it appears in the regulatory definition of "negligible impact" at 50 C.F.R. § 18.27(c). Here again, AWA seeks to supplant the deference owed to FWS in applying its own regulation to a complex scientific and technical question. AWA offers a red-herring argument challenging the Report's citation to one dictionary without mentioning that the Report also relies on Black's Law Dictionary and the Cornell Law School online legal dictionary. AWA's focus on the word "reasonably" is blind to the fact that FWS has provided a plausible and sensible application of its own regulatory term, i.e., a reasonable interpretation that is owed deference. US Br. at 25-28.

AWA also pursues its argument (Obj. at 11) that FWS arbitrarily failed to estimate that at least one Level A harassment would occur based on the results of the agency's predictive modeling. This argument fails for the simple reason that FWS did not ignore this issue, but instead considered AWA's technical critiques and specifically rejected their alternative analysis. US Br. at 28-31; *see also, e.g.*, BSITR0002427-2431. AWA does not explain how a probability of less than 50% must be deemed as reasonably likely under FWS' regulation. Nor does it explain how low a probability below 50% FWS must
*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
No. 3:21-cv-00209-SLG (D. Alaska)

find reasonably likely as a matter of law. AWA's silence illustrates the difficult questions presented and the deference owed to FWS. Congress intended FWS to have discretion in striking this balance of probabilities and harms. BSITR0002423.

AWA also repeats its point that FWS erred in not deeming early den site departure to cause cub mortality. Again, FWS affirmatively reviewed all the scientific information and considered the biological and timing issues AWA incorrectly says were ignored. BSITR0002394. FWS nonetheless came to a different professional judgment than AWA about the effects of early den site departure. US Br. at 32-33; BSITR0002409; BSITR0002436. That difference of opinion on a scientific issue provides no basis to find FWS' negligible impact finding arbitrary.

**IV. The ITR Prohibits Level A Harassment and Lethal Incidental Take**.

The ITR, like the MMPA itself, prohibits all Level A harassment and lethal incidental take. 50 C.F.R. § 18.125. AWA's argument that such take of polar bears is all but certain to occur rests on its flawed interpretation of FWS' predictive modeling. AWA fails to provide any reason to doubt the Report's treatment of *Kokechik Fishermen's Ass'n v. Secretary of Commerce*, 839 F.2d 795, 800 (D.C. Cir. 1988).

**V. The ITR Requires the Least Practicable Adverse Impacts.**

AWA does not clearly delineate the difference between the specific restrictions and requirements of the ITR and the additional mitigation measures it seeks. That shifting line and vagueness dooms their argument. The ITR requires operators, prior to annual operations, to survey potential denning habitat during denning season and in the

*Alaska Wildlife Alliance v. U.S. Fish and Wildlife Service*
No. 3:21-cv-209-SLG (D. Alaska) Page 8
Case 3:21-cv-00209-SLG-KFR Document 61 Filed 03/07/23 Page 9 of 12

areas identified on a USGS map of potential denning habitat, exceeding the survey requirements of prior rules. BSITR0002424; BSITR0002455-56; BSITR0002443; BSITR0002448. AOGA conducts these surveys using aerial infrared ("AIR") imagery in optimal weather conditions and temporal windows to increase den detection rates. BSITR0002442-43; BSITR0002448; BSITR0002455-56. In advance of seismic surveys, in addition to a third AIR survey, AOGA will also have crews scout potential denning habitat on the ground (such as deep snow and steep bluffs) and avoid such areas. BSITR0002424. Operators must then observe a one-mile exclusion zone around all known and putative polar bear dens, including any that might inadvertently later be identified. BSITR0002455-56, BSITR0002424. AWA, in contrast, would categorically ban all new activities, such as seismic surveys, in all areas on the USGS map of potential denning habitat regardless of whether sufficient snow has accumulated to support denning there (this can vary year-to-year), or whether the multiple required surveys indicate the presence of dens.

FWS explained why a buffer on all potential denning habitat is not practicable, such as the inability to cease existing operations in those areas. BSITR0002424-25, BSITR0002447-48. FWS also lacks the authority to permanently exclude new operations from all potential denning habitat, a plainly impracticable suggestion. BSITR0002447. FWS also found an "exceedingly low" probability of an undetected den being overrun by a vehicle, such as during seismic surveys. BSITR0002435, BSITR0002439. FWS had good basis to reject AWA's suggestion and its explanations are not post hoc rationales, as

demonstrated by the Report's extensive citation to FWS' record and the record analysis cited above. Report at 35-38.

## VI. FWS Complied with NEPA.

AWA's National Environmental Policy Act ("NEPA") objections simply reiterate their original limited NEPA challenge, which is that FWS failed to consider "geographic and timing restrictions." Obj. at 15-16[1] FWS did take the requisite "hard look" at the alternatives AWA argues should have been considered. US Br. at 40-43. FWS just considered those alternatives during an earlier phase of the ITR development process. *Id*. at 41-42 (discussing FWS' geographic and timing analysis). The environmental assessment ("EA") specifically noted that it incorporated these earlier considerations and that doing so "obviated the need" to reconsider them separately as part of the EA. BSITR0018588. AWA does not explain why FWS must repeat its analysis of timing and geographic limitations in the EA when its proposed rule already discussed those issues and incorporated all practicable measures. After all, NEPA's purpose is to ensure informed decision-making, not to generate paperwork. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 100 (1983) ("Congress did not enact NEPA, of course, so that an agency would contemplate the environmental impact of an action as an abstract exercise."); *see also* 40 C.F.R. § 1500.1(a) ("NEPA's purpose is not to generate paperwork . . ."). FWS complied with NEPA.

---

[1] Although AWA contends (Obj. at 15-16) that the Report's reliance on *Salazar* was improper, AWA cannot distinguish *Salazar* and its relevance to this case. US Br. at 40-43.

For the reasons set forth above, FWS respectfully requests that the Court grant summary judgment to Defendants.

Dated this 7th day of March, 2023.

Respectfully submitted,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

<u>*/s/ John H. Martin*</u>
JOHN H. MARTIN (Colo. Bar 32667)
Trial Attorney, Wildlife & Marine Resources Section

PETER BROCKER
Trial Attorney, Natural Resources Section

Of Counsel:

MICHAEL ROUTHIER
U.S. Department of the Interior

*Attorneys for Federal Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing to be served upon counsel of record through the Court's electronic service system.

Dated: March 7, 2023 */s/ John H. Martin*