# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

ALASKA WILDLIFE ALLIANCE, *et al.*,

    Plaintiffs,

    v.

U.S. FISH AND WILDLIFE SERVICE, *et al.*,

    Defendants,

    and

ALASKA OIL AND GAS ASSOCIATION, *et al.*,

    Intervenor-Defendants.

Case No. 3:21-cv-00209-SLG-KFR

## ORDER RE FINAL REPORT AND RECOMMENDATION

Before the Court at Docket 31 is Plaintiffs' Motion for Summary Judgment. Federal Defendants responded in opposition and with a cross-motion for summary judgment at Docket 38. Intervenor-Defendant State of Alaska ("SOA") responded in opposition at Docket 41. Intervenor-Defendant Alaska Oil and Gas Association ("AOGA") responded in opposition and with a cross-motion for summary judgment at Docket 43. Plaintiffs filed a reply in support of their motion at Docket 46. No party requested oral argument and it was not necessary to the Court's determination.

The motion was referred to the Honorable Magistrate Judge Kyle F. Reardon. At Docket 53, Judge Reardon issued a Report and Recommendation ("R&R"), in which he recommended that Plaintiffs' Motion for Summary Judgment be denied and that Federal Defendants and Intervenor-Defendant AOGA's cross-motions for summary judgment be granted. Plaintiffs filed objections to the R&R at Docket 57. Intervenors SOA and AOGA responded to the objections at Docket 60 and Federal Defendants responded to the objections at Docket 61.

The matter is now before this Court pursuant to 28 U.S.C. § 636(b)(1). That statute provides that a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."[1] A court is to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."[2] However, § 636(b)(1) does not "require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."[3]

Preliminarily, Intervenor-Defendants assert that this Court should summarily approve the R&R and disregard Plaintiffs' objections because they maintain that the objections "are nothing more than a rehashing of the same arguments and

---

[1] 28 U.S.C. § 636(b)(1).

[2] *Id.*

[3] *Thomas v. Arn*, 474 U.S. 140, 150 (1985); *see also United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 2 of 21

positions taken in the original papers submitted to the Magistrate Judge."[4] Intervenor-Defendants assert that Plaintiffs, by attempting to relitigate every claim they pursued in their summary judgment briefing, did not lodge proper objections and the Court therefore can summarily adopt the R&R in its entirety.[5] While there is considerable merit to this suggestion, the Court has in fact undertaken a complete de novo review of the record and therefore will address the objections on the merits.

## I. Background, Jurisdiction, Legal Standard, and Plaintiff's Arguments Under the MMPA

At pages 1 through 11, the R&R sets forth the factual background regarding incidental take regulations ("ITRs") in the South Beaufort Sea ("SBS"), the procedural background of this case, a statement setting forth the basis for this Court's subject matter jurisdiction, and the legal standard applicable to the review of agency action under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). This portion of the R&R also discusses the statutory and regulatory framework of the Marine Mammal Protection Act of 1972 ("MMPA").[6] No specific objections

---

[4] Docket 60 at 3 (quoting *Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)).

[5] Docket 60 at 5 (citing *Hagberg v. Astrue*, No. CV-09-01-BLG-RFC-CS, 2009 WL 3386595, at *1 (D. Mont. Oct. 14, 2009)).

[6] 16 U.S.C. § 1361, *et seq*.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 3 of 21

were raised with respect to these sections of the report, and the Court ADOPTS these pages in their entirety.[7]

## II.    The Small Numbers Determination

Plaintiffs assert that the Magistrate Judge's recommendation to uphold the U.S. Fish and Wildlife Service's ("Service") small numbers determination was error because the Service's failure to aggregate the total take over the five-year ITR period is at odds with the plain language of the MMPA and thus contrary to law.[8] On de novo review, the Court disagrees with Plaintiffs' analysis and adopts nearly all of the R&R on this topic as set forth on pages 12 to 17 of the R&R.[9]   The Court does not read the MMPA to require that the small numbers determination must be made by comparing the number of takes that could occur across multiple years to a single year's population estimate.[10]   And in any event, the Service's small numbers determination considered the total take during the entire 5-year period

---

[7] The Court notes that the Ninth Circuit has invalidated the regulatory definition of "small numbers" quoted on page 10 of the R&R.  *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 904 (9th Cir. 2012) (holding that in order "[t]o effectuate Congress' intent, 'small numbers' and 'negligible impact' must be defined so that each term has a separate meaning" (quoting *Nat. Res. Def. Council, Inc. v. Evan*s, 279 F. Supp. 2d 1129, 1153 (N.D. Cal. 2003))).  The Service did not apply that definition in the ITR at issue here.  *See* BSITR0002422 ("For our small numbers determination, we consider whether the estimated number of marine mammals to be subjected to incidental take is small relative to the population size of the species or stock.").  All references to the Administrative Record for the 2021 Beaufort Sea ITR are abbreviated "BSITR."

[8] Docket 57 at 3-4.

[9] The Court does not adopt the sentence regarding walruses set out in footnote 89 of the R&R.

[10] *See generally Salazar*, 695 F.3d at 905-06 (holding that the MMPA does not require FWS to quantify the number of mammals that would be taken when making a small numbers determination).

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 4 of 21

("we estimate that there will be no more than 443 Level B harassment takes of polar bears during the 5-year period of this ITR") and the Service also considered the estimated annual take as a percentage of the estimated population in the stock ("we note that take of 92 animals [within a single year] is 10.14 percent of the best available estimate of the current stock size of 907 animals").[11] The Service's small numbers determination was not arbitrary, capricious, or otherwise not in accordance with the law.

### III. Consistency with Prior Agency Practice

Plaintiffs have asserted that the small numbers determination for this ITR represents a departure from prior agency determinations. As a preliminary matter, the Court acknowledges that Plaintiffs did cite the 2011-2016 Beaufort Sea ITR in its merits briefing, and the R&R's statement to the contrary is not adopted.[12]

Plaintiffs reference again the Cook Inlet ITR, which the R&R found was not "sufficient evidence of a policy reversal," as the ITR in the instant case "involved a different species in a different location."[13] And given the relative abundance of sea otters in Cook Inlet, Federal Defendants maintain that the small numbers determination for sea otters in that ITR "did not present a debatable question."[14]

---

[11] BSITR0002422.

[12] Docket 53 at 17, lines 15-16. *See* Docket 31 at 28 n.94; Docket 46 at 17.

[13] Docket 53 at 19.

[14] Docket 61 at 5.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 5 of 21
Case 3:21-cv-00209-SLG-KFR   Document 62   Filed 03/29/23   Page 5 of 21

On de novo review, the Court agrees with the R&R that to the extent *FCC v. Fox Television Stations, Inc.*[15] would even apply to a small numbers determination, the current ITR's reference to both cumulative and annual take in its small numbers determination does not constitute a policy reversal by the agency from the Cook Inlet ITR.[16]

Plaintiffs also take issue with the R&R's interpretation of the small numbers determination in the 2016-2021 ITR. Although the Court acknowledges that the agency's mathematical path is not the clearest to discern on this issue,[17] when the ITR is read as a whole, it is clear that the agency had determined that the best estimate of the SBS polar bear population for that ITR was 900 bears.[18] 7.5% of 900 equals 68, which is precisely the annual take that the Service had estimated for that ITR.

Plaintiffs also reference the 2013-2018 Chukchi Sea ITR and maintain that the agency there "relied on total five-year take when making the small numbers findings."[19] Plaintiffs cite to a portion of the ITR in which a commentator stated,

---

[15] 556 U.S. 502 (2009).

[16] *See Salazar*, 695 F.3d at 907 (holding that "[t]he Service need not quantify the number of marine mammals that would be taken under the regulations, so long as the agency reasonably determines through some other means that the specified activity will result in take of only 'small numbers' of marine mammals").

[17] See BSITR0013791.

[18] *See* BSITR0013773, 13781.

[19] Docket 57 at 9 (citing Marine Mammals; Incidental Take During Specified Activities, 78 Fed. Reg. 35,364, 35,415 (June 12, 2013) ("we find that the total expected taking of . . . polar bears

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 6 of 21

Case 3:21-cv-00209-SLG-KFR   Document 62   Filed 03/29/23   Page 6 of 21

"The Service fails to explain how 125 polar bears is a 'small number,'" to which the Service responded that "[t]he Service's determination that 125 polar bears (25 bears annually) constitutes a small number within the meaning of the MMPA is based on the fact [that] 125 polar bears is small relative to the total abundance of the Chukchi-Bering Sea and Southern Beaufort Sea polar bear populations, which consists of approximately 3,500 total bears collectively."[20] Plaintiffs assert that the R&R erred in "fail[ing] to account for FWS's statement that it was relying on total take" for the five-year period in making the small numbers determination.[21] Rather, the R&R cited to portions of that ITR that referenced the incidental take at 25 animals per year.[22] The Court finds that similar to the current ITR, the Service considered both the number of takes per year and the total takes over the five-year period in making its small numbers determination in the 2013-2018 Chukchi Sea ITR.

In sum, Plaintiffs' objection to the R&R that rejected Plaintiffs' policy change argument on the small numbers determination is overruled, and the Court ADOPTS that portion of the R&R.

---

during Industry exploration activities will impact small numbers of animals")).

[20] Marine Mammals; Incidental Take During Specified Activities, 78 Fed. Reg. at 35,415.

[21] Docket 57 at 9 (citing Marine Mammals; Incidental Take During Specified Activities, 73 Fed. Reg. 33,212 (June 11, 2008)).

[22] Docket 53 at 18 (citing Marine Mammals; Incidental Take During Specified Activities, 78 Fed. Reg. at 35,400-01).

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 7 of 21

Case 3:21-cv-00209-SLG-KFR   Document 62   Filed 03/29/23   Page 7 of 21

## IV.    Categorization of Level A Take

At pages 19 through 23, the R&R concluded that the Service's division of Level A Harassment into "Serious" and "Non-serious" categories is not contrary to the plain language of the MMPA. Plaintiffs assert this finding is erroneous, as they maintain that the "sub-categories unreasonably conceal the high probability of Level A harassment occurring."[23]

On de novo review, the Court agrees with and adopts the Magistrate Judge's analysis on this point. Categorizing Level A harassment as serious or non-serious is a permissible construction of the statute, particularly as the Service is tasked with determining whether Level A harassment will have a "negligible impact" on the SBS polar bear's "recruitment and survival."[24] Accordingly, Plaintiffs' objection to this section of the R&R is overruled and the Court ADOPTS this portion of the R&R.

## V.    Whether the Service's Negligible Impact Finding Violated the MMPA

Preliminarily, Plaintiffs did not object to that portion of the report that detailed the parties' positions with regards to the Service's negligible impact finding at pages 23 and 24 of the R&R, and the Court ADOPTS that portion of the R&R here.

---

[23] Docket 57 at 10.

[24] *See* 50 C.F.R. § 18.27(c) (definition of "negligible impact"); *see also* 16 U.S.C. § 1371(a)(5)(A)(i)(I) (tasking agency with making negligible impact finding).

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 8 of 21

Plaintiffs did object to the Magistrate Judge's determination upholding the Service's finding that the impact of the activity specified in the ITR was "not reasonably likely to[] adversely affect the species or stock through effects on annual rates of recruitment or survival."[25]  The Magistrate Judge adopted a definition of "reasonably likely" to require a preponderance of the evidence.  The Court does not adopt this portion of the R&R as set forth on page 26 through the top of page 31.  Rather, on de novo review, the Court affirms the agency's negligible impact determination for the following reasons:

The agency explained its interpretation of the modeling results on Level A take as follows:

> The distributions of both non-serious Level A and serious Level A/Lethal possible takes were non-normal and heavily skewed, as indicated by markedly different mean and median values. The heavily skewed nature of these distributions has led to a mean value that is not representative of the most common model result (*i.e.*, the median value), which for both non-serious Level A and serious Level A/Lethal takes is 0.0 takes. Due to the low (<0.29 for non-serious Level A and ≤0.462 for serious Level A/Lethal takes) probability of greater than or equal to 1 non-serious or serious injury Level A harassment/Lethal take each year of the proposed ITR period, combined with the median of 0.0 for each, we do not estimate the proposed activities will result in non-serious or serious injury Level A harassment or lethal take of polar bears.[26]

---

[25] 50 C.F.R. § 18.27(c).

[26] BSITR0002414.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 9 of 21

Case 3:21-cv-00209-SLG-KFR   Document 62   Filed 03/29/23   Page 9 of 21

Later in the ITR, in making its negligible impacts determination, the agency identified and discussed the following factors that it considered: (1) that there are relatively few animals in the proposed areas of industry activity, such that "few animals are likely to be affected"; (2) that documented impacts of previous industry activity demonstrated that "[t]he vast majority of reported polar bear observations have been of polar bears moving through the Beaufort Sea ITR region, undisturbed by the Industry activity"; (3) that the footprint of proposed industry activity is expected to be small relative to the range of the polar bear stock; (4) that the Service "does not anticipate any lethal or injurious take that would remove individual polar bears . . . from the population or prevent their successful reproduction"; and (5) that "[m]itigation measures will limit potential effects of Industry activities."[27]   Based on its consideration of each of these factors, the Service concluded that "the impacts of these specified activities cannot be reasonably expected to, and are not reasonably likely to, adversely affect . . . SBS polar bears through effects on annual rates of recruitment or survival," and hence the total take authorized by the ITR would have a negligible impact on SBS polar bears.[28]

---

[27] BSITR0002423.

[28] BSITR0002424.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 10 of 21

Plaintiffs take issue with several aspects of this determination. First, they assert that the Service's determination that a 45% to 46% annual probability of at least one "serious Level A/lethal" cub take was not reasonably likely to occur was arbitrary.[29] Stated differently, they assert "it is arbitrary for [the Service] to assert that such a substantial probability is not within the meaning of 'reasonably likely.'"[30] They assert that just because the median was zero "does not rationally explain why one or more takes occurring 46% of the time was not considered reasonably likely."[31] But the Service explained that its negligible impact determination was based on a consideration of multiple factors, including the 46% annual probability of serious Level A/lethal take, "combined with the median of 0.0" for any Level A take. In essence, Plaintiffs disagree with the Service's interpretation of the modeling data and how the Service factored that data into its negligible impact determination. The Court does not find that Plaintiffs have demonstrated that the Service's interpretation of that data and its consideration in the negligible impact determination was arbitrary and capricious. Rather, the Service "examined the relevant data and articulated a . . . rational connection between the facts found and the choice made."[32] "Mere differences in opinion . . . are not sufficient grounds for

---

[29] Docket 57 at 13; Docket 46 at 26-27.

[30] Docket 46 at 33.

[31] Docket 46 at 26.

[32] *S. Cal. Edison Co. v. F.E.R.C.*, 717 F.3d 177, 181 (D.C. Cir. 2013) (denying arbitrary and capricious challenge to Commission's rate increase that was based on median value instead of

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 11 of 21

rejecting the analysis of agency experts."[33]  In sum, the Service did not disregard the 46% probability; rather, it rationally explained how its consideration of this data, together with its assessment of the other factors it identified, resulted in its determination that the planned activities would have a negligible impact on the SBS polar bear stock.

Plaintiffs also assert that the Service improperly dismissed their assertion that there is a 94% or greater probability that at least one serious Level A cub take would occur over the five-year ITR period.[34]  A commentator to the Service suggested that the Service "should account for take by Level A harassment for the duration of the 5-year regulation period in order to determine whether there would be more than a negligible impact."[35]  In its response to this comment, the Service cited to the regulatory definition of negligible impact, which looks at "effects on annual rates of recruitment and survival,"[36] as well as the fact that Letters of Authorization are of 1-year duration.[37]  And the Service again stated its expectation that the numerous mitigation measures it had adopted would "further reduce the

_____

average).

[33] *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1148 (9th Cir. 2016).

[34] Docket 57 at 13; Docket 46 at 27.

[35] BSITR0002430.  *See also* BSITR0017857, 17878, 17970.

[36] 50 C.F.R. § 18.27(c).

[37] BSITR0002430.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 12 of 21

potential for such events."[38]  That the Service did not specifically evaluate the effect on annual recruitment and survival of the polar bear stock in light of the estimated 94% probability of at least one serious Level A/lethal take occurring during the five-year period does not mean that the Service's negligible impact determination was arbitrary and capricious or contrary to the law.  While Plaintiffs assert that the Service failed to consider the impacts of the full five years of authorized activities in its negligible impact determination, the determination itself states otherwise.  At the conclusion of its extended discussion of the factors listed above, it states, "[W]e have concluded that the authorized taking of . . . polar bears during the activities proposed by Industry during this 5-year rule will not adversely impact the survival of these species and will have no more than negligible effects."[39]

Plaintiffs also assert that the Service arbitrarily "ignored potential survival-impairing impacts to cubs from early den departure in its negligible impact determination."[40]  Plaintiffs maintain that the Service erred by summarily labeling this risk as a non-serious Level A take that would not affect the annual rates of recruitment or survival.[41]  But the Service adequately addressed this issue in its ITR.  It noted that there was "[c]onsiderable variation" in the duration of times that

---

[38] BSITR0002430.

[39] BSITR0002424.

[40] Docket 57 at 14.

[41] Docket 57 at 14; *see* BSITR0002408, Table 7, post-emergence data.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 13 of 21

bears spend at dens post-emergence and that "the relationship between the duration and cub survival has not been formally evaluated."[42] Plaintiffs omit the next sentences of the Service's analysis on this topic: "However, a maternal female should be highly motivated to return to the sea ice to begin hunting and replenish her energy stores to support lactation, thus, time spent at the den site post emergency likely confers some fitness benefit to cubs. A disturbance that leads the family group to depart the den site early during this period therefore is likely to lead to a non-serious Level A harassment for the cubs and a Level B harassment for the adult female."[43] In addition, the Service noted that "[s]urvival of cubs-of-the-year is often low, and this is especially true in the Southern Beaufort Sea subpopulation, even for those cubs from undisturbed dens."[44] As this discussion indicates, and contrary to Plaintiffs' assertion, the Service did not classify the early den departure risk as a non-serious Level A take due solely to the fact that the impact of the disturbance had not been evaluated. In sum, the Service used the best available science and its modeling in assigning a "serious" Level A harassment to all cubs subjected to early den emergence and a "non-serious" Level A harassment to all cubs subjected to an early den site departure.[45] The

---

[42] BSITR0002394.

[43] BSITR0002394.

[44] BSITR0002438.

[45] BSITR0002394, 2438, 2436.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 14 of 21

Service's explanation and considerations for the classification are rational and sufficiently detailed.

For the foregoing reasons, the Court finds that the Service's negligible impact finding in this case was not arbitrary and capricious.

## VI. The Likelihood of Level A Take

At pages 32 through 34 of the R&R, the Magistrate Judge rejected Plaintiffs' argument that the ITR violates the MMPA because it also permits likely Level A takes. On de novo review, the Court ADOPTS the first, second, and fourth paragraphs of the R&R on this topic. The Court does not adopt the third paragraph of the R&R in this section. Instead, the Court finds as follows:

The Court agrees with Federal Defendants that Plaintiffs' reliance on *Kokechik Fishermen's Ass'n v. Secretary of Commerce*[46] is misplaced. In *Kokechik*, the agency issued a permit authorizing the incidental taking of Dall's porpoise. But the permit prohibited the incidental taking of northern fur seals and other mammals.[47] The Circuit Court held that the permit was invalid because it was clear that there would be an incidental take of the fur seals, and held that "[t]he MMPA . . . does not provide for a 'negligible impact' exception to its permitting requirements where incidental takings are not merely a remote possibility but a

---

[46] 839 F.2d 795 (D.C. Cir. 1988). Congress subsequently abrogated *Kokechik*'s holding by implementing a new statutory scheme governing the incidental take of marine mammals in commercial fisheries. *See* H.R. Rep. No. 100-970, at 18-20 (1988).

[47] *Kokechik*, 839 F.2d at 799.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 15 of 21

Case 3:21-cv-00209-SLG-KFR   Document 62   Filed 03/29/23   Page 15 of 21

certainty."[48] Unlikely the taking of the fur seals in *Kokechik*, the unauthorized Level A taking of SBS polar bears is not at all certain to occur as Plaintiffs assert.[49] Rather, the Service rationally concluded that "Level A harassment (either non-serious or serious) to bears on the surface is extremely rare within the ITR region" and further found that "the fact [that] zero Level A harassment or lethal takes is the most likely result in any given year precludes a reasonable expectation that such take will, in fact, occur."[50] While the Court agrees with Plaintiffs' assertion that "the applicant's choice not to apply for Level A take authorization is not controlling,"[51] the Court affirms the Service's determination that Level A take, if any were to occur, is not reasonably likely to cause more than a negligible impact on the recruitment and survival of the SBS polar bear stock.

## VII. Geographic and Timing Restrictions

Plaintiffs object to the Magistrate Judge's finding at pages 34 to 39 that the Service's least practicable adverse impact ("LPAI") analysis did not violate the MMPA. Specifically, Plaintiffs object to the Magistrate Judge's finding that it would be impracticable to locate and require a buffer around all suitable denning habitat

---

[48] *Kokechik*, 839 F.2d at 802.

[49] Docket 31 at 41-42.

[50] BSITR0002430.

[51] Docket 57 at 15.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 16 of 21

within the 20-million acres covered by the SBS ITR.[52] Plaintiffs maintain that this finding "repeats Defendant's post hoc arguments and conflicts with the ITR's requirements that operators locate suitable denning habitat prior to operations."[53] But the ITR itself explained that because "[p]roper denning habitat requires the creation of snow drifts, which can differ from year-to-year, . . . [t]he ability to identify areas in which these snow drifts may occur each year prior to operations is not practicable."[54]  And the fact that the ITR requires den-detection surveys and establishes a 1-mile exclusion zone around all known polar bear dens for certain activities is not inconsistent with a decision not to require such a buffer around all suitable denning habitat.[55]  Accordingly, Plaintiffs' objection to this portion of the R&R is overruled.

To the extent Plaintiffs object because they were not advocating for a suitable denning habitat around existing facilities, the Magistrate Judge's discussion of the impracticality of that is not incorrect, but simply surplusage, as is the reference in the R&R to restrictions for areas in which polar bear denning activity is unlikely.  And this Court disagrees with Plaintiffs' assertion that the ITR gave only "one reason for dismissing timing and geographic mitigation measures—

---

[52] Docket 57 at 15.

[53] Docket 57 at 16.

[54] BSITR0002448; *see also* BSITR0002447.

[55] *See* BSITR0002424.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 17 of 21

industry said they were impracticable."[56]   Rather, the Service's LPAI analysis reflects a considered evaluation of additional mitigation measures containing explanations of why the agency determined each one not to be practicable.[57] Further, as the agency noted, many "[t]emporal and geographic constraints were incorporated into AOGA's revised request in light of collaboration with the Service."[58]

For the foregoing reasons, on de novo review, the Court ADOPTS the Magistrate Judge's LPAI analysis.

### VIII.   The NEPA Alternatives Analysis

Plaintiffs next assert that the Magistrate Judge erred in the National Environmental Policy Act ("NEPA") analysis by "absolving [the Service] of the duty to provide a reasonable, non-cursory explanation for rejecting an entire category of alternatives the agency previously considered practicable and effective," an apparent reference to alternative restrictions the Service had considered for a seismic activity proposal in the Arctic National Wildlife Refuge.[59]

---

[56] Docket 57 at 16 (citing BSITR0002424).

[57] BSITR0002424-25.

[58] BSITR0002446.  *See generally* Docket 38 at 48-49 (citing to record regarding iterative process).

[59] Docket 57 at 18; Docket 31 at 49.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 18 of 21

Plaintiffs cite to an unpublished Ninth Circuit disposition, *Environmental Protection Information Center v. United States Forest Service*.[60]  In that case, the Circuit Court remanded to the agency after determining that the Service had failed to undertake full and meaningful consideration of alternatives.  The Circuit Court explained that the Service had improperly "defined the objectives of the [forest thinning] project so narrowly that the proposed project was the only alternative that would serve those objectives," by including as a purpose of the project "pay[ing] for the thinning by selling the trees cut."[61]  Here, the stated goal of the project is broad: the authorization of the incidental, nonlethal and unintentional take of polar bears and Pacific Walruses in the Beaufort Sea area in a manner that is consistent with the Marine Mammal Protection Act.  The agency did not define its objectives in unreasonably narrow terms.  And while the Environmental Assessment ("EA") focused on two final alternatives, the Service did initially consider other alternatives, including temporal and geographic restrictions.[62]  In *Center for Biological Diversity v. Salazar*, the Ninth Circuit held that the Service did not violate the regulatory scheme for an EA when it focused on "two final alternatives" when issuing an ITR for the Chukchi Sea.[63]  That holding applies with equal force here.

---

[60] 234 F. App'x 440 (9th Cir. 2007); Docket 57 at 17.

[61] *Env't Prot. Info. Ctr.*, 234 F. App'x at 443.

[62] *See* Docket 38 at 48-49 (citing to record regarding iterative process).

[63] 695 F.3d at 916 (citing *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005)).

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 19 of 21

For the foregoing reasons, as well as those articulated by the Magistrate Judge, which on de novo review the Court incorporates herein, the Court finds that the ITR comports with NEPA.

## IX.    The Endangered Species Act

Plaintiffs' last objection to the R&R asserts that the Magistrate Judge "incorrectly rejected [Plaintiffs'] claim that the incidental take statement for the ITR failed to account for reasonably certain Level A harassment/lethal take."[64]  For the reasons discussed above, the Court overrules this objection.  The agency did not act arbitrarily or capriciously when it concluded, "we do not estimate the proposed activities will result in non-serious or serious injury Level A harassment or lethal take of polar bears."[65]  In addition, the Court ADOPTS the R&R's finding that the reinitiation notice in this case was not defective.[66]

## CONCLUSION

The Magistrate Judge recommended that the Court deny Plaintiffs' Motion for Summary Judgment and that the Court grant Federal Defendants' and AOGA's cross-motions for summary judgment. On de novo review, the Court has in large part adopted that R&R, with the modifications and additional rulings as set forth herein.

---

[64] Docket 57 at 18.

[65] BSITR0002414.

[66] *See* Docket 53 at 45-47.

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 20 of 21

For the foregoing reasons, IT IS ORDERED that Plaintiffs' Motion for Summary Judgment at Docket 31 is DENIED; that Federal Defendants' cross-motion for summary judgment at Docket 38 is GRANTED; and that Intervenor-Defendant AOGA's cross-motion for summary judgment at Docket 43 is GRANTED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 29th day of March, 2023, at Anchorage, Alaska.

*/s/SHARON L. GLEASON*
UNITED STATES DISTRICT JUDGE

Case No. 3:21-cv-00209-SLG-KFR, *Alaska Wildlife Alliance, et al. v. U.S. Fish & Wildlife Service, et al.*
Order re Final Report and Recommendation
Page 21 of 21

Case 3:21-cv-00209-SLG-KFR   Document 62   Filed 03/29/23   Page 21 of 21